UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., MEGAN NEWSOME,
AMOL JETHWANI, MARY ROY a/k/a
JAMIE ROY, DILLON BOATNER,
ALEXANDER ADAMS and ANJA
RMUS,

     Plaintiffs,

v.

KENNETH W. DETZNER, in his official
capacity as the Florida Secretary of State,

     Defendant.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., MEGAN

NEWSOME, AMOL JETHWANI, MARY ROY a/k/a JAMIE ROY, DILLON

BOATNER, ALEXANDER ADAMS, and ANJA RMUS, by and through their

undersigned counsel, file this COMPLAINT FOR DECLARATORY AND

INJUNCTIVE RELIEF against Defendant KENNETH ("KEN") W. DETZNER, in

his official capacity as the Florida Secretary of State (the "Secretary"), and allege

as follows:

1

## NATURE OF THE CASE

1.     This litigation concerns the Secretary's interpretation and application of Florida law as it relates to early voting sites in facilities affiliated with Florida's public colleges and universities. Although nothing in the law explicitly prohibits the use of such facilities for early voting, the Secretary maintains that their use is not permitted. Plaintiffs bring this action challenging that position as unconstitutional under the First, Fourteenth, and Twenty-Sixth Amendments.

2.     Following the disastrous 2012 general election, in which voters across Florida encountered unconscionably long lines when attempting to vote during the early voting period and on Election Day, the Florida Legislature amended the State's election laws to expand the availability of early voting. First, the Legislature expanded the early voting period from a maximum of eight days to a maximum of 14 days and expanded the minimum number of hours each early voting site must be open daily from six to eight hours. Second, the Legislature expanded the types of locations that may permissibly serve as early voting locations.

3.     Before 2013, Florida supervisors of elections[1] were only required to offer early voting in their main or branch office and only permitted to designate a

---

[1] In Florida, each county has a supervisor of elections who administers all federal, state, county, municipal and special district elections in the county in accordance

"city hall or permanent public library facility" as additional early voting sites. But, when the Legislature amended the law in 2013, supervisors of elections were also given the power to designate "*any* . . . fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as [an] early voting site[]." Fla. Stat. § 101.657 (1)(a) (the "Early Vote Statute") (emphasis added). The supervisors of elections were further given discretion to "designate one early voting site per election in an area of the county that does not have any of the eligible early voting locations," with the requirement that each county "at a minimum, operate the same total number of early voting sites for a general election which the county operated for the 2012 general election." *Id.*

4.      Although the plain language of the Early Vote Statute explicitly authorizes the use of many facilities traditionally associated with public educational institutions (e.g., civic centers, stadiums, convention centers, libraries, and community centers) as early voting sites, the Secretary has taken the broad and contrary position that the Statute *prohibits* the use of *any* facilities that are "related" to, "designated for," "affiliated with," or "part of" a public Florida college or university. Thus, even in counties where supervisors of elections

---

with the Florida election code, and federal election law. *See, e.g.*, Sarasota County Supervisor of Elections, *Responsibilities of the Supervisor* (last visited May 16, 2018), *available at* http://www.sarasotavotes.com/content.aspx?id=13.

determine that equal access to early voting is best served by locating an early voting site, for example, at a stadium affiliated with a public university, the Secretary irrationally, unreasonably, and unconstitutionally prohibits them from doing so.

5.     The result of the Secretary's interpretation of the Early Vote Statute is an unjustifiable burden on the voting rights of hundreds of thousands of eligible Florida voters. These burdens fall particularly and disproportionately on the State's young voters, who are significantly more likely to live on or near Florida's public colleges and universities and, at the same time, are less likely to have easy, immediate access to reliable transportation to vote early in those communities, where the nearest site is often located a mile or more from the campuses where they spend the vast majority of their time. Plaintiffs, several individual Florida young voters who attend, and/or live on or near, public college or university campuses in Florida, together with the League of Women Voters of Florida (the "League"), bring this lawsuit to protect their right to vote and, in the case of the League, the rights of their members and constituencies.

6.     Early voting has proved enormously popular in Florida since its introduction in 2004, particularly among young voters. In fact, every election since 2008 has seen a greater portion of voters utilize early voting, with as many as 68%

4

of Florida's voters voting before Election Day in 2016. Florida's college-age voters also utilize early voting at a rate significantly above the national average.

7.     Young Floridians have been particularly energized to register and pre-register to vote due to the tragic shootings at Marjory Stoneman Douglas High School on February 14, 2018. *See* Steven Lemongello, *High School Students Learn the Power of the Vote*, ORLANDO SENTINEL (Apr. 5, 2018), *available at* http://www.orlandosentinel.com/news/politics/political-pulse/os-high-school-voter-registration-20180327-story.html. Many of these newly registered voters will be beginning their college education at Florida colleges and universities in the fall of 2018. The Secretary's interpretation of the Early Vote Statute will place a substantial and unnecessary burden on this growing group of voters and send a discouraging message about the State's view of their interest in civic involvement.

8.     The Secretary's interpretation and implementation of the Early Vote Statute discriminatorily denies equal access to this increasingly popular means of voting to a significant segment of the Florida electorate. The Secretary's position makes it more difficult, and in some cases impossible, for hundreds of thousands of Florida's voters—particularly those living or working on or near the State's public colleges or universities, which, in 2016, included 106,715 staff, in addition to the students—to participate in early voting in the communities in which they live and have a right to vote, in violation of the First and Fourteenth Amendments. In

addition, because the Secretary's preclusive interpretation and application of the Early Vote Statute specifically targets and burdens the right to vote of Florida's young voters, it also violates the Twenty-Sixth Amendment.

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

11.     This Court has personal jurisdiction over the Secretary, who is sued in his official capacity only.

12.     Venue is proper in the Tallahassee Division of the U.S. District Court in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, the Secretary resides in the Tallahassee Division in the Northern District, is subject to this Court's personal jurisdiction, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

13.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

14.   All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise waived.

## PARTIES

15.   Plaintiff, LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., is a nonpartisan political organization dedicated to encouraging informed and active participation of citizens in government, including young citizens in Florida. Among other things, the League educates citizens about their voting rights and facilitates voting including through get-out-the-vote efforts, registration drives, and BeReadytoVote.org, which is a website published by the League to give Florida voters "all the voter registration and election information [they] need." The League is active in, and dedicated to, enabling and protecting the right to vote of Florida's young voters, including specifically students who are eligible to vote. Demonstrative of this commitment, the League offers free membership to all Florida students. The League has 5,762 members, approximately 225 of whom are students. A substantial number of the League's student members reside on or near Florida's public college or university campuses. To achieve its mission, the League devotes substantial time, effort, and resources to encouraging voting by engaging in voter registration at various community events, in public places, such as parks and college and university campuses, and by educating members of the community, including young people on campuses, about the League, public policy

issues, and the importance of voting. Thus, as a direct result of the Secretary's interpretation of the Early Vote Statute, the League's organizational mission and a substantial number of its members have been and will suffer injury to both their organizational mission and voting rights. In addition, many of the League's members, and members of the voting constituencies the League exists to serve, will find it highly difficult—and, in some cases, impossible—to travel to their closest early voting site, which, in many cases, may be several miles away, to participate in early voting.

16.     Plaintiff MEGAN NEWSOME is a resident of, and registered voter in, Alachua County, Florida. She is 22 years-old and a December 2017 graduate of the University of Florida; she currently works as a post-graduate researcher in the University of Florida Physics Department. Ms. Newsome lives approximately three miles off-campus at 2800 SW Williston Road, Gainesville, FL 32608, where she is registered to vote. Ms. Newsome commutes to campus daily on the bus for her job, and for her occasional additional work as a private tutor. Ms. Newsome preregistered to vote at age 16, when the League came to her 11th grade history class, and she verified her registration at the Department of Motor Vehicles when she was 18 years old. Ms. Newsome has consistently used early voting to vote in Florida, but because all of her experience as a voter thus far has been as a student of a public university in Florida, early voting has always come with considerable

difficulty, particularly in finding transportation. In 2016, she was instrumental in coordinating a one-day student shuttle program with the University of Florida and the Andrew Goodman Foundation to transport students several miles each way to the nearest early voting site to cast their ballots in the November general election. The shuttle was paid for by the University of Florida, but it was free for those students who took advantage of it. Even so, the shuttle did not alleviate many of the burdens that students at Florida's public colleges and universities frequently encounter when attempting to utilize early voting. For example, it still came with considerable temporal costs: students who took the shuttle had to wait until enough students arrived to fill the shuttle, they would then all ride together to the early voting site, wait in line to vote, and then the shuttle would not transport them back to campus until all of the students who used the shuttle were finished voting. On average (and not accounting for the time that students had to wait for the shuttle to fill up at the outset), each trip usually took approximately one hour. In elections when there has not been a shuttle program, Ms. Newsome has had to ask others for rides and, in one instance, had to take an Uber hired car from school to the nearest early voting location and back. Because her busy schedule is likely to make it difficult and burdensome to vote on Election Day, Ms. Newsome hopes to be able to use early voting in the 2018 general election. However, traveling to and from the nearest early voting site to where she spends the vast majority of her day—i.e., the

campus on which she works—is likely to be burdensome. In the 2016 general election, the closest early voting location to Ms. Newsome's residence was located approximately 5 miles away, at the Gainesville Office of the Supervisor of Elections. While Ms. Newsome currently owns a car, she commutes to campus on the bus daily because she is unable to afford a campus parking pass and because parking on campus is difficult. Ms. Newsome's work days on the campus of the University of Florida place her a short walk away from several facilities that would qualify as acceptable early voting sites under the plain terms of the Early Vote Statute, and her use of such facilities to early vote would significantly alleviate the burdens currently associated with early voting for her and countless others who live and work on or near the University of Florida campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute, Ms. Newsome's right to vote has been and will continue to be burdened, both because she is being denied an equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Ms. Newsome, to access early voting in Florida.

17.    Plaintiff AMOL JETHWANI is a resident and registered voter in Alachua County, Florida. He is 21 years-old and a rising senior at the University of

Florida. Mr. Jethwani lives four blocks from the campus of the University of Florida at 1500 NW 4th Avenue, Gainesville, FL 32603, and he is registered to vote at that address. Mr. Jethwani originally preregistered to vote in high school, and the University of Florida College Democrats helped him change his registration to Gainesville when he was a freshman. Mr. Jethwani has consistently used early voting to vote in Florida, but because all of his experience as a voter in Florida thus far has been as a student of a public university, early voting has always come with considerable difficulty. In the spring of 2016, he was able to vote in the Democratic primary and city election only because he was driven to the polls by a member of the University of Florida College Democrats, who had a car. In the fall of 2016, Mr. Jethwani worked with the Florida Democratic Party to coordinate rides to polling sites for college students for both early and Election Day voting. This involved signing up students who wanted to vote, finding students willing to drive, coordinating the students who wanted to vote with the students with cars, and then finding a time when everyone's schedule would permit them to go to vote. In addition, given space constraints, each car could necessarily only fit four interested voters.  Last semester, Mr. Jethwani was a full-time student and active member of the Florida College Democrats at both the University of Florida and statewide level. Currently, he is a candidate for the Florida House of Representatives, and his course load in the upcoming fall semester will depend on

11

the success of his campaign. Because his schedule is likely to make it difficult and burdensome for him to vote on Election Day, he hopes to be able to use early voting in the 2018 primary and general elections. However, traveling to and from the nearest early voting site is likely to be burdensome. In the 2016 general election, the closest early voting location to Mr. Jethwani's residence was located 1.5 miles away, at the Gainesville Office of the Supervisor of Elections. There are several facilities that would qualify as acceptable early voting sites under the plain terms of the Early Vote Statute that are closer to Mr. Jethwani's residence and would significantly alleviate the burdens currently associated with early voting for him and countless others who live and work on or near the University of Florida campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute Mr. Jethwani's right to vote has been and will continue to be burdened, both because he is being denied equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Mr. Jethwani, to access early voting in Florida.

18.   Plaintiff MARY ROY, who identifies as gender queer, prefers the use of the gender-neutral pronoun "they," and goes by "Jamie," is a resident and registered voter in Alachua County, Florida. They are 20 years-old and a rising

senior at the University of Florida. In addition to attending school fulltime, they also work approximately 15 to 20 hours a week as a freelance writer and have a busy extracurricular schedule that involves youth civic engagement organizing and activism and swing dancing. Mx. Roy lives approximately three miles from the campus of the University of Florida and is registered to vote at their current address, 4455 SW 34th Street, Gainesville, FL 32608. Mx. Roy has used both early and Election Day voting to vote in Florida, but voting early and on Election Day has come with considerable difficulty as Mx. Roy does not own a vehicle and is entirely dependent on public transportation. They were able to vote early in the 2016 general election at Gainesville's Millhopper Library, because they were given a ride by their sister. For the 2018 Gainesville City Commissioner Race, Mx. Roy voted in-person on Election Day at the Florida Museum of Natural History in Gainesville. In order to get to the Florida Museum of Natural History to vote, Mx. Roy had to take two buses from their house for a trip that takes between 40 minutes to one hour each way. Because Mx. Roy's schedule is likely to make it difficult and burdensome for them to vote on Election Day, they hope to be able to use early voting in the 2018 primary and general elections. However, traveling to and from the nearest early voting site is likely to be burdensome. There are several facilities that would qualify as acceptable early voting sites under the plain terms of the Early Vote Statute that are closer to where Mx. Roy spends most of their

time on campus, and early voting at those facilities would significantly alleviate the burdens currently associated with early voting for them and countless others who live and work on or near the University of Florida campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute, Mx. Roy's right to vote has been and will continue to be burdened, both because they are being denied equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Mx. Roy, to access early voting in Florida.

19.   Plaintiff DILLON BOATNER is currently a registered voter in Volusia County, Florida. He is 21 years-old, a student at the University of Florida, and a student member of the League. Mr. Boatner intends to change his registration to Alachua County and vote there in the upcoming 2018 election. Last school year, Mr. Boatner lived approximately three miles off-campus at 2933 Southwest 35th Place, Gainesville, FL 32608, and he took the bus to campus daily for class; Mr. Boatner may again live and register to vote at that address in the fall of 2018, although he has not fully settled on his housing for the upcoming school year.  Mr. Boatner has not voted early in-person previously, but he would utilize early in-person voting if there were an option to do so on campus. He passionately believes

there should be early in-person voting on campus and he has vigorously campaigned for a change in State law to permit students to vote early on campus. At an on-campus League event in December 2017, Mr. Boatner asked State Senator Keith Perry (R-8) whether he would be willing to support a bill to change Florida law to explicitly permit early in-person voting on campus. Mr. Boatner was told by Senator Perry, however, that it was too late in the legislative session to propose a new bill. Undeterred, Mr. Boatner found a somewhat-related bill that sought to amend the vote-by-mail statute to allow for voters to drop off vote by mail ballots at any early voting location within the county where the voter is registered, and he testified before the Senate Rules Committee about amending the bill to include a change to the Early Voting Statute. Mr. Boatner is both a fulltime student and has worked since his freshman year, first delivering pizzas and since on political campaigns. Mr. Boatner is concerned his schedule is likely to make it difficult and burdensome to vote on Election Day, so he hopes to be able to use early voting in the 2018 general election. In the 2016 general election, the closest early voting location to Mr. Boatner's residence was located 5 miles away at the Gainesville Office of the Supervisor of Elections. While Mr. Boatner owns a car, he commutes to campus on the bus daily for class because parking on campus is difficult. Mr. Boatner's classes on the campus of the University of Florida place him a short walk away from several facilities that would qualify as acceptable early

voting sites under the plain terms of the Early Vote Statute and would significantly alleviate the burdens currently associated with early voting for him and countless others who live and work on or near the University of Florida campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute, Mr. Boatner's right to vote has been and will continue to be burdened, both because he is being denied an equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Mr. Boatner, to access early voting in Florida.

20.     Plaintiff ALEXANDER ADAMS is a registered voter in Leon County, Florida. He is 19 years-old and a rising junior at Florida State University. Mr. Adams lives on-campus and is registered to vote at 0 Landis Hall, Tallahassee, FL 32306, although his dorm assignment changes from semester to semester. Mr. Adams anticipates that his dorm assignment will change in the fall; he intends to update his registration to reflect this change once he has a final dorm assignment. The 2018 election will be the first election in which Mr. Adams will be eligible to vote. Mr. Adams is eager to vote and was preregistered to vote at the Department of Motor Vehicles when he first received his driver's license at 16 years-old, while living with his parents. When he arrived on campus at 17 years-old, a student

group helped him change his registration to reflect his campus address. However, because the 2018 primary and general elections will be the first elections in which Mr. Adams will be eligible to vote, he does not know his polling place or the nearest early vote location to his residence. Further, in the 2018-2019 school year, Mr. Adams will be a teaching assistant for two classes, taking an 18-credit course load, and beginning to work on his honors thesis in political science. A traditional fulltime course load is 12 credits, and most students take between 12 to 15 credits per semester. Mr. Adams is concerned that this schedule is likely to make it difficult and burdensome to vote on Election Day, so he hopes to be able to use early voting in the 2018 general election. In the 2016 general election, the closest early voting location to Mr. Adam's residence was located 1.0 miles away at the Leon County Courthouse. Mr. Adam's classes on the campus of Florida State University place him a short walk away from several facilities that would qualify as acceptable early voting sites under the plain terms of the Early Vote Statute and would significantly alleviate the burdens currently associated with early voting for him and countless others who live and work on or near the Florida State University campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute, Mr. Adam's right to vote will be burdened, both because he is being denied an equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to

Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Mr. Adams, to access early voting in Florida.

21.    Plaintiff ANJA RMUS is a resident and registered voter in Alachua County, Florida. She is 19 years-old and a rising sophomore at the University of Florida. Ms. Rmus lives one block from the campus of the University of Florida and is registered to vote at her current address, 1142 SW 3rd Avenue, Gainesville, FL 32601. Ms. Rmus has used both early and Election Day voting to vote in Florida, but because she has been a student of a public university in Florida for her only two elections since turning 18 years-old, early voting has come with considerable difficulty. Ms. Rmus has a vehicle but is concerned about using it frequently because it does not run well and because she is always concerned with losing her parking space, a frequent issue in Gainesville. Ms. Rmus uses her vehicle only to visit her family in Sarasota once or twice a month and otherwise walks everywhere. In the first election in which she was eligible to vote, her car was not functioning well and she was able to use early voting only because she was driven to the polls by a friend with a functioning vehicle and a dedicated parking space. In the second election for which she was eligible to vote, the recent Gainesville City Commissioner run-off election, Ms. Rmus found time to vote on Election Day only because she did not have classes that day. Because Ms. Rmus's

schedule is likely to make it difficult and burdensome for her to vote on Election Day, she hopes to be able to use early voting in the 2018 primary and general elections. However, traveling to and from the nearest early voting site is likely to be burdensome. In the 2016 general election, the closest early voting location to Ms. Rmus's residence was located 1.2 miles away, at the Gainesville Office of the Supervisor of Elections. There are several facilities that would qualify as acceptable early voting sites under the plain terms of the Early Vote Statute that are closer to Ms. Rmus's residence and would significantly alleviate the burdens currently associated with early voting for her and countless others who live and work on or near the University of Florida campus. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute, Ms. Rmus's right to vote has been and will continue to be burdened, both because she is being denied equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's public higher educational institutions, and because, upon information and belief, the Secretary's interpretation is meant to make it more difficult for young voters, such as Ms. Rmus, to access early voting in Florida.

22.   Defendant KEN DETZNER is the Secretary of State of Florida and is named as a Defendant in his official capacity. He is Florida's chief elections officer and, as such, is responsible for the administration and implementation of

election laws in Florida, including the Early Vote Statute. *See* Fla. Stat. § 97.012(1) (describing Secretary of State as "the chief election officer of the state" who has the responsibility to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws"). To this end, the Secretary has the power and authority to "[p]rovide written direction and opinions to the supervisors of election on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State," and to "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a county supervisor of elections or any official performing duties with respect to [Florida election law]." *Id.* at §§ 97.012(16), 97.012(14). This case challenges the Secretary's preclusive interpretation and application of the Early Vote Statute prohibiting supervisors of elections from placing early voting sites on public university or college campuses. The Secretary, personally and through the conduct of his employees and agents, acted under color of state law at all times relevant to this action.

### STATEMENTS OF FACTS AND LAW

**A.    History of Early Voting in Florida pre-2012**

23.    Florida infamously experienced a host of problems surrounding the administration of the 2000 general election, including problems with registration, absentee ballots, butterfly ballots, and significant recount issues, which eventually

required resolution in the Supreme Court. *See generally Bush v. Gore*, 531 U.S. 98 (2000); Mireya Navarro & Somini Sengupta, *Arriving at Florida Voting Places, Some Blacks Found Frustration*, N.Y. TIMES (Nov. 30, 2000).[2] In an attempt to remedy these problems, Florida introduced several reforms, including early voting, which was enacted in 2004. *See* C.S.S.B. 2346, 2004 Fla. Sess. Ch. 2004-252, § 13; *see also* Abby Goodnough & Jim Yardley, *In Florida, Early Voting Means Early Woes*, N.Y. TIMES, Oct. 19, 2004 ("Presidential voting in Florida began two weeks early on Monday, in an effort to avoid many of the problems that plagued Election Day 2000.").[3]

24.    Since its introduction, early voting has proved enormously popular among Florida voters. More than one-third of Floridians who voted in 2004 used early voting or absentee voting, accounting for around 2.8 of 7.6 million ballots cast (37%). Since 2012, this ratio has been above 50% in every election: 56% in 2012 (roughly 4.8 million of the 8.53 million ballots cast), 53% in 2014 (roughly 3.2 million of the 6 million ballots cast), and 68% in 2016 (roughly 6.6 million of the 9.6 million ballots cast).

---

[2]    *Available at* https://www.nytimes.com/2000/11/30/us/contesting-vote-black-voters-arriving-florida-voting-places-some-blacks-found.html;   William   Welch, Florida voting -- what's the hang up?, USA Today (Nov. 7, 2012).
[3] *Available at* https://www.nytimes.com/2004/10/19/us/the-2004-campaign-voters-in-florida-early-voting-means-early-woes.html.

25.     Early voting has been particularly popular among Florida's college students. Among Florida college students whose campuses are enrolled in the National Study of Learning Voting, and Engagement ("NSLVE"),[4] which includes around 65% of all Florida college students, 29% of those voting utilized early voting in 2012, 19% utilized it in 2014, and 43% utilized it in 2016. These numbers were significantly above the national averages in the 32 states plus the District of Columbia that allow some form of early-in person voting, where early-in person voting comprised 16% of college student turnout in 2012, 8% in 2014, and 18% in 2016.

26.     As originally enacted, the Early Vote Statute provided that:

Early voting shall begin on the 15th day before an election and end on the day before an election. . . . Early voting shall be provided for at least 8 hours per weekday during the applicable periods. Early voting shall also be provided for 8 hours in the aggregate for each weekend during the applicable periods.

Fla. Stat. § 101.657(d) (2005).

27.     Thus, when early voting was first approved in Florida, the early vote period lasted 13 to 15 days, with 104 total hours of early voting, including eight hours during each of the two weekends immediately preceding the election. The

---

[4] The NSLVE is a dataset that includes nearly 10 million students for each of the past three national elections: 2012, 2014, and 2016. About 20 million students are enrolled in U.S. higher education, so the NSLVE contains about half of all U.S. college students. The NSLVE contains data for 705,140 students enrolled at Florida institutions in 2012, 601,888 in 2014, and 727,597 in 2016.

early vote statute gave supervisors of elections the discretion to determine whether weekend voting would take place on a Saturday, Sunday, or be split between those days. *See Florida v. United States*, 885 F. Supp. 2d 299, 308-09 (D.D.C. 2012).

28.    In 2005, the legislature amended the statute slightly to allow more time between the end of early voting and Election Day, amending the statute to allow early voting to end "on the 2nd day before an election." *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1240 n.4 (M.D. Fla. 2012). This modification still left 96 total hours of early voting.

29.    This changed drastically in 2011, when the Republican-controlled Florida Legislature passed, and Governor Rick Scott signed, House Bill 1355 ("HB 1355"), an omnibus election reform bill.

30.    As is relevant for the purposes of this lawsuit, HB 1355 reduced the number of days that supervisors of elections could offer early voting, from a maximum of 14 to a maximum of eight days; eliminated early voting on the Sunday immediately preceding Election Day; and gave supervisors of elections the discretion to offer a total of between 48 and 96 hours of early voting, eliminating the requirement to provide 96 such hours.

31.    The Early Vote Statute in 2011 thus read in relevant part:

Early voting shall begin on the 10th day before an election that contains state or federal races and end on the 3rd day before the election, and shall be provided for no less than 6 hours and no more than 12 hours per day at each site during the applicable period.

23

Fla. Stat. § 101.657(d) (2011).

32.    At the time that HB 1355 was enacted, five of Florida's counties—Collier, Hardee, Hendry, Hillsborough, and Monroe—were designated as "covered" jurisdictions under Section 5 of the Voting Rights Act. *Florida*, 885 F. Supp. 2d at 305. This meant that between 1975 and 2013, when the Supreme Court decided *Shelby County v. Holder*, 570 U.S. 529 (2013), Florida's language and racial minority voters in those counties enjoyed protection from disenfranchisement and burdens on the right to vote in the form of federal oversight of any changes in voting laws, practices, or procedures.

33.    Specifically, Section 5 prohibited covered jurisdictions from making any changes to their election laws, practices, or procedures until either the U.S. Department of Justice or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 42 U.S.C. § 1973(c) (2011). This process of seeking approval from the Department of Justice or a federal court was known as "preclearance."

34.    In accordance with Section 5's requirements, shortly after HB 1355's reductions to early voting were passed by the Legislature and signed by the Governor, the five covered Florida counties filed a complaint, seeking judicial preclearance of the changes. The federal court, however, found that it could not

preclear the early voting changes in HB 1355, "because the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters." *Florida*, 885 F. Supp. 2d at 303. "Specifically, the State has not proven that the changes will be nonretrogressive if the covered counties offer only the minimum number of early voting hours that they are required to offer under the new statute, which would constitute only half the hours required under the prior law." *Id.*[5]

35.    Eventually, the State was able to obtain Section 5 preclearance, but only after it instituted a 7 a.m. to 7 p.m. voting schedule for the five covered Florida counties. *See* Resp. re Mot. for J. on Count Four of the Fourth Am. Compl. & Order *State of Florida v. United States of America, et al.*, No. 1:11-cv-01428, (D.D.C. Sept. 5, 6, 2012), ECF Nos. 158, 159. The remainder of Florida's counties retained discretion to offer between 48 and 96 hours of early voting, under the amended version of the law.

**B.    The 2012 Election**

36.    Thus, at the time of the 2012 election, Florida law gave each county (except for those then covered by Section 5) discretion to offer between 48 and 96

---

[5] Under Section 5 of the VRA, a change affecting voting is considered to have a discriminatory effect if it will lead to a retrogression in the position of members of a racial or language minority group (i.e., will make members of such a group worse off than they had been before the change) with respect to their effective exercise of the electoral franchise. *Beer v. United States*, 425 U.S. 130, 140–42 (1976).

hours of early voting over a maximum of eight days. At the same time, Florida law also severely limited the types of facilities that could be designated as early voting sites.

37.     The pre-2013 version of the Early Vote Statute provided in relevant part:

> As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor . . . The supervisor may also designate any city hall or permanent public library facility as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable.

Fla. Stat. § 101.657(1)(a) (2012).

38.     In other words, in 2012, the Early Vote Statute limited the locations that could be used for early voting to the main or branch office of the supervisor of elections. For a branch site to be used, it had to be a permanent facility of the supervisor of elections and to have been designated and used as such for at least one year prior to the election in which it would serve as an early voting site. The only other permissible early voting sites were city halls or permanent public library facilities.

39.     This combination of voting laws proved to be a recipe for disaster, as demonstrated by the November 2012 general election. Floridians attempting to vote early and on Election Day that year encountered what the Secretary would

later characterize as "excessive and unreasonable" long lines at several different voting sites across the state. Sec'y of State Ken Detzner, *Recommendations for Increased Accessibility & Efficiency in Florida Elections* at 4, Fla. Dep't of State (Feb. 4, 2013) (the "Secretary's 2013 Recommendations").[6]

40.    Some voters waited in line for as long as seven hours to cast an early ballot, and as many as 200,000 Florida voters may have given up and not voted at all due to such unreasonably long lines. *See* Lawrence Norden, Brennan Center for Justice, *How to Fix Long Lines* (2013), at 1.[7]

41.    Young voters were particularly burdened, as numerous Florida counties showed a high correlation between youth voters and longer lines. *See* Advancement Project, *The Time Tax: America's Newest Form of Voter Suppression for Millennials, and How it Must be Eliminated to Make Voting Accessible for the Next Generation* (2013)[8]; Project Vote, *Enfranchising America's Youth* (2014).[9]

---

[6]    *Available at* http://dos.myflorida.com/pdf/2-4-2013_recs_for_increased_accessibility_and_efficiency_in_fl_elections.pdf.
[7]    *Available at* http://www.brennancenter.org/sites/default/files/publications/How_to_Fix_Long_Lines.pdf.
[8]    *Available at* http://b.3cdn.net/advancement/ba719924e82b44bb92_14m6bgjh0.pdf, at 4.
[9]    *Available at* http://www.projectvote.org/wp-content/uploads/2014/05/POLICY-PAPER-Enfranchising-Americas-Youth-May-9-2014.pdf.

42.     In the aftermath of the 2012 election, Governor Scott "tasked [the Secretary] with making recommendations to increase the accessibility and efficiency in Florida Elections." Sec'y's 2013 Recommendations at 3.

43.     In a report published in February of 2013, the Secretary acknowledged the serious problems with long lines that Floridians had encountered, with "many voters . . . waiting in line for hours to cast a ballot both during the early voting period and on Election Day." *Id*. at 4. The Secretary further attributed the "longer wait times … to factors including … inadequate voting locations." *Id*.

44.     The Secretary made several recommendations to protect against long lines in the future, including specifically: (1) to "[e]xtend the early voting schedule from a minimum of 8 days to a maximum of 14 days, while also allowing supervisors of elections the flexibility to offer early voting on the Sunday immediately prior to Election Day"; and (2) to "[e]xpand the allowable locations of early voting sites at government owned, managed or occupied facilities to include the main or branch office of a supervisor of elections, a city hall, courthouse, county commission building, public library, civic center, convention center, fairgrounds or stadium." *Id*.

45.     The Secretary specifically recommended expanding the early voting locations to address the problems that arose when "several early voting sites in

some counties could not manage the volume of voters without enduring excessive and unreasonable waiting times to vote." *Id.* at 4. He found that, "[i]f given the flexibility to choose more and larger sites, supervisors could more effectively select early voting locations that meet the geographic needs of their voters and reduce the wait times at these locations." *Id.* at 5. The Secretary further acknowledged that, "[d]ue to varying populations, geography and voting habits in Florida counties, 'one size does not fit all'" when it comes to early voting. *Id.*

46.     The Florida Legislature subsequently enacted both recommendations into law with House Bill 7013 ("HB 7013") in the 2013 legislative session. In a gesture that was reportedly aimed at "correcting the legislative-created dysfunction of the 2012 election," TAMPA BAY TIMES, *Editorial: House voting reforms don't go far enough* (Mar. 7, 2013),[10] the House passed HB 7013 on the first day of the 2013 session—March 5, 2013—by a vote of 118-1. The bill passed the Senate on May 5, 2013 by a vote of 27-13. The Governor signed HB 7013 into law on May 21, 2013.

47.     One of HB 7013's explicit purposes was to "*expand[]* currently authorized [early voting] sites," Fla. House of Representatives Final Bill Analysis, Bill No. CS/HB 7013 (May 21, 2013) (emphasis added), specifically, to address

---

[10]     *Available at* http://www.tampabay.com/opinion/editorials/editorial-house-voting-reforms-dont-go-far-enough/2107637.

the excessive and unreasonable long lines encountered by many of Florida's voters in 2012.

48.   As enacted, HB 7013 maintained that the county supervisors of elections must offer a minimum of eight days of early voting, but it expanded the minimum number of hours per day that each site was required to be open from a six-hour minimum to an eight-hour minimum.

49.   HB 7013 also revised the Early Vote Statute to permit supervisors of elections to offer, in their discretion and in addition to the mandatory minimum of eight early voting days, additional days of early voting "on the 15th, 14th, 13th, 12th, 11th, or 2nd day before an election that contains state or federal races." Fla. Stat. § 101.657(1)(d). If the supervisors chose to offer additional days of early voting on these days, they must do so "for at least 8 hours per day, but not more than 12 hours per day." *Id*.

50.   At the same time, HB 7013 also expanded the types of facilities that could permissibly be used as early voting locations. While previously the Early Vote Statute had only allowed for early voting sites to be located at the main or branch office of the supervisor of elections, city hall, or a public library facility, HB 7013 expanded that list to include "*any* . . . fairground, civic center, courthouse, county commission building, stadium, convention center, government-

owned senior center, or government-owned community center." *Id.* at 1(a) (emphasis added).

51.    Thus, the language in the Early Vote Statute that governs the sites where early voting sites may be located was amended to read as follows:

> As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor. . . . In order for a branch office to be used for early voting, it shall be a permanent facility of the supervisor and shall have been designated and used as such for at least 1 year prior to the election. The supervisor may also designate any city hall, or permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable. In addition, a supervisor may designate one early voting site per election in an area of the county that does not have any of the eligible early voting locations. Such additional early voting site must be geographically located so as to provide all voters in that area with an equal opportunity to cast a ballot, insofar as is practicable. Each county shall, at a minimum, operate the same total number of early voting sites for a general election which the county operated for the 2012 general election.

*Id.*

52.    Nothing in the text of the law, as adopted by the Legislature (or the Secretary's recommendations that precipitated the law), limited or excluded the use of facilities associated with a public educational institution, provided that they otherwise qualify as one of the types of locations that the Early Vote Statute expressly identifies as an acceptable venue for early voting.

C.     **The Secretary's Interpretation of the Early Vote Statute**

53.    Less than a year after HB 7013 was enacted, however, the Secretary promulgated an opinion severely limiting the scope of the Early Vote Statute.

54.    The opinion arose when the City of Gainesville inquired regarding the usage of the University of Florida's student union as an early voting site in advance of a March 2014 municipal election. At the time, the University of Florida was home to over 50,000 students, many of whom were residents of the campus.

55.    In particular, Nicolle M. Shalley, the City Attorney of Gainesville, sought a formal opinion from the Secretary to answer the following question: "Does the J. Wayne Reitz Union on the University of Florida campus constitute a government-owned community center or a convention center for purposes of early voting under [the Early Vote Statute]?" Fla. Dep't of State, Sec'y Op. RE: DE 14-01 Early Voting - Facilities, Locations § 101.657, Florida Statutes at 1 (Jan. 17, 2014) *available at* http://opinions.dos.state.fl.us/searchable/pdf/2014/de1401.pdf (the "Secretary's Early Vote Opinion").

56.    The Secretary answered this question in the negative in a letter opinion issued on January 17, 2014. *See id*. at 2. In reaching that opinion, the Secretary broadly opined, not only that the student union was not a permissible early voting site, but that *no* "college- or university-related facilities" could be used as early voting sites. *Id*. Specifically, the Secretary found that the union center was

unacceptable as an early voting site because it "is a structure designed for, and affiliated with, a specific educational institution," i.e., "[i]t is part of the University of Florida." *Id*. The Secretary concluded that the Early Vote Statute "cannot be construed so broadly to include the . . . Union *or any other college- or university-related facilities*…." *Id*. (emphasis added).

57.    Although the text of the Early Vote Statute includes no limiting language that would prohibit the use of facilities "related" to, "designed for," "affiliated with," or "part of" a public Florida college or university, the Secretary claimed that the Early Vote Statute had to be interpreted to exclude all such sites because, in the same session that it ultimately enacted HB 7013, the Florida Legislature also considered and rejected "several bills, as well as an amendment to House Bill 7013," which would have broadly permitted the use of *any* public college or university facility as an early voting site. *See id*. at 2 (describing proposed bill that would have permitted use of "*any* 'Florida College System institution facility, state university facility, or college facility'") (emphasis added); "Fla. SB 388, 2013 Leg., Reg. Sess. (2013) (same); Fla. SB 82, 2013 Leg., Reg. Sess. (2013)" (proposed bill that would have permitted the use of "*any* 'community college facility, [or] university or college'"); "Fla. SB 80, 2013 Leg., Reg. Sess. (2013) (any 'university or college'); Amendment to Fla. HB 7013 (bar code no. 152969), filed Feb. 20, 2013, 7:54 p.m., in Appropriations Committee, 2013 Leg.

Reg. Sess. (2013)" (proposed bill that would have allowed, without limitation, any "Florida College System institution facility" to serve as early voting site).

58.     From the Legislature's failure to enact these proposed bills, the Secretary made the unsubstantiated and unsupportable leap that the Early Vote Statute must be read to prohibit the use of *any* college- or university-affiliated facility.

59.     As a result, the City of Gainesville used two different early voting sites for the March 2014 election, both of which were more than a mile and a half away from the J. Wayne Reitz Union, the University of Florida site that was the subject of Ms. Shalley's inquiry to the Secretary.

60.     At the time, University of Florida spokeswoman Janine Sykes acknowledged that "[w]e're not opposed to the concept of hosting early voting on campus, but we are precluded by state law from doing so." Steve Bousquet, *Gainesville Mayor Blasts Crist, Nelson in Early-Vote Dispute*, MIAMI HERALD (Feb. 11, 2014).[11]

**D.     Young Voters and Early Voting**

61.     In the Fall of 2016, there were 1,127,988 students enrolled at higher education institutions in Florida, with nearly three-quarters (828,181) enrolled at

---

[11]     *Available     at*     http://miamiherald.typepad.com/nakedpolitics/2014/02/11/index.html.

public institutions. Hundreds of thousands of these students are eligible to vote in Florida. The Early Vote Statute, as currently interpreted by the Secretary, directly infringes upon and burdens their right to participate in elections in Florida, with the result too often being that they are required to travel long distances to reach the nearest early voting location.

62.     During the 2016 general election, the closest early vote location to the University of North Florida was 2.6 miles from campus, the closet early vote location to Florida State University was 1.4 miles from campus, and the closet early vote location to Florida Atlantic University was 1.3 miles from campus. Each of these institutions have facilities that would otherwise plainly qualify as acceptable early voting locations under the plain terms of the Early Vote Statute.

63.     Accessible early voting is particularly critical to young voters, who are less likely than members of the general public to have easy and immediate access to reliable transportation, while at the same time having demanding, inflexible school and work schedules. The percentage of 20 to 24-year-olds possessing driver's licenses has also steadily decreased over the last 35 years, Michael Sivak & Brandon Schoettle, *Recent Decreases in the Proportion of Persons with a Driver's License Across All Age Groups*, (January 2016) *available at* http://www.umich.edu/~umtriswt/PDF/UMTRI-2016-4.pdf ("[T]here was a continuous decrease in the percentage of persons with a driver's license for the

years examined. For example, the percentages for 20- to 24-year-olds in 1983, 2008, 2011, and 2014 were 91.8%, 82.0%, 79.7%, and 76.7%, respectively."), while the percentage for other age groups has remained significantly higher, *id.* ("[T]he percentages for 60- to 64-year-olds in 1983, 2008, 2011, and 2014 were 83.8%, 95.9%, 92.7%, and 92.1%, respectively."). Those that do have driver's licenses, often do not own vehicles, or the vehicles that they own are not easily accessible or reliable. Thus, they often must rely on public transportation or arrangements largely dictated by others, in order to access early voting sites.

64.    Younger voters (particularly first-time voters) also face information costs and are less likely to know where to vote, how Florida's voting process works in general, and the voting processes and facilities in their geographical area in particular. Without the flexibility that early voting provides, it is likely that many young voters would find it highly difficult—and, in some cases, impossible—to make it to the polls to cast their ballots.

65.    Limitations on accessible early voting also correlate with significantly longer lines and wait times for the voters who are able to make it to the polls. Young voters in Florida already often face long lines and wait times due to large populations of registered voters at their precincts, as well as the information deficits they face, which cause them to need more time to fill out ballots and navigate the voting process. When faced with a long line, some voters will be

36

forced to forego voting, meaning that these added burdens are likely to discourage many from attempting to vote. This is particularly true of young voters, who are more likely to be first time voters and thus more likely to be discouraged by these, and other, barriers to entry. *See* Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 AM. POL. SCI. REV. 41, 41-56 (2002) (noting that voter turnout rates increase with age due, in part, to barriers to entry that reduce once voting becomes a habit and gains "inertia").

66.   There is no legitimate, much less compelling, state interest in permitting the use of "any" "public library facility[ies]," "civic center[s]," "stadium[s]," "convention center[s]," or "government-owned community center[s]," Fla. Stat. § 101.657(1)(a), to serve as early voting locations, *except* when those sites are "related" to, "designed for," "affiliated with," or "part of" a specific educational institution.

67.   The Secretary's preclusive interpretation of the Early Vote Statute is the most recent attempt by politicians in Florida to limit early voting, specifically to the detriment of young voters, who historically have been among the groups that have disproportionately sought to exercise their voting rights through early voting in Florida. *See* Michael Herron & Daniel Smith, *Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355*, 11 ELEC. LAW J.: RULES, POLITICS, AND

POLICY 3, 331-347 (Sept. 2012) (concluding Democratic, young, and first-time voters were disproportionately likely to vote early in 2008 in Florida).

68.     As recently as last year, Republican State Representative Chuck Clemons publicly approved of the Secretary's textually dubious interpretation of the law, arguing that the responsibility should be on students to work harder to have their voices heard.

69.     Upon information and belief, these efforts to particularly burden young voters are animated by a belief that doing so will assist in gaining or maintaining a partisan electoral advantage.

70.     Upon information and belief, the intended effect of prohibiting all public university and college buildings in Florida from serving as early voting locations was meant to make it more difficult for young voters to cast early ballots. Tellingly, the Secretary has not read any exclusion into the Early Vote Statute, *other than* for public university and college facilities.

**E.     Criticisms of the Secretary's Interpretation of the Early Vote Statute**

71.     There has been widespread criticism of the Secretary's interpretation and application of the Early Vote Statute, including from supervisors of elections, one of whom publicly stated that she believed that the restrictive approach was "strategic," and specifically designed to make it more difficult for young people to

vote. Steve Bousquet, *State Nixes UF Student Union as Early Voting Site*, MIAMI HERALD (Feb. 6, 2014).[12]

72.   A former Republican Governor of Florida, Charlie Crist, similarly stated that "[i]t's pretty clear to me they don't want young people to be voting, and there's no better way to illustrate that than on a university campus." Chris Alcantara, *Crist Comes to UF to Weigh in on Early Voting at Reitz Union*, THE GAINESVILLE                SUN                 (Feb.                12,                2014), http://www.gainesville.com/article/LK/20140212/News/ 604132431/GS/.

73.   Nonpartisan, nonprofit groups also protested that the Secretary's interpretation and application of the Early Vote Statute unfairly targets the voting rights of young Florida voters in particular.

74.   In 2014, the then-President of the League, Deidre Macnab, described the Secretary's interpretation as "jaw dropping to consider that we wouldn't open up the student union, the student library and other buildings on campus to make it easier for our leaders of tomorrow to start their civic duty of voting." She continued: "[o]ne can only be left with the impression that . . . [the] Secretary of State would frankly prefer to discourage student participation." Steve Bousquet, *supra*.

---

[12] *Available at* http://miamiherald.typepad.com/nakedpolitics/2014/02/state-nixes-uf-student-union-as-early-voting-site.html.

75.     Howard Simon, the Executive Director of the American Civil Liberties Union of Florida, echoed that statement: "[h]ow is a student union building any different from a library or other government building serving a community, especially since the UF student union already satisfies the requirements to serve as a polling place on election day?" ACLU of Florida, Division of Elections Claims Site Not "Government-Owned Community Center"; ACLU Investigating Possible Challenge to Decision (Feb. 7, 2014).[13] He continued that "[t]he decision by the Secretary of State's office that a student union at a state university is somehow not a 'government-owned community center' is a transparently political interpretation of the law intended to make it harder for students to vote." *Id.*

76.     Nor can the Secretary credibly argue that reading the Early Vote Statute to permit the use of facilities affiliated with a public educational institution that otherwise qualify as one of the identified approved venues for an early voting site as listed in the Statute would unduly burden elections officials. The supervisors of elections would retain the discretion to determine whether, to best serve the voters in their counties, additional early voting sites beyond the single site required

---

[13]   *Available at* https://www.aclufl.org/en/press-releases/aclu-responds-decision-block-early-voting-university-florida-campus.

by law were necessary and, if so, where those additional sites should be located to give the county's voters an equal opportunity to access early voting.

77.    In contrast, under the current regime, the Secretary has limited the discretion of local supervisors of elections, in situations in which the voters would be best served by locating early voting sites in facilities affiliated with educational institutions, to comply with the mandate of the law that all voters in the county have equal access to early voting. As a constitutional matter, this interpretation and application of the law cannot be sustained.

## CLAIMS FOR RELIEF

## COUNT I

### First Amendment and Equal Protection
### U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202
### Undue Burden on the Right to Vote

78.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 77 as though fully set forth herein.

79.    Under the Equal Protection Clause, a state cannot utilize election practices that unduly burden the right to vote. While Florida does not have a constitutional obligation to provide early voting, having adopted early voting, Florida may not "by later arbitrary and disparate treatment, value one person's vote over that of another." *Obama For Am. v. Husted*, 888 F. Supp. 2d 897, 910 (S.D.

Ohio 2012), *aff'd*, 697 F.3d 423 (6th Cir. 2012) (citing *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)).

80.     The Secretary's interpretation of the Early Vote Statute does not treat Florida voters equally regarding access to early voting. To the contrary, it *mandates an inequality*, because Florida voters living or working on or near a public college or university are prohibited from having access to an early voting location that is on campus or otherwise affiliated with that institution, even if the lack of such a location means that all voters in the county do *not* have an equal opportunity to cast an early ballot. There is no similar restriction on the access to early voting sites for other Florida voters, who do not live on or near a public college or university.

81.     The Secretary's interpretation further restricts supervisors of elections' ability to designate early voting sites based on community geography and population, limiting their ability to ensure that all voters in a county have an equal opportunity to cast an early ballot, whether they live and are qualified to vote in a community affiliated with one of Florida's public colleges or universities, or in any other community.

82.     Absent relief from this Court, Plaintiffs, and in the case of the League, many of their members and those among their constituency, will be denied this opportunity to have an equal opportunity to cast an early ballot.

83.    The burden of the current restrictive application of the Early Vote Statute, further, falls heaviest on Florida's young voters.

84.    Not only are young voters significantly more likely to live in or near one of the public institutions that the Secretary's interpretation has made a "no man's zone" for early voting, but they are also less likely to have easy, immediate access to reliable transportation to travel to what has in practice often turned out to be significant distances to reach the nearest early voting site.

85.    Young voters are also more likely to be first time voters and to be figuring out how to vote for the first time. This fact already imposes significant barriers to entry for young voters seeking to vote. *See* Eric Plutzer, *supra*. The Secretary's interpretation only increases the barriers and is likely to discourage young people, in particular, from exercising their right to vote.

86.    In a case such as this, the Court must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiffs seek to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election*

*Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

87.    Here, the Secretary's interpretation and application of the Early Vote Statute clearly burden the Plaintiffs' (and in the case of the League, their members' and constituencies') right to vote. *See Husted*, 888 F. Supp. 2d at 907 (holding restrictions on times of early voting violated voters' right to vote), *aff'd*, 697 F.3d 423 (6th Cir. 2012); *see also Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 974 (D. Nev. 2016) (holding "distance Plaintiffs must travel and the associated costs [to vote early at certain locations] are a material limitation" on voting); *Florida*, 885 F. Supp. 2d at 329  (recognizing that restrictions on early voting in Florida "would impose a sufficiently material burden to cause some reasonable . . . voters not to vote" in Voting Rights Act context).

88.    Moreover, those burdens are not outweighed by any legitimate, much less compelling, state interest in the law. Indeed, the State has declared through the very same Early Vote Statute that a multitude of government-affiliated sites are acceptable locations for early voting sites, including several of the types of facilities that are commonly affiliated with public colleges and universities. The State has further required that the supervisors of elections chose among these sites to locate early voting facilities so as to ensure, whenever practicable, that all voters in the county have an equal opportunity to cast an early ballot. The current

restrictive interpretation of the law is plainly contrary to the explicit State interest in promoting equal opportunity to access early voting.

89.    Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Secretary's interpretation of the Early Vote Statute subjects Plaintiffs (and, in the case of the League, also its members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held on August 28, 2018 and November 6, 2018.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a)    declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Secretary's interpretation of the Early Vote Statute violates the First and Fourteenth Amendments to the United States Constitution;

b)    preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from enforcing his interpretation of the Early Vote Statute;

c)    awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)    granting such other and further relief as the Court deems just and proper.

## COUNT II

**Twenty-Sixth Amendment**
**U.S. Const. Amend XXVI, 42 U.S.C. § 1983, 28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Denial or Abridgement of the Right to Vote on Account of Age**

90.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 77 as though fully set forth herein.

91.     The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age." The goal of the Amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. Sup. 1972).

92.     The Twenty-Sixth Amendment guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process. As a result, election laws, practices and procedures that have the purpose, at least in part, of denying or abridging the right to vote on account of age are unconstitutional. While the amendment "speaks only to age discrimination, it has, as noted by Senators Percy and Brooke, among many other legislators, particular relevance for the college youth who comprise approximately 50 per cent of all who

46

were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825).

93.     On its face, the Early Vote Statute clearly authorizes supervisors of elections to designate additional early voting sites at "*any* city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites." Fla. Stat. § 101.657(1)(a) (emphasis added). There is no further explicit limitation on the characteristics that these facilities must have in order to be properly utilized for early voting purposes.

94.     Nevertheless, the Secretary has read into the Statute an additional limitation, forbidding the use of *any* facilities that are "related" to, "designated for," "affiliated with," or "part of" a public Florida college or university. Sec'y's Early Vote Op. This is the only limitation that the Secretary has read into the law and, as many have publicly noted, it unfairly and facially targets Florida's young voters to a significantly greater degree than the rest of Florida's voting population.

95.     Thus, upon information and belief, the Secretary acted with the intent, at least in part, to suppress the vote of young voters in Florida with his interpretation of the Early Vote Statute. As such, his interpretation violates the Twenty-Sixth Amendment.

96.    This is consistent with several other attempts in recent years by lawmakers to make it more difficult for Florida's young voters to participate in the electoral process in the hope of gaining or maintaining a partisan electoral advantage.

97.    Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Secretary's interpretation of the Early Vote Statute subjects Plaintiffs (and, in the case of the League, also its members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held on August 28, 2018 and November 6, 2018.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a)    declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Secretary's interpretation of the Early Vote Statute violates the Twenty-Sixth Amendment to the United States Constitution;

b)    preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. §2202, from enforcing his interpretation of the Early Vote Statute;

c)    awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)     granting such other and further relief as the Court deems just and proper.

Dated: May 22, 2018.

Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111
KING, BLACKWELL, ZEHNDER
        & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Amanda Callais*
Jacki L. Anderson*
John M. Geise*
Alexi Velez*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
acallais@perkinscoie.com
jackianderson@perkinscoie.com
jgeise@perkinscoie.com
avelez@perkinscoie.com

*Counsel for the Plaintiffs*
  *Motions for Pro Hac Vice Forthcoming*

49