## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., THE ANDREW
GOODMAN FOUNDATION, INC.,
MEGAN NEWSOME, AMOL
JETHWANI, MARY ROY a/k/a JAMIE
ROY, DILLON BOATNER,
ALEXANDER ADAMS, and ANJA
RMUS,

      Plaintiffs,

      v.

KENNETH W. DETZNER, in his official
capacity as the Florida Secretary of State,

      Defendant.

Case No. 4:18-cv-00251
(MW/CAS)

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

I.  INTRODUCTION ....................................................................1

II.  BACKGROUND ......................................................................3

  A.  History of Early Voting............................................................3

  B.  The Secretary's Interpretation ................................................6

  C.  Burdens Resulting from the Secretary's Interpretation .......................10

III.  ARGUMENT..........................................................................13

  A.  Plaintiffs Are Likely to Succeed on the Merits.....................................13

    1.  First and Fourteenth Amendments.............................................13

      a.  Legal Standard ...................................................................14

      b.  The Secretary Unconstitutionally Creates Two Classes
          of Differently Treated Voters ...........................................15

      c.  The Resulting Burdens Are Severe....................................18

      d.  No State Interest Justifies the Burdens on Voting Rights .26

    2.  The Twenty-Sixth Amendment ................................................29

  B.  Plaintiffs Will Suffer Irreparable Injury................................................34

  C.  The Balance of the Equities and Public Interest Favor an Injunction ..37

IV.  CONCLUSION...........................................................................39

## TABLE OF AUTHORITIES

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)........................................................14, 17, 28

*Anderson v. Martin,*
    375 U.S. 399 (1964)..................................................................36

*Bangerter v. Orem City Corp.,*
    46 F.3d 1491 (10th Cir. 1995) .................................................33

*Burdick v. Takushi,*
    504 U.S. 428 (1992)............................................................14, 15

*Bush v. Gore,*
    531 U.S. 98 (2000)............................................................15, 16

*Carillon Importers, Ltd. v. Frank Pesce Int'l Grp., Ltd.,*
    112 F.3d 1125 (11th Cir. 1997) ...............................................13

*Cf. Nashville Student Org. Comm. v. Hargett,*
    155 F. Supp. 3d 749 (M.D. Tenn. 2015)...................................31

*Cf. Sanchez v. Cegavske,*
    214 F. Supp. 3d 961 (D. Nev. 2016).........................................24

*Common Cause Indiana v. Marion County Election Board,*
    F. Supp. 3d, 2018 WL 1940300 (S.D. Ind. Apr. 25, 2018) .........17, 28, 34, 38

*Crawford v. Marion Cty. Election Bd.,*
    553 U.S. 181 (2008)........................................................14, 17, 18

*Doe v. Miller,*
    573 F. Supp. 461 (N.D. Ill. 1983)..............................................37

*Dunn v. Blumstein,*
    405 U.S. 330 (1972)..................................................................15

*Ferrill v. Parker Grp., Inc.,*
    168 F.3d 468 (11th Cir. 1999) .................................................33

*Fla. Democratic Party v. Detzner*,
    No. 4:16CV607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ....3

*Fla. Democratic Party v. Scott*,
    215. F. Supp. 3d 1250 (N.D. Fla. 2016) ......................................................14

*Gresham v. Windrush Partners, Ltd*.,
    730 F.2d 1417 (11th Cir. 1984) ...................................................................36

*Hand v. Scott*,
    285 F. Supp. 3d 1289 (N.D. Fla. 2018) .......................................................14

*Harper v. State Bd. of Elections*,
    383 U.S. 663 (1966)...............................................................................15, 17

*Hunter v. Underwood*,
    471 U.S. 222 (1985)......................................................................................36

*Jolicoeur v. Mihaly*,
    5 Cal.3d 565 (1971) ......................................................................................29

*League of Women Voters of Fla. v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) .......................................................38

*League of Women Voters of N.C. v. N.C.*,
    769 F.3d 224 (4th Cir. 2014) .......................................................................34

*NAACP v. McCrory,*
    831 F.3d 204 (4th Cir. 2016) .......................................................................36

*Ne. Ohio Coal. for Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) .......................................................................15

*Norman v. Reed*,
    502 U.S. 279 (1992)................................................................................14, 26

*Obama For America v. Husted*,
    697 F.3d 423 (6th Cir. 2012) .............................. 13, 14, 15, 16, 28, 34, 37, 38

*OFA v. Husted*,
    888 F. Supp. 2d 897 (E.D. Ohio 2012) ....................................................15, 19

*Ownby v. Dies*,
    337 F. Supp. 38 (E.D. Tex. 1971)...................................................................29

*Reynolds v. Sims*,
    377 U.S. 533 (1964)......................................................................................16

*Rice v. Cayetano*,
    528 U.S. 495 (2000)......................................................................................30

*Symm v. United States*,
    439 U.S. 1105 (1979)....................................................................................30

*U.S. v. Reese*,
    92 U.S. 214 (1876).......................................................................................30

*U.S. v. Texas*,
    445 F. Supp. 1245 (S.D. Tex. 1978)............................................................30

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) .......................................................................30

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)......................................................................................33

*Walgren v. Bd. of Selectmen of Town of Amherst*,
    519 F.2d 1364 (1st Cir. 1975)......................................................................31

*Walgren v. Howes*,
    482 F.2d 95 (1st Cir. 1973)..........................................................................30

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).........................................................................................15

*Worden v. Mercer Cty. Bd. of Elections*,
    61 N.J. 325 (1972) .......................................................................................30

Statutes and Other Authority

Fla. Stat. §§ 97.012 ...................................................................2, 3, 4

Fla. Stat. § 101.657 ..............................................1, 2, 3, 6, 17, 26, 31

Fla. Stat. § 106.23 .....................................................................20

117 Cong. Rec. 5817, 5825.............................................................30

3 Ronald D. Rotunda & John E. Nowak,
    TREATISE ON CONSTITUTIONAL LAW § 18.4 (10th ed. 2012) ...........................31

U.S. Const. Amend. XXVI ...............................................................30

U.S. Const. Amend. XV..................................................................30

# I.     INTRODUCTION

This case concerns the Secretary of State's ("Secretary") impermissible and unconstitutional construction of Florida's early vote ("EV") statute, Fla. Stat. § 101.657(1)(a) (the "Statute"), set forth in an Advisory Opinion (the "Opinion"), which has resulted in and, absent relief from this Court, will continue to cause severe burdens on the right to vote, particularly of young voters, including the individual Plaintiffs, and voters among the membership and constituencies that the League of Women Voters of Florida (the "League") and the Andrew Goodman Foundation ("AGF") serve (collectively, "Plaintiffs"). Because there is no state interest adequate to justify that irreparable harm, and the balance of the equities and public interest favor relief, an injunction enjoining the Secretary from enforcing the Statute as set forth in this Motion, in advance of the upcoming August primary and November general elections, is appropriate and necessary.

The Statute permits the use of "*any* . . . permanent public library . . . , fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as [an] early voting site[]." *Id*. (emphasis added). Directly contrary to this plain, unqualified, and unambiguous language, the Opinion declares that the Statute *prohibits* the use of any facilities "related" to, "designed for," "affiliated with," or "part of" a college or university for EV. Ex. A.[1] In so doing, it stripped supervisors of elections ("SOEs") of the discretion they had to

---

[1] All citations to Exhibits are to materials attached to the Declaration of Elisabeth Frost.

offer EV on college and university campuses in the facilities listed in the Statute, even where prohibiting their use means that EV sites are not "to provide all voters in the county an equal opportunity to cast a ballot" (despite the Statute's directive that SOEs do so, whenever "practicable," Fla. Stat. § 101.657(1)(a)).

The Secretary is Florida's chief elections officer, vested with power to obtain and maintain uniformity in the interpretation and implementation of election laws, including by initiating enforcement actions against SOEs. Fla. Stat. §§ 97.012(1), (16). SOEs have thus followed the Opinion's interpretation of the Statute. And, the result has been an unjustifiable burden on the voting rights of hundreds of thousands of voters, including Plaintiffs. Those burdens fall particularly and disproportionately on young voters, who are far more likely to live where the Opinion bars EV, and far less likely to have reliable, accessible transportation to the nearest EV site, which is often more than a mile away. The result is a startling imbalance that specifically harms those (primarily young voters) who live and work in college and university communities. This disparity is plain from the face of the Opinion, which singles out those –and *only* those– communities, as *EV-free zones*. It is also borne out by expert analysis, demonstrating that the burden on impacted voters is severe. These burdens cannot be justified by legitimate, much less compelling, state interests.

## II.    BACKGROUND

### A.    History of Early Voting

In response to significant problems encountered by Florida voters in 2000, the Legislature enacted several election-related reforms in 2004, including introducing EV. *See* C.S.S.B. 2346, 2004 Fla. Sess. Ch. 2004-252, § 13. Although EV was immediately popular among voters, in 2011, the Republican-controlled Legislature and Governor Rick Scott severely curtailed its use, including by reducing EV from 14 to eight days, and eliminating EV on the Sunday before Election Day. Ex. B at 9; *see also* Fla. Stat. § 101.657(d) (2011).[2] This abrupt reversal was widely recognized as partisan; as the chair of the Florida Republican Party would later explain, the "Party, the strategists, the consultants . . . firmly believe that [EV] is bad for Republican Party candidates." Ex. B at 9. Thus, going into 2012, EV was limited, not just by hours, but also by location: at the time, SOEs were *only* permitted to designate as EV sites, their "main or branch office," and, at SOE discretion, "any city hall or permanent public library facility." Fla. Stat. § 101.657(1)(a) (2011).[3]

---

[2] Nearly 2.7 million Floridians who voted in 2008 did so using EV, accounting for almost 32% of voters. Ex. B at 5. In 2012, approximately 2.4 million (28.1%) used EV (a number that was likely depressed by the curtailment supported by Governor Scott in 2011), and in 2016, over 40% (nearly 3.9 million) did so. Ex. B at 4-5.

[3] This Court has previously found SOEs are bound by Florida's election laws and the Secretary's interpretations of those laws. *See Fla. Democratic Party v. Detzner* ("*FDP*"), No. 4:16CV607-MW/CAS, 2016 WL 6090943, at *5 (N.D. Fla. Oct. 16, 2016) (citing Fla. Stat. § 97.012(1), (16), (14)). Although the Secretary appears to argue that only the SOE in Gainesville is prohibited from offering EV on campus under the Opinion, *see* Def.'s Rule 12(b) Motion to Abstain, or in the Alternative Mot. to Dismiss ("Mot. to Dismiss") 6 (ECF No. 20), he notably stops short of asserting that SOEs remain free to do so (an easy enough thing to assert, if true).

The ensuing election was a disaster. Voters statewide encountered what the Secretary would afterward describe as "excessive and unreasonable" lines when attempting to EV. Ex. C at 4. Young voters, in particular, suffered significantly, with numerous counties showing a high correlation between young voters and longer lines. Ex. B at 15-19.

In the aftermath, Governor Scott "tasked [the Secretary] with making recommendations to increase the accessibility and efficiency in Florida Elections." Ex. C at 3; *see also* Ex. B at 18. The Secretary published a report attributing the "longer wait times . . . to factors including . . . inadequate voting locations" and made several recommendations, including to "expand the allowable locations of [EV] sites at government owned, managed or occupied facilities to include . . . a city hall, courthouse, county commission building, public library, civic center, convention center, fairgrounds or stadium." Ex. C at 4, 7. The Secretary explained that, "[i]f given the flexibility to choose more and larger sites, [SOEs] could more effectively select [EV] locations that meet the geographic needs of their voters and reduce the wait times . . . ." *Id.* at 5.

---

Further, pursuant to long-standing practice, SOEs do not act contrary to the Secretary's directions in advisory opinions, no matter to whom they are nominally directed. *See* Sancho Decl. ¶¶ 14-16. This makes both practical and legal sense, as the Secretary has the power to "[o]btain and maintain uniformity in the interpretation and implementation of election laws," "[p]rovide written direction and opinions to [SOEs] on the performance of their official duties with respect to the Florida Election Code," and "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the performance of any duties of a [SOE] or any official performing duties with respect to [Florida election law]," Fla. Stat. §§ 97.012(1), (14), (16).

4

On February 13, 2013, House Bill 7013 ("HB7013") was introduced, proposing several reforms, including to expand SOEs' authority to use "any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, or convention center as early voting sites." HB7013, 2013 Leg., Reg. Sess. (2013). More than 60 amendments were proposed to HB7013, but only one mentioned the use of higher educational facilities for EV: that amendment, proposed in the House Appropriations Committee but not adopted, would have added to the list of permissible EV locations "*[a]ny* . . . Florida College System institution facility . . . ." Ex. D (emphasis added). No language was considered to exclude facilities that otherwise qualified as one of the listed locations (e.g., public library, civic center, etc.) for *any* reason, including affiliation with an educational institution.[4] HB7013 received broad support and was signed by the Governor on May 21, 2013. Ex. E, F.

As a result, the Statute now provides in relevant part:

> [T]he supervisor . . . shall allow an elector to vote early in the main or branch office of the supervisor . . . . [F]or a branch office to be used for early voting, it shall be a permanent facility of the supervisor and shall have been designated and used as such for at least 1 year prior to the election. ***The supervisor may also designate any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites;*** however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable.

---

[4] HB7013's history is available at
http://www.flsenate.gov/Session/Bill/2013/7013/?Tab=BillHistory.

Fla. Stat. § 101.657(1)(a) (emphasis added).[5]

## B.   The Secretary's Interpretation

Less than a year after HB7013 became law, the Secretary promulgated the Opinion, severely limiting the list of acceptable EV sites. *See* Ex. A. It was initiated when UF students requested that EV be offered at the J. Wayne Reitz Student Union ("Reitz Union") for the 2014 municipal elections. *See* Ex. G. Unsure whether Reitz Union qualified as a "government-owned community center" or "convention center" under the newly-amended Statute, the City Attorney sought an advisory opinion from the Secretary as to its permissible use. *See* Ex. A at 1; Ex. H. The Reitz Union had previously, and has since, been used as an Election Day voting site, often with very long lines. *See* Ex. B at 16; Ex. H; Boatner Decl. ¶¶ 5, 8.

Considering UF's demographics, it is unsurprising that Gainesville would consider offering on-campus EV. *See* Ex. I at 9, 27 ("[I]f election administrators had the goal of minimizing disparities in [EV] access through metro Gainesville . . . , an on-campus [EV] location would be the obvious choice."). UF is the fifth largest university nationally by enrollment; its campus covers over three-square miles in central Gainesville. Ex. I at 18. In 2014, it enrolled over 50,000 students;

---

[5] The Statute also allows for a so-called "wildcard" site in any type of facility "in an area of the county that does not have any of the eligible [EV] locations." *Id*. This exception is not further defined, but Gainesville has the view that this exception does not authorize them to offer EV on the University of Florida ("UF") campus. *See* Ex. G; Ex. O. This is consistent with the Opinion discussed *infra*, which presumably would have stated that the Reitz Union could be used under that exception, had that been the Secretary's view.

that number has since grown. *See id.*[6] As of May 2018, *almost 53% of Gainesville's total population consisted of students from UF and Santa Fe College, and students from those institutions account for nearly 68% of Gainesville's residents of voting age, with UF alone accounting for 53% of its citizen voting age population ("CVAP").* Ex. H; Ex. I at 9.[7] UF's student population is especially concentrated in dormitories on campus and in nearby apartments and rental houses. Ex. I at 18; Jethwani Decl. ¶ 4; Rmus Decl. ¶ 4. Nine-thousand live in tightly packed on-campus dormitories. Ex. I at 18-19. Those without automobiles are concentrated on campus, in nearby neighborhoods, and in student neighborhoods located along the bus route to campus. Ex. I at 19; Boatner Decl. ¶¶ 4, 10; Roy Decl. ¶¶ 4-5. Thousands more residents work on, or live near, the UF campus. Ex. J at 1; Ex. I at 27; Newsome Decl. ¶ 16.

Nevertheless, on January 17, 2014, the Secretary's office responded to the City Attorney' in the negative in the Opinion, which was posted on the Secretary's

---

[6] Plaintiffs Amol Jethwani, Mary "Jamie" Roy, Dillon Boatner, and Anja Rmus are UF students; Megan Newsome is an alum who works on campus. *See* Amol Jethwani Decl. ¶¶ 2-3; Jamie Roy Decl. ¶ 3; Dillon Boatner Decl. ¶ 3; Anja Rmus Decl. ¶¶ 2-4; Megan Newsome Decl. ¶¶ 2, 3. Newsome is also a former, and Roy a current, Vote Everywhere Student Ambassador for AGF, a national, nonpartisan, nonprofit with the mission of making young voices and votes a powerful force in democracy. David Goodman Decl. ("AGF Decl.") ¶¶ 3-10; Newsome Decl. ¶¶ 3, 8; Roy Decl. ¶¶ 3, 8. AGF trains its Vote Everywhere Student Ambassadors (including at four Florida campuses) in civil engagement, including to remove voter barriers and promote get-out-the-vote activities. AGF Decl. ¶¶ 6-17. Boatner is also one of the League's approximately 221 active student members in Florida, 42 of whom are from Alachua County and include UF students. Boatner Decl. ¶ 3, ¶ 13; Patricia Bringham Decl. ("LOWV Decl.") ¶ 7.

[7] 69,727 voters at Santa Fe College and UF are affected by the Opinion. Ex. H at 2.

website. Ex. A; *see also* Sancho Decl. ¶ 15. The Secretary broadly directed, not only that Reitz Union could *not* be used for EV, but that the same was true of *any* "college- or university-related facilities." Ex. A at 2; *see also* Ex. H. The Secretary wrote:

> The Reitz Union is a structure designed for, and affiliated with, a specific educational institution. It is a part of [UF]. The terms 'convention center' and 'government-owned community center' cannot be construed so broadly as to include the Reitz Union or *any other* college- or university-related facilities . . . .

Ex. A at 2 (emphasis added).

The *only* support identified for this conclusion was that the Legislature did not enact proposed legislation further expanding the law to permit SOEs to use *any* facility associated with higher educational institutions (i.e., not limited to libraries, community centers, stadiums, etc.) for EV. *See id.* at 2 (describing bill that would have permitted use of "*any* 'Florida College System institution facility, state university facility, or college facility'") (emphasis added); Ex. K at 13, Fla. SB 388, 2013 Leg., Reg. Sess. (2013) (same); Ex. L at 2, Fla. SB 82, 2013 Leg., Reg. Sess. (2013) ("any 'community college facility, [or] university or college'");  Ex. M at 2, Fla. SB 80, 2013 Leg., Reg. Sess. (2013) ("any 'university or college'"); Ex. D, Amend. 3 to HB7013, 2013 Leg. Reg. Sess. (2013) (proposed amendment that would have allowed use of any "Florida College System institution facility"). When a member of the Ethics and Elections Committee that formulated HB7013 sent the Secretary a letter advising that the Opinion got it wrong, asserting, "[t]here is no ambiguity in the statute," and pointing out that, "[t]he Reitz Union is

government-owned, as [UF] is a public institution founded and funded by the state," and "is also a community center, obviously," the Secretary reportedly had no response, except to state through a spokesperson that the "opinion speaks for itself." *Id.*

As a result, both of the EV sites for the March 2014 Gainesville election were more than a mile-and-a-half from Reitz Union. Ex. G; Ex. T. At the time, a UF spokesperson stated that the university was "not opposed . . . to hosting [EV], but . . . we are precluded under state law from doing so." Ex. O. Presently, Gainesville's EV locations "are not readily accessible to the student population": UF's closest EV site is more than a 40-minute walk from Reitz Union, and there are no direct public transportation routes to it from UF. Ex. H at 1; *see also* Ex. I at 26-27.

The need for and interest in EV at UF has not abated. On March 30, 2018, the Student Senate passed a resolution declaring the need for on-campus EV, sending a copy to the Secretary and SOE. Newsome Decl. ¶ 17; Roy Decl. ¶ 8; Tingum Decl. ¶ 16. On May 17, the Gainesville City Commission passed a resolution declaring support for on-campus EV, specifically laying out the need for a UF site. *See* Ex. H. And, on June 12, the Alachua County Board of County Commissioners, which provides the SOE's budget, passed a resolution declaring support for EV at UF. Ex. J. It asserts that, "allowing . . . [EV] on campus . . . would alleviate the difficulties of voting early for thousands of students, along with those who live near, or work on, campus," and that it is important to provide "equitable access to" EV. *Id.* The Board further resolved to support efforts to allow

EV at UF (including this lawsuit and those by UF's Student Government, which the resolution notes, "has identified establishing" on-campus EV "[a]s one of its top legislative priorities"), and to "favorably consider funding requests to support" an EV site at UF in 2018. *Id.*; *see also* Newsome Decl. ¶ 17; Roy Decl. ¶ 8; Boatner Decl. ¶¶ 16-17 (describing efforts to lobby Legislature to explicitly permit on-campus EV); Rmus Decl. ¶¶ 10-11 (describing efforts of student organizations).

## C.    Burdens Resulting from the Secretary's Interpretation

The Secretary's interpretation ensures that a significant segment of Florida's electorate does not have equal access to EV, exacerbates the burdens young voters already face in attempting to vote, and ensures that one of the best ways to alleviate those burdens remains out of reach. Given the size of Florida's young voting population and the number of higher educational institutions within its borders, the effects of the Secretary's indefensible position can be felt across the State.

Florida's young voter population is large, more racially diverse than the older voting population, and, in recent years, has tended to support Democratic candidates. Ex. P at 13.[8] As of 2016, Florida was home to 2.7 million young citizens. Ex. P at 6. It had 371 institutions of higher education, with more than 1.1 million students, approximately 830,000 in public institutions. *Id.*[9] Thus,

---

[8] Florida's young voters of color are particularly likely to rely on EV. Ex. P at 16-18.

[9] Florida has 12 public universities with multiple campuses, 28 state colleges and community colleges, and many additional private institutions of higher learning. Ex. I at 7. It has three of the country's five largest public universities, and four of

participation of young voters meaningfully changes the partisan composition of the electorate, and youth and college students represent pivotal constituencies, such that imposing barriers that make it more difficult for them to vote has significant and often predictable implications for electoral outcomes in Florida. *See id.* This has not been lost on Florida's political class, and the Secretary was roundly criticized for attempting to obtain a partisan advantage when he issued the Opinion. *See, e.g.*, Ex. Q; Ex. G; Ex. R; Ex. N; Ex. S.

Despite their significant numbers, turnout of Florida's young voters has been depressed. Ex. B at 7-8. In 2016, for example, slightly less than 1.27 million of the 2.4 million citizens under 30 years old who were registered (approximately 53%) participated in the general election, far below the nearly 70% of all registered voters who did. *Id.*

Nevertheless, when EV is accessible, a substantial portion of Florida's young voters rely upon it. Among Florida students whose campuses are enrolled in the National Study of Learning Voting and Engagement, 29% of those voting in 2012 used EV, 19% did so in the 2014 mid-terms, and 43% did in 2016. Ex. P at 14; *see also* Ex. B at 5. These numbers are particularly impressive given that accessing EV is often difficult for young voters, who are more likely to be students in the communities where the Secretary prohibits EV and less likely to have reliable access to transportation. *See, e.g.*, Boatner Decl. ¶¶ 10, 20; Jethwani Decl. ¶¶ 6-9; Newsome Decl. ¶¶ 7-11; Rmus Decl. ¶ 4-9, 12-15; Roy Decl. ¶¶ 2-7, 10;

---

the top ten. *Id.* As of Fall 2016, Florida's public higher educational institutions employed nearly 107,000 staff. Ex. P at 6; *see also* Ex. I at 9.

Ex. B at 13-14; Ex. I at 12-13; Ex. P 10. Indeed, expert analysis consistently demonstrates that in Florida's communities with the largest universities, travel times to EV sites are almost always significantly longer where there are large populations of dorm-dwellers and college students. Ex. I at 74-75.

Not surprisingly, these inequalities in access weigh most heavily on young people: Floridians between 18 and 24 are three times more likely to live within two miles of a public college or university than those over 24. Ex. I at 3. Thus, to use EV, Florida's young voters must disproportionately overcome the significant and systematic inequalities of access that follow from the Secretary's interpretation, in addition to the burdens they typically face in navigating elections, including being less habituated to voting than their older counterparts and more likely to be negatively impacted by election administration that raises obstacles to voting. Ex. B at 8-9; Ex. P at 8-12. They are more likely to face significant informational costs, which they often must overcome within weeks of arriving on campus, Ex. B at 8-9, 13-14; Ex. P at 10-11; Alexander Adams Decl. ¶¶ 5-11; are more geographically mobile, requiring them to repeatedly familiarize themselves with new voting environments, Ex. P at 9-10; Adams Decl. ¶¶ 5-11; Tingum Decl. ¶¶ 4-6; and are often doing all of this while managing busy, inflexible work and school schedules, Ex. B at 19-20; Adams Decl. ¶¶ 12-16; Boatner Decl. ¶¶ 18-19; Jethwani Decl. ¶ 13; Rmus Decl. ¶ 12; Roy Decl. ¶ 3.

These difficulties are well known among those that have sought to activate and engage young voters in Florida, as well as political scientists, who recommend EV because it reduces many burdens related to voting, at no cost to security or

public confidence in elections. Ex. P at 8, 18; *see also* Boatner Decl. ¶ 11; Jethwani Decl. ¶¶ 8-11, 15-16; Newsome Decl. ¶¶ 8-9; Rmus Decl. ¶¶ 10-11. Thus, use of EV—and turnout as a whole—would likely be higher if it were more accessible in the communities where so many of Florida's young voters live. Ex. B at 7, 8, 11; Ex. P at 5-6; Boatner Decl. ¶ 15.

### III.   ARGUMENT

Plaintiffs are entitled to an injunction because: (1) they are substantially likely to succeed on the merits; (2) they will suffer irreparable harm absent relief; (3) that harm outweighs harm the Secretary will suffer because of an injunction; and (4) an injunction is in the public interest. *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).

### A.   Plaintiffs Are Likely to Succeed on the Merits

#### 1.   First and Fourteenth Amendments

Rarely does a case present such an obvious imbalance in access to the franchise for similarly situated voters, without adequate justification. "The Equal Protection Clause applies when a state either classifies voters in disparate ways, . . . or places restrictions on the right to vote." *Obama For America v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) ("*OFA*") (citations omitted). The Secretary both: (1) treats voters who live in university and college communities differently by declaring that only they inhabit EV-free zones; and (2) burdens their voting rights by mandating they travel longer to access EV and overcome other related burdens. Because the burdens on impacted voters are severe, strict scrutiny is appropriate.

But even under a less rigorous standard, Plaintiffs are highly likely to succeed on the merits.

### a.    Legal Standard

When a state burdens the right to vote, including by "treat[ing] voters differently in a way that burdens" that fundamental right, "the *Anderson-Burdick* standard applies." *OFA*, 697 F.3d at 430; *see also Fla. Democratic Party v. Scott*, 215. F. Supp. 3d 1250, 1257 (N.D. Fla. 2016); *Hand v. Scott*, 285 F. Supp. 3d 1289, 1308 (N.D. Fla. 2018). That standard requires the Court to "weigh 'the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). It is a "flexible" sliding scale, where "the rigorousness of [the court's] inquiry . . . depends upon the extent to which [the challenged law] burdens [voting rights]." *Id.*

Thus, when voting rights are subject to a "severe" restriction, it "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 280 (1992). Less severe burdens remain subject to balancing; "[h]owever slight" the burden on voting rights "may appear," "it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cty. Election Bd*., 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288-89). Courts must apply this

standard to "[t]he precise character of the state's action and the nature of the burden on voters." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591-93 (6th Cir. 2012) ("*NEOCH*"). Vague or speculative state interests are treated skeptically: a state must identify its "precise interests" in the challenged provision. *Burdick*, 504 U.S. at 434.

### b. The Secretary Unconstitutionally Creates Two Classes of Differently Treated Voters

The Secretary mandates an inequality that cannot be sustained. In our representative democracy, the right to vote is "'precious' and 'fundamental.'" *FDP*, 2016 WL 6090943, at *1 (quoting *Harper v. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). "Other rights . . . are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Moreover, "'[t]he right to vote is protected in more than the initial allocation of the franchise. *Equal protection applies as well to the manner of its exercise*.'" *OFA*, 697 F.3d at 428 (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)) (citation omitted) (emphasis added). "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Id.* (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)). "'Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" *Id.* (quoting *Bush*, 531 U.S. at 104-05); *see also Wesberry*, 376 U.S. at 17-18 ("Our Constitution leaves no room for classification of people in a way that unnecessarily abridges [the right to vote.]"); *OFA v. Husted*, 888 F. Supp. 2d 897, 905 (E.D. Ohio 2012) ("The . . . Supreme Court has reiterated time and

again the particular importance of treating voters equally . . . .") (citing cases). Finally, "[i]t must be remembered that" the right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise." *Bush*, 531 U.S. at 104-05 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

Thus, in *OFA v. Husted*, the Sixth Circuit affirmed a preliminary injunction that returned discretion to boards of elections to offer EV to all voters through the Monday before Election Day, by forbidding the Secretary of State from enforcing two EV deadlines for different types of voters: military and non-military. 697 F.3d at 426. As here, the elections "scheme [was] self-evidently not neutrally applicable; it restrict[ed] the rights of some voters and not others." *Id*. at 433 n.6. The court agreed this burdened the voting rights of non-military voters and rejected the argument that disparate treatment was justified by administrative convenience or needs of the military community. *Id*. at 431-36.

Similarly, in *FDP v. Detzner*, this Court found the Secretary's enforcement of an election law (implemented by SOEs), "which provid[ed] an opportunity to cure no-signature ballots yet deni[ed] that same opportunity for mismatched-signature ballots," not "legally tenable." 2016 WL 6090943, at *1. Because the Secretary presented no interest that could justify the disparate treatment (indeed, it did "not even survive rational basis," *id*. at *7), the Court issued an injunction requiring the Secretary to direct the SOEs that the imbalanced treatment of voters was unconstitutional. *Id*. at *1, 9.

16

Most recently, in *Common Cause Indiana v. Marion County Election Board*, -- F. Supp. 3d --, 2018 WL 1940300 (S.D. Ind. Apr. 25, 2018), a court granted a preliminary injunction, finding plaintiffs were likely to prove that a County Board of Elections, the sole Republican member of which had consistently vetoed the addition of EV sites in the predominately Democratic county, creating a stark imbalance in EV accessibility (as compared to access enjoyed in more Republican counties), violated the 14th Amendment. *Id*. at *8. The court emphasized that it "'matters'" for *Anderson-Burdick*, "whether the effects of a . . . law are unevenly distributed across identifiable groups, 'whose members share a particular viewpoint, associational preference, or economic status,'" *id*. at *13 (citing *Crawford*, 128 S. Ct. 1610 (Souter, J., dissenting); quoting *Anderson*, 460 U.S. at 793), "or are delineated by 'capricious or irrelevant factors' such as "'[w]ealth, . . . race, creed, or color,'" and "age and health." *Id*. (quoting *Harper*, 383 U.S. at 668). Finding none of the purported interests in limiting access "credible," the court ordered the Board to provide satellite EV voting in November. *Id*. at *19, 21.

The Secretary's interpretation similarly mandates an inequality, without a rational, much less compelling, justification. It prohibits SOEs from offering EV on college or university campuses, even if necessary to ensure equal access. *Cf.* Fla. Stat. 101.657(1)(a); *see also* Ex. I at 66 (finding consistently significantly longer travel times for students and dorm-dwellers and explaining, "[t]his asymmetry emerges because communities with a large university presence tend to have a dense clustering of population—often with low rates of auto access—where election administrators are prohibited [by the Secretary's interpretation] from

placing [EV] locations"). This decree, on its face, operates to the singular detriment of one class of voters: those in college and university communities, including, in particular, hundreds of thousands of young voters, who are less likely to be able to surmount the consequent burdens to access EV. There is no similar restriction imposed on *any other category* of voter.

### c.    The Resulting Burdens Are Severe

The burdens on impacted voters are both lopsided and severe, serving only to enhance the burdens young voters already face when voting, as compared to the older voting population. *See Crawford*, 553 U.S. at 186, 191, 198, 201 (controlling op.) (holding, in determining severity of burden, pertinent question is extent to which those impacted are burdened). Young voters tend to face additional "costs" when voting, because many are navigating the system for the first time, and live among others unfamiliar with the system, who cannot educate them, Ex. P at 9, 11[10]; they are more geographically mobile—often moving every year, or more—and thus have to work harder to stay registered, each time surmounting new informational barriers (e.g., determining how and where to register, where they can vote, what they need to bring, etc.), Ex. P at 9; Ex. B at 13-14; Adams Decl. ¶¶ 5-7;

_____

[10] Political scientists understand voting behavior to be a result of "cost/benefit" analyses. Ex. B at 10; Ex. P at 8, 8 n.6. Students may have particular difficulties with registration deadlines because of the interaction between the academic and elections calendars. In Fall 2018, classes at UF begin on August 22, thus students, many of whom will be first-time voters in the November 6 election, will have just over a month before the October 9 registration deadline to learn how to navigate that process while also moving into new homes and adjusting to and managing countless other brand-new experiences. Ex. P at 10-11; Adams Decl. ¶¶ 5-8, 11; Tingum Decl. ¶¶ 4-6.

Tingum Decl. ¶¶ 4-6; Boatner Decl. ¶¶ 4, 8-9; they face transportation difficulties not generally shared by the general (older) public, Ex. P at 10;  Boatner Decl. ¶ 10; Rmus Decl. ¶¶ 6-9; Roy Decl. ¶¶ 5-7, 10; and they often have inflexible, demanding schedules, *see* Ex. B at 19-20; Adams Decl. ¶¶ 12-13; Rmus Decl. ¶ 12; Roy Decl. ¶¶ 3, 10. As a result, turnout rises with age consistently until the eighth decade of life. Ex. P at 9.

The Secretary's ban on on-campus EV particularly burdens young voters due to increased travel times and transportation costs. *See OFA*, 888 F. Supp. 2d at 905 (recognizing voting rights burdened by restriction to EV access—i.e., less available EV days—when certain groups of voters were "disproportionately affected"). This is reflected in the data, which demonstrates that the travel times to EV for young and student voters is significantly longer than for other voters. Ex. I at 74; *see also id*. at 19 n.11 (noting UF report that 19% of on-campus students have access to vehicles); Ex. P at 10.

For example, in Alachua County, where UF is located, the median travel time for voters living in dormitory-dominated areas is more than double that for the rest of the County. Ex. I at 24.[11] Yet, as discussed, despite the willingness of UF to host EV; the fact that the City Commission, the County Board, and UF's student body and government strongly believe that on-campus EV is necessary and are vigorously advocating for it; the fact that a significant portion of Gainesville's population lives or works on or near UF (indeed, a *majority* of Gainesville's CVAP

---

[11] These are highly conservative estimates, assuming likely unrealistically short wait times on either end of the trip. *See* Ex. I at 26-27.

is UF-affiliated, *see* Ex. I at 9); and the fact that the County Board is resolved to favorably consider funding requests to support an on-campus EV site in 2018—absent an order from this Court, the Opinion strips the SOE of the discretion to put EV on UF's campus.[12] *See supra* at II.B.

Similar scenarios play out across the State, including in Tallahassee, home to Florida State University ("FSU"), where the median travel time to EV for dorm-dwellers is conservatively estimated as roughly twice that of other residents. Ex. I at 34. This burden affects many of FSU's 42,000 students, including Adams, a junior, who lives on campus, and many of the 25 student members of the League in Leon County. *Id*. at 27-29; Adams Decl. ¶¶ 3, 4; LOWV Decl. ¶ 7. There are nearly 7,000 staff at FSU, and together enrollment and staff make up 26% of Tallahassee's CVAP. Ex. I at 9. The campus also has a significant footprint in Tallahassee, taking up approximately 2.5 square miles in one of the city's most developed areas. *Id*. at 27; Sancho Decl. ¶ 3. The surrounding neighborhoods are among Tallahassee's most populated and have heavy concentrations of students. Sancho Decl. ¶ 4. "[B]ecause of the large, concentrated population of voters" on campus, the SOE has regularly arranged for on-campus Election Day voting. *Id*. ¶ 7.

---

[12] Although, in his Motion to Dismiss, the Secretary implies (though stops short of actually stating) that the Opinion does not preclude any other SOEs from offering EV on campuses, he concedes it has that effect in Alachua County. *See* Mot. to Dismiss at 6 (acknowledging advisory opinions "bind[] . . . the 'person or organization who sought the opinion or with reference to whom the opinion was sought . . . .'" (quoting Fla. Stat. § 106.23(2)). As discussed, the Secretary is wrong to imply the Opinion does not also have preclusive effect on the rest of the State's SOEs. *See supra* at n.3.

The expert analysis finding significant disparities in access, moreover, is consistent with the experience of Ion Sancho, Leon County's SOE for 28 years, who recognizes that the absence of on-campus EV has meant that "there is a large population of voting age residents . . . who have been and will continue to be disproportionately disadvantaged in their access to early voting." *Id*. ¶ 6. Lacking an accessible EV site, many students vote on campus on Election Day, but "the election-day voting sites on . . . Campus experienced the most consistent and substantial delays associated with voter-administration difficulties . . . as compared with voting sites elsewhere in Leon County that serve less transient, suburban populations, with older and more experienced voters." *Id*. ¶ 8. Having on-campus EV "would help alleviate the disproportionate burdens on voting, including transportation issues and administrative delay, faced by the large population of voting-aged individuals who live or work on" or near FSU. *Id*. ¶ 10.

The same is true at Florida International University ("FIU"), the country's fourth largest public university, with almost 57,000 students, including many of the 28 student League members in Miami-Dade and Broward Counties. Ex. I at 36; LOWV Decl. ¶ 7. Even in this urban center, residents of dorm-dominated areas face travel times roughly double that in the rest of Miami-Dade County. Ex. I at 36, 41. These stark differences do not go away even assuming high rates of car-access among dorm-dwellers. *Id*. at 36, 42, 87-88.

Disparities persist at exurban Orlando's University of Central Florida ("UCF"), which is the country's largest university by enrollment, with over 66,000 students, including many of the 54 student League members in Orange County. *Id*.

at 42; LOWV Decl. ¶ 7.  Its campus is on 1,400 relatively isolated acres, surrounded by a research park, nature preserve, and low-density single-family homes. Ex. I at 42. Even assuming a high rate of car-access among UCF's 11,000 dorm-dwellers, their average travel time to the closest EV site, nearly three miles away, remains roughly twice that of the rest of metro Orange County. *Id*. at 48; *see also id*. at 49-50 (describing arduous journey a carless UCF student would take to EV, approximately 40 minutes each way, not accounting for any time spent waiting).

Student voters at University of South Florida ("USF")'s large suburban campus also face disparate burdens, with dorm dwellers travelling roughly twice as long as other voters. Ex. I at 56. USF is the tenth-largest university in the country, with over 50,500 students, including many of the 35 student League members in Hillsborough and Pinellas Counties. *Id*. at 50; LOWV Decl. ¶ 7. In past elections, the closest EV site has been nearly four miles from the center of campus. Ex. I at 50.

Travel times to EV are also imbalanced for Florida Gulf Coast University ("FGCU") students, where enrollment is almost 15,000, with 2,670 housed on campus, and approximately 1,600 staff. Ex. I at 9, 57. Its location is "especially isolated on a parklike campus in the middle of a nature preserve 17 miles from downtown Fort Meyers." *Id*. at 61. Travel times to EV are more than double for students and dorm-dwellers than the rest of Lee County's population. *Id*. They are also substantially higher for students and dorm-dwellers in Escambia County,

home to University of West Florida, which has approximately 16,500 students and 1,860 staff. *Id*. at 9, 63.

When the data is viewed in the aggregate, moreover, "going from a block group with zero dorm population to one with 100 percent . . . is associated with a 31-minute increase in travel time to the nearest [EV] location," a difference "highly statistically significant" difference. *Id*. at 42. The marked asymmetry in access to EV is not only evident when comparing students and dorm-dwellers to other voters in the same jurisdictions, it is also clear when communities with significant dorm-dwelling populations are compared with similar communities that lack them: "In each of these case studies . . . [the] communities without dorm populations had lower travel times, and less inequality in travel times across neighborhoods." *Id*. at 71.

As these analyses demonstrate, although, in many cases, "it appears that election administrators have . . . . attempted to locate [EV] locations in the closest possible public buildings to . . . campus[es]," honoring the Secretary's interpretation and not placing those locations on campus itself, *id*. at 74, they cannot cure the inequality of access that is the natural consequence of the Secretary's interpretation, *see generally id*.; *see also id*. at 74 ("If . . . election administrators set out to minimize variation in travel times across neighborhoods . . . when choosing [EV] locations under the current interpretation of Florida law, they face a significant constraint in communities with large public universities," due in part to the fact that "[t]hese institutions often take up large amounts of real estate, and include large, dense populations of young voters that do not have access

to automobiles, often . . . where public transportation is sparse."). *Cf. Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 974 (D. Nev. 2016) (noting "considerable body of research that supports the intuitive notion that the greater the distance a voter has to travel to the polls, and the more impediments to travel, the less likely that voter is to vote").

Nor is it an answer to say that young voters can simply vote by mail ("VBM") or on Election Day. In Florida, young voters' VBM ballots are rejected at a far greater rate than other age groups, with voters aged 18-21 roughly eight times more likely to be disenfranchised than voters over 65. Ex. B at 12-13; *see also* Newsome Decl. ¶ 13. As for Election Day, younger voters often face the longest wait times in the State. Ex. B at 16.[13] Younger voters are also significantly more likely to have provisional ballots rejected. Ex. B at 14-15. Further, the fact that Election Day sites are often located on campuses does not mean that all of a school's student voters can vote there: unlike EV, when a voter can cast a ballot at any site in the jurisdiction, on Election Day, a voter can only vote at their assigned precinct; students living off-campus are unlikely to be assigned to the on-campus precinct, and if they cast a provisional ballot there, it will be rejected. *See, e.g.*, Ex. B at 14-15, 19-20; Boatner Decl. ¶¶ 6-7; Newsome Decl. ¶ 11; Rmus Decl. ¶ 14; *see also* Roy Decl. ¶ 7 (explaining because they live off campus and do not have a

---

[13] The three precincts with Election Day sites on UF's campus have some of the most registered voters of any of Alachua County's 63 precincts, and Election Day voters at Reitz Union faced some of the County's longest lines in 2016. Ex. B at 16-17; *see also* Boatner Decl. ¶ 5 (observed long lines at Reitz Union during 2016 primary and general); Sancho Decl. ¶¶ 7-8 (lines at FSU Election Day voting site typically disproportionately long).

car, it takes them approximately 40 minutes to an hour each way by bus to travel to their Election Day voting site). Their unfamiliarity with the voting system heightens the possibility that student voters will be disenfranchised as a result. *See* Ex. B at 14-15; Ex. P at 9.

Making EV accessible is one of the best ways to combat these burdens. *See* Ex. P at 18. Because the Secretary's interpretation bars that possibility, student and civic organizations and campaigns have tried to help student voters access EV, but as worthwhile and important as these efforts are, they cannot solve the problem. For example, in November 2016, Newsome worked with UF and AGF to run a shuttle program to transport students to the nearest EV site. Newsome Decl. ¶ 8; AGF Decl. ¶¶ 16-17. That program was only able to help approximately 100 students, and it came with considerable temporal costs. Newsome Decl. ¶ 8. Further, a number of students with a need were unaware it existed. *Id*. ¶ 9. Also in 2016, Jethwani worked with the Democratic Party to coordinate rides for UF students to EV at the SOE's office. Jethwani Decl. ¶ 8. That program took enormous effort, including signing up voters, finding willing drivers, and coordinating everyone's schedules. *Id*. ¶¶ 8-12. Each car could only transport—at most—four voters at a time; still, the interest was so great, that the influx of students caused lines at the SOE's office. *Id*. ¶¶ 9, 12. That program helped hundreds of students vote, but that was still only a small fraction who could have benefited. *Id*. ¶¶ 8-10; s*ee also* Boatner Decl. ¶ 11; Ex. P at 12.

In contrast, offering EV on campuses would lower the costs of voting for a much larger group of voters and in a more significant way. *See* Ex. B at 19-20;

Adams Decl. ¶¶ 15-16; Boatner Decl. ¶¶ 14-15, 21; Jethwani Decl. ¶¶ 13, 17-18; Newsome Decl. ¶ 16; Roy Decl. ¶¶ 9, 11; Ex. P at 18. It would not only reduce transportation, time, and informational costs, but would allow students more flexibility in deciding when to vote, so that, if they encounter long lines, there is less risk they are disenfranchised because they cannot wait. Ex. B at 19-20; *see also* Boatner Decl. ¶¶ 5, 14. Offering on-campus EV would also help ensure that young voters are not disparately disenfranchised because of rejected VBM or provisional ballots. Ex. B at 11-15. And it may help address Florida's traditionally depressed young voter turnout and shorten lines at on-campus voting sites on Election Day. Ex. B at 7-8; Boatner Decl. ¶¶ 5, 14; Sancho Decl. ¶ 10.

### d. No State Interest Justifies the Burdens on Voting Rights

The Opinion offers only one justification for its conclusion—rejected legislation—but, that cannot outweigh the burdens imposed on Plaintiffs' right to vote. Because the resulting burdens are severe, the restriction "must be narrowly drawn to advance a state interest of compelling importance" to pass constitutional scrutiny, and it is not. *Norman*, 502 U.S. at 280. Further, if some lesser level of scrutiny applied, the restriction would still be unconstitutional. Indeed, it is so "illogical [and] irrational" that it is unlikely that it could even survive rational basis review. *FDP*, 2016 WL 6090943, at *7.

*First*, the Opinion conflicts with the Statute, which provides no basis for excepting college or university-affiliated facilities from its expansive and unlimited plain language. *See* Fla. Stat. § 101.657(1)(a) ("The supervisor[s] may . . .

26

designate *any* . . . ."). If the Legislature intended such a carve out, it would have been simple as a textual matter (though problematic as a constitutional one, as the burdens on voters in impacted communities would be the same). Further, the Statute explicitly requires SOEs to designate sites "geographically . . . to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable," *id.*; yet, the Secretary effectively bars SOEs in communities with significantly large higher educational institutions from complying with this mandate. *See* Ex. I at 74.

*Second*, the legislative history neither compels nor supports the restriction. The Opinion purports to be supported by: (1) unenacted legislation considered contemporaneously with HB7013; and (2) an unenacted amendment to HB7013. Ex. A at 2. But even assuming it could be appropriate to "interpret" a statute whose plain text is unambiguous by reference to these sources, a cursory review of the Opinion's citations demonstrates that this justification is not well-founded: each was a proposal to, in some fashion, permit the use of *any* facility associated with a college or university as an EV site. *See supra* at II.B. If those bills had become law, SOEs could have conceivably designated campus mailrooms, or snack bars, or the dorm rooms of residential assistants as EV sites.

If anything, the absence of an explicit carve-out of college- and university-affiliated facilities proves the opposite. It also makes sense in context and as policy: why, in expanding EV to address long lines, would the Legislature carve out a broad subset of otherwise permissible facilities, precisely in those places that have historically hosted some of the longest lines? Moreover, in many

27

communities, the vast majority of facilities meeting HB7013's expanded definition of permissible EV sites are those affiliated with colleges or universities.

Because the legislative history is the only rationale offered by the Opinion, the Court's inquiry can stop there. *See Anderson*, 460 U.S. at 789 (holding court "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule"). But a prohibition on on-campus EV is also irrational as a matter of elections administration. In effect, it "requires election administrators to avoid 1) the most densely populated neighborhoods . . . and 2) the areas with the least access to automobiles." Ex. I at 13. Further, providing SOEs with the flexibility to offer on-campus EV will relieve the strain of having more voters at limited locations and on Election Day. *See* Sancho Decl. ¶¶ 2, 10; *see also OFA*, 697 F.3d at 433; *Common Cause Ind.*, 2018 WL 1940300, at *16; Ex. C at 4-5. Finally, even if allowing on-campus EV would impose some monetary burden, this would be insufficient to justify burdening voting rights as here. *See OFA*, 697 F.3d at 436 (finding burden on voting rights "outweighs any corresponding burden on the State, which has not shown that local boards will be unable to cope with three extra days of [EV]"); *Common Cause Ind.*, 2018 WL 1940300, at *17 (rejecting argument that avoiding "the [monetary] cost and administrative headache that [satellite EV] would bring," as not sufficiently weighty to justify burden on voting rights); *see also* Sancho Decl. ¶ 12 (his office "was generally able to obtain or reallocate funding . . . to open and staff additional voting sites, as necessary" and he "would anticipate that sufficient funding would be available to open" an on-campus EV site); Ex. J at 2 (resolving to "favorably

consider funding requests to support" an on-campus EV site in 2018). This is particularly so, where Plaintiffs do not seek an injunction requiring SOEs to exercise their discretion in a particular way, but instead to require the Secretary to untie their hands, so they can properly assess the needs of *all* voters, including those living in communities dominated by college- and university related facilities. *Cf.* Ex. C at 5 (recognizing "one size does not fit all" for EV in Florida, and "[i]f given the flexibility to choose more and larger sites, [SOEs] could more effectively select [EV] locations that meet the geographic needs of their voters and reduce the wait times at those locations").

### 2.    The Twenty-Sixth Amendment

Plaintiffs are also likely to prevail on their claim that the Secretary's interpretation evinces an invidious intent to discriminate against young voters on account of age, in violation of the Twenty-Sixth Amendment. The intent to discriminate is evident on the face of the Opinion, because it (1) it targets *only* those communities where young voters are disproportionately found, (2) finds no support in the Statute or legislative history, and (3) serves no discernable purpose, other than to suppress the youth vote.

The Twenty-Sixth Amendment forbids abridging or denying the voting rights of young voters by singling them out for disparate treatment. *See Jolicoeur v. Mihaly*, 5 Cal.3d 565, 575 (1971); *see also Ownby v. Dies*, 337 F. Supp. 38, 39 (E.D. Tex. 1971) (holding Twenty-Sixth Amendment violated by statute that required heightened standard for individuals under 21 to establish residency for

voting); *U.S. v. Texas*, 445 F. Supp. 1245, 1257 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979) (same); *Worden v. Mercer Cty. Bd. of Elections*, 61 N.J. 325, 348 (1972) (same). Although commonly known as the Amendment that lowered the voting age to 18, its text is far more expansive and reflects that its goal "was not merely to empower voting by our youths but . . . *affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers*, so that their vigor and idealism could be brought within rather than remain outside lawfully constituted institutions." *Worden*, 61 N.J. at 345 (emphasis added). It has "particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825). Consistent with this history, the Twenty-Sixth Amendment tracks language of the Fifteenth, which forbids intentional efforts to deny or abridge the right to vote on account of race. *Id.*; *compare* U.S. Const. amend. XXVI, *with* U.S. Const. amend. XV. Thus, a state similarly cannot constitutionally target young voters with special burdens that make it harder for them access the franchise.[14]

The Secretary's interpretation deducts such a finding on its face, because it is "imposed solely or with marked disproportion on the exercise of the franchise by

---

[14] *See Rice v. Cayetano*, 528 U.S. 495, 512 (2000) ("'If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be.'") (quoting *U.S. v. Reese*, 92 U.S. 214, 218 (1876)); *Veasey v. Abbott*, 830 F.3d 216, 253 (5th Cir. 2016) (in addition to prohibiting the denial of the right to vote, "the Fifteenth Amendment . . . also explicitly prohibit[s] abridgement of the right to vote"), *cert. denied*, 137 S. Ct. 612 (2017).

the benefactors of that amendment." *Walgren v. Bd. of Selectmen of Town of Amherst*, 519 F.2d 1364, 1367 (1st Cir. 1975); *see also* 3 Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW § 18.4 (10th ed.2012) (When a law establishes an impermissible classification on its face, "by its own terms classif[ing] persons for different treatment . . . there is no problem of proof and the court can proceed to test the validity of the classification by the appropriate standard."). The Secretary singles out "college- or university-related facilities," and *only* those facilities, as off-limits for EV sites, even when they otherwise clearly qualify as an authorized site as listed in the Statute.

This prohibition can only rationally be understood as a proxy for targeting young voters, and it violates the Twenty-Sixth Amendment on its face. *Cf. Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015) (rejecting challenge to voter ID law that forbid use of student IDs, but implying that a law that imposes a "unique burden" on student voting rights might violate the Twenty-Sixth Amendment). This is particularly apparent, where neither the Statute's plain language, nor (as the Opinion claims) its legislative history, provides support for the restriction. *See supra* at II.B. If anything, the text and history demonstrate that the Legislature intended to *expand* access to EV and *increase* the discretion of SOEs to respond to the particularized needs of voters in their communities by distributing sites geographically "to provide *all* voters in the county an *equal opportunity* to cast an early ballot, insofar as is practicable." Fla. Stat. § 101.657(1)(a) (emphases added). *See supra* at II.A, II.B; *see also* Mot. to

Dismiss at 2, 4; Ex. C at 5. Yet, the Secretary effectively *prevents* SOEs from doing so, but *only* in communities with significant student populations.

The Secretary's discriminatory intent was readily apparent to legislators and elections officials alike, who publicly challenged the interpretation. For example, the Polk County SOE, stated that the interpretation "is strategic," and meant to address concerns "about young people voting." Ex. Q. State Senator Jeff Clemens said, "The question needs to be asked: Why are we discouraging young people from voting? The answer is, it's political." Ex. G. Former Republican Governor Charlie Crist stated, "[i]t's pretty clear . . . they don't want young people to be voting, and there's no better way to illustrate that than on a university campus." Ex. R. State Representative Clovis Watson said the interpretation gave the impression the Governor, "may be attempting to thwart the student vote at one of our state's most important educational institutions." Ex. N. And, the Secretary, an elected Republican, had strong motivation to do so: as discussed, Florida's potential youth vote is substantial, its numbers so significant that a relatively small increase in turnout could impact the outcomes of elections, its make-up more racially diverse than that of older voters, and its members have increasingly voted Democratic. *See* Ex. P at 12-13. Indeed, after the Republican-controlled Legislature and Governor Scott moved to severely curtail early voting in 2011, the chair of the Republican Party admitted that the "Republican Party, the strategists, the consultants . . . firmly believe that early voting is bad for Republican Party candidates." Ex. B at 9.

To succeed on this claim, Plaintiffs need not show that the Secretary was hostile to students, only that he intended to make it more difficult for them to access EV. *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473 n.7 (11th Cir. 1999) ("[I]ll will, enmity, or hostility are not prerequisites of intentional discrimination."); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (Where a challenged policy overtly and expressly singles out a protected group for disparate treatment, "a plaintiff need not prove the malice or discriminatory animus of a defendant"). Therefore, the stark differential treatment of the Opinion, its irrational basis, its demonstrated disparate impact, and that the most logical explanation is that it was intended to make it more difficult for young voters, in particular college and university students, to vote, is more than enough to establish that Plaintiffs are likely to succeed on this claim, as well.[15]

---

[15] Even if the Secretary's interpretation were not discriminatory on its face, Plaintiffs would still be likely to succeed on this claim under the *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), framework, pursuant to which courts consider whether a defendant's facially-neutral actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a "clear pattern, unexplainable on grounds other than" discriminatory ones, (2) "[t]he historical background of the decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant "legislative or administrative history." *Id.* at 266-68. As discussed, the expert analyses demonstrate that the Secretary's interpretation specifically, severely, and disproportionately burdens young voters, the history of the decision—including that it was levied in response to efforts by UF students to obtain equal access to EV and is at odds with the history of the Statute, which even the Secretary admits was meant to *expand* access to EV, *see* Mot. to Dismiss at 2, 4—belies the only justification offered. It also represents the *only* limitation the Secretary has read into the Statute.

**B.      Plaintiffs Will Suffer Irreparable Injury**

Absent an order enjoining the Secretary's enforcement of his interpretation of the Statute, Plaintiffs will suffer irreparable injury. This Court has recognized that deprivation of the right to vote constitutes irreparable injury. *See FDP*, 2016 WL 6090943, at *8 ("[I]rreparable injury is presumed when '[a] restriction on the fundamental right to vote' is at issue.") (quoting *OFA*, 697 F.3d at 436); *see also League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted). And, at least two federal courts have specifically found that burdening the right to vote by providing less access to EV to some voters than others constitutes irreparable injury. *See OFA*, 697 F.3d at 436, 437; *Common Cause Ind.*, 2018 WL 1940300, at *20.

Moreover, the irreparable injury that the Plaintiffs individually are likely to suffer is well supported. For example, without the possibility of EV on campus, Roy, who does not own a car and must take two buses and travel up to one hour each way to get to their Election Day polling location. Roy Decl. ¶¶ 7, 10. Newsome, Jethwani, Boatner, and Rmus will also find it difficult to travel to their nearest EV sites; in a prior year, Newsome had to pay for an Uber to do so. Newsome Decl. ¶¶ 10, 14-15, 17; Jethwani Decl. ¶¶ 17-18; Boatner Decl. ¶¶ 19-20; Rmus Decl. ¶¶ 12-13; Roy Decl. ¶¶ 10-11.

Although Adams will be voting for the first time and is unsure where his assigned polling location is, even assuming he is assigned to an on-campus Election-Day site, he has a busy class and teaching schedule and is likely to

encounter disproportionate and substantial wait times if he attempts to vote then. *See* Adams Decl. ¶¶ 8, 11-14; Sancho Decl. ¶ 8. If the SOE were free to place an EV site on FSU's campus, that would help alleviate the types of significant burdens on voting (and, indeed, elections administration) regularly experienced there on Election Days past. Sancho Decl. ¶ 10. Further, if Adams has the choice to vote EV on campus, he will be able to choose a time when his schedule is flexible, rather than being limited to a single day when he may not have any control, making it less likely that he will be disenfranchised as a result. Adams Decl. ¶¶ 13, 16; *see also* Ex. B at 19-20; Boatner Decl. ¶¶ 5, 15.

Access to on-campus EV, particularly to allow for flexibility and to help manage lines, will be crucially important in the upcoming November 2018 election, because the ballot will be exceptionally long, proposing *thirteen* constitutional amendments. *See* Tingum Decl. ¶ 15; Newsome Decl. ¶ 12. As a result, Election Day lines are expected to be long. *See* Ex. B at 19; *see also* Tingum Decl. ¶ 15; Newsome Decl. ¶ 12. These problems will only be exacerbated if, as many presently anticipate, the 2018 midterms have an especially high youth turnout. Ex. B at 19.

The League will directly suffer harm to its organizational mission of encouraging informed and active participation of citizens in government, including young citizens in Florida, *and* a substantial number of its members will suffer injury to their voting rights. LOWV Decl. ¶¶ 3, 14-15. Similarly, AGF's organizational mission, as well as the voting rights of the student voters that AGF serves to champion and protect will be injured. AGF Decl. ¶ 18. Not only will

AGF's Student Ambassadors and Puffin Democracy Fellows themselves be burdened, they will need to invest significant resources that could have otherwise been used to educate student voters to assist them in accessing EV, including through programs that require enormous effort. *Id.*; Tingum Decl. ¶ 11-13; Roy Decl. ¶ 3; *see also* Newsome ¶¶ 8-10; Jethwani ¶¶ 7-11.

Further, the individual Plaintiffs are young voters who suffer the burdens described as a result of their membership in a class of voters intentionally targeted by the Opinion. Thus, Plaintiffs have also demonstrated irreparable harm with regard to their Twenty-Sixth Amendment claim. *See, e.g.*, *NAACP v. McCrory*, 831 F.3d 204, 238 (4th Cir. 2016) (citing *Hunter v. Underwood*, 471 U.S. 222, 231 (1985); *Anderson v. Martin*, 375 U.S. 399, 400-04 (1964)) ("When discriminatory intent impermissibly motivates the passage of a law, a court may remedy the injury—the impact of the legislation—by invalidating the law."); *cf. Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) (holding "because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury").

Finally, it is no answer to argue, as the Secretary appears to assert in his Motion to Dismiss, that Plaintiffs cannot establish irreparable harm because, if the Court enters the requested injunction, the SOEs may decide, for different reasons, other than the Secretary's current prohibition, not to offer on-campus EV. *See* Mot. to Dismiss at 17-19. First, there is significant evidence that, at least with regard to UF and FSU, the likely result will be on-campus EV. *See supra* at II.B; Sancho

Dec. ¶¶ 10-12. But even if that were not the case, the Sixth Circuit rejected a virtually identical argument in *OFA*, where the preliminary injunction "return[ed] discretion to local boards of elections" to allow access for *all* Ohio voters to EV during the last three days before the election. *See* 697 F.3d at 437; *see also id.* ("[T]he State is not affirmatively required to order the boards to be open for early voting. . . ."). Other courts have similarly found that, where, as here, it is the defendant's policies that force a third party to treat the plaintiffs in a way that causes them irreparable harm, this element of the standard for a preliminary injunction is met, even if the result may not be total remediation of the plaintiffs' injuries. *See, e.g.*, *Doe v. Miller*, 573 F. Supp. 461, 468 (N.D. Ill. 1983).

## C.    The Balance of the Equities and Public Interest Favor an Injunction

As this Court has held, "[a]ny potential hardship [to the state] imposed by providing the same opportunity . . . for [] voters pales in comparison to that imposed by unconstitutionally depriving those voters of their right to vote." *FDP*, 2016 WL 6090943, at *8. Here, on one side of the scale are Plaintiffs, their membership and the voting constituencies they exist to service, as well as hundreds of thousands of student voters, whose right to vote is severely burdened. On the other side, there is the Secretary, who would only be restrained from enforcing his unconstitutional interpretation of the Statute. As the Secretary himself has emphasized, the ultimate decision of whether to offer EV on campus (and any consequent burdens) will fall to SOEs. *See* Mot. to Dismiss at 17-19. Thus, there are admittedly no harms to balance on the Secretary's side. Moreover, courts

routinely reject arguments that moderate administration burdens can outweigh unconstitutional burdens on the right to vote. *See, e.g.*, *Common Cause Ind.*, 2018 WL 1940300, at *21; *OFA*, 697 F.3d at 436. Indeed, to the contrary, providing SOEs with the flexibility to offer on-campus EV may *relieve* election workers of some current strains. *See OFA*, 697 F.3d at 433; *Common Cause Ind.*, 2018 WL 1940300, at *16; *see also* Sancho Decl. ¶¶ 8-10. And, at least in the case of UF, the County has already announced that it will favorably consider any funding requests to place an EV site on campus in 2018. Ex. J at 2.

For the reasons discussed, issuing the requested injunction would be in the public interest. Indeed, "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition," including specifically when at issue is the right to vote. *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights . . . serve[s] the public interest almost by definition," and "making it easier for citizens to register and vote—promotes democracy."); *FDP*, 2016 WL 6090942, at *8. Further, the public interest "is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful" and "favors permitting as many qualified voters to vote as possible," including specifically in the context of EV restrictions. *OFA*, 697 F.3d at 437; *Common Cause Ind.*, 2018 WL 1940300, at *21. Thus, here, ensuring that SOEs are not unconstitutionally restricted by the Secretary in their ability to provide on-campus EV to voters would clearly serve the public interest.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue the requested preliminary injunction as set forth in the Motion. *See* Pls.' Mot. for Preliminary Injunction at 1-2.

## LOCAL RULE 7.1(F) CERTIFICATION

Counsel for Plaintiffs, Frederick Wermuth, Esquire, certifies that this memorandum contains 9,923 words.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 21, 2018 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated:  June 21, 2018                    By: /s/ Frederick S. Wermuth
                                         Frederick S. Wermuth
                                         Florida Bar No.: 0184111
                                         KING, BLACKWELL, ZEHNDER
                                                 & WERMUTH, P.A.
                                         P.O. Box 1631
                                         Orlando, FL 32802-1631
                                         Telephone: (407) 422-2472
                                         Facsimile: (407) 648-0161
                                         fwermuth@kbzwlaw.com

                                         Marc E. Elias
                                         Elisabeth C. Frost*
                                         Amanda Callais*
                                         Jacki L. Anderson*
                                         John M. Geise*
                                         Alexi M. Velez*
                                         PERKINS COIE LLP
                                         700 Thirteenth St., N.W., Suite 600
                                         Washington, D.C. 20005-3960
                                         Telephone: (202) 654-6200
                                         Facsimile: (202) 654-9959
                                         melias@perkinscoie.com
                                         efrost@perkinscoie.com
                                         acallais@perkinscoie.com
                                         jackianderson@perkinscoie.com
                                         jgeise@perkinscoie.com
                                         avelez@perkinscoie.com

                                         *Counsel for the Plaintiffs*
                                          **Admitted Pro Hac Vice*