UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., THE ANDREW
GOODMAN FOUNDATION, INC.,
MEGAN NEWSOME, AMOL
JETHWANI, MARY ROY a/k/a JAMIE
ROY, DILLON BOATNER,
ALEXANDER ADAMS, AND ANJA
RMUS,

    Plaintiffs,

v.

KENNETH DETZNER, in his official
capacity as the Florida Secretary of State,

    Defendant.

Case No. 4:18-cv-00251-MW-CAS

**RESPONSE TO REQUEST FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

This Court should deny the Plaintiffs' request for a preliminary injunction because the request contravenes well-established principles of federalism.[1]   The Plaintiffs challenge only an advisory opinion providing an *interpretation* of state law.   They argue that the interpretation is "directly contrary to th[e] plain, unqualified, and unambiguous language" of § 101.657(1)(a) of the Florida Statutes.

---

[1] This Response refers to the Plaintiffs collectively as "Plaintiffs," Florida Secretary of State Kenneth Detzner as "Secretary," and filings before this Court as "ECF" followed by the docket number and pincite.   While the Plaintiffs refer to the 2014 Advisory Opinion issued by the Director of the Division of Elections as the "Secretary's interpretation and application," ECF 16 at ¶ 1, this filing refers to it as the "Division's 2014 Advisory Opinion" for the sake of correctness and clarity.

ECF 23-1 at 1. Yet the Plaintiffs filed their case in federal district court. The Plaintiffs have now put this Court in a position of interpreting *state* law and then requiring *state* officials – the Secretary and 67 separate constitutional officers – to follow that *federal* interpretation of *state* law. The U.S. Supreme Court's decision in *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984) and the Eleventh Circuit's decision in *Hand v. Scott,* 888 F.3d 1206, 1213-14 (11th Cir. 2018) caution this Court against granting the relief that the Plaintiffs seek. Abstention is appropriate. A preliminary injunction is not.

The Plaintiffs also fail to satisfy any of the four requisites for preliminary injunctive relief. Gaps and inconsistencies in the Plaintiffs' declarations aside, the salient facts are these: (1) all of the Plaintiffs who wanted to vote early, did vote early in recent elections; (2) there have historically been early voting sites approximately 1 mile from the campuses of the University of Florida and Florida State University, the only two universities the named Plaintiffs attend; (3) it takes mere minutes to walk or bike 1 mile; (4) parking on-campus is difficult for students, faculty, employees, and the general public alike; (5) supervisors of elections must select early voting sites accessible to all *registered* voters within a county – most of whom do *not* live on-campus; (6) students have a minimum of 8 days (and up to 14 days depending on the local supervisor) to vote at an early voting location of their choice; (7) students remain free to vote early by mail or on

2

Election Day including, for many students, at on-campus precinct locations; and (8) the Division of Elections – through its 2014 Advisory Opinion – is simply interpreting and following *state* law concerning early voting sites *after* being asked to provide guidance.  At most, the alleged burden on young voters is *de minimus* and can be overcome with reasonable effort.  There is no constitutionally cognizable burden requiring relief, no likelihood for success on the merits, and ultimately no irreparable harm.

The equities and the public interest similarly caution against a preliminary injunction.  The Plaintiffs filed their lawsuit over 4 years *after* the Division issued its 2014 Advisory Opinion.  Put another way, the Plaintiffs filed their lawsuit only weeks before Florida's 67 supervisors of elections must finalize early voting locations.  The relief the Plaintiffs now seek would inject unnecessary confusion and uncertainty into the current election cycle because of the Plaintiffs' own 4-year delay in bringing this lawsuit.

## II.    STANDARD FOR PRELIMINARY INJUNCTION

"The purpose of a preliminary injunction is merely to preserve the relative position of the parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981).   "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites."  *Keister v. Bell,* 879

F.3d 1282, 1287 (11th Cir. 2018) (collecting citations).  The four requisites the Plaintiffs "must clearly establish" are as follows:  "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the [P]laintiff[s] outweighs the potential harm to the [D]efendant; and (4) that the injunction will not disservice the public interest."  *Id.* (citations omitted).  Notably, the rule governing preliminary injunctions "does not place upon the non-moving party the burden of coming forward and presenting its case against a preliminary injunction."  *Alabama. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1136 (11th Cir. 2005) (quoting *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70,* 415 U.S. 423, 442 (1974)).

## III.   ARGUMENT

The Plaintiffs' request for a preliminary injunction contravenes well-established principles of federalism.  The Plaintiffs also cannot satisfy any of the four requisites for preliminary injunctive relief.

### A.    *A federal court cannot compel state officials to follow a federal court's interpretation of state law.*

The Plaintiffs insist that the Division's 2014 Advisory Opinion is "directly contrary to th[e] plain, unqualified, and unambiguous language" of § 101.657(1)(a) of the Florida Statutes.  ECF 23-1 at 1.  So the Plaintiffs ask this Court to preliminarily enjoin the Secretary from "implementing or enforcing" this *state* statutory provision "in any way that prohibits or discourages" the use of on-

campus early voting sites.  ECF 23 at 2.  The Plaintiffs further ask that this Court issue an order "requiring the Secretary to issue a directive to the supervisors of elections" informing these 67 separate, state constitutional officials that the Division incorrectly interpreted a provision of *state* law.  *Id.*

But a federal court cannot compel state officials to follow a federal court's interpretation of state law.  As the U.S. Supreme Court explained in *Pennhurst*:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Pennhurst,* 465 U.S. at 106.  The Eleventh Circuit recently reiterated this point, emphasizing that "the district court cannot enjoin Florida to follow the district court's interpretation of Florida's own constitution."  *Hand,* 888 F.3d at 1213-14.

To be sure, an unsettled interpretation of state law lies at the heart of this case.  The City of Gainesville sought an interpretation of state law from the Division.  ECF 16 at ¶ 56.  The Division provided an interpretation of state law. *Id.*  Although Florida state courts have not interpreted the law, the Plaintiffs argue that the statute is clear, and now ask that this Court declare that the Division's interpretation is incorrect. *Id.* at ¶¶ 4, 17-22, 51-60, 63, 94; ECF 23-1 at 1.  But the state courts are in a better position to interpret (and then enforce) state law.  The

resolution of this interpretive question on narrow, state statutory interpretation grounds would avoid the need to address any constitutional issues. *See, e.g., Bellotti v. Baird*, 428 U.S. 132, 184 (1976) ("It is sufficient that the statute is susceptible of the interpretation offered by appellants, and we so find, and that such an interpretation would avoid or substantially modify the federal constitutional challenge to the statute . . . ."); ECF 20 at 9-10, 12-17 (noting the deeply rooted constitutional doctrines intended to avoid constitutional grounds where possible and abstain where necessary).

Abstention (or even outright dismissal) makes sense.[2]   *Id.*   A preliminary injunction does not.   *See Pennhurst,* 465 U.S. at 106; *Hand,* 888 F.3d at 1213-14.

## B.      *The Plaintiffs cannot satisfy the four requisites for preliminary injunctive relief.*

The request for a preliminary injunction also falls short of the four-part test for such relief.  The Plaintiffs "must clearly establish" a likelihood for success on the merits, irreparable harm, a balance of the equities that favors them, and that their request would not do disservice to the public interest.  *Keister,* 879 F.3d at 1287.  They fail to clear any of these high hurdles.

---

[2] The Plaintiffs argue in their response to the Secretary's request for abstention that the Secretary "relies entirely on inapplicable precedent from other Circuits."  ECF 42 at 2.  That is not true.  The Secretary's request for abstention relies on *Railroad Commission of Texas v. Pullman Company,* 312 U.S. 496 (1941).  This U.S. Supreme Court precedent binds courts within the Eleventh Circuit.  There is also no bright-line rule prohibiting abstention in election-related cases especially where a narrow, state law grounds for relief is available.

### 1.   *Likelihood for Success and Irreparable Harm*

The Plaintiffs analysis of their likelihood for success and their claim of irreparable harm rests on the false premise that the Division's 2014 Advisory Opinion imposes a severe burden on a college student's right to vote and thus fails the *Anderson-Burdick* test.  *See* ECF 23-1 at 18-26, 34-37.  Not so.

First, it is prudent to again highlight what Plaintiffs challenge – an *advisory opinion*.  The 2014 Advisory Opinion is limited in scope.  Section 106.23 of the Florida Statutes says so.  It provides that "[t]he opinion, until amended or revoked, shall be binding on any person or organization who sought the opinion or with reference to whom the opinion was sought [i.e., the election official, candidate, political party, party committee, or other agent seeking the opinion], unless material facts were omitted or misstated in the request . . . ."  § 106.23(2), Fla. Stat.  Nothing in any of the Plaintiffs' declarations alters this statutory provision.  And contrary to Plaintiff's assertions, a four-year-old advisory opinion, requested by a city attorney, that is binding only on the requester, regarding one voting location, does not present a cognizable constitutional concern.  *Cf. Sullivan v. Div. of Elections*, 718 F.2d 363, 364-65 (11th Cir. 1983) (noting that  the state appellate court dismissed a petition for review of an advisory opinion issued by the Division because the state appellate court lacked subject matter jurisdiction to review such "an advisory opinion").

Second, assuming the Division's interpretation of state law is correct, § 101.657 does not impose an undue burden on Plaintiffs' ability to cast a ballot. Because *Anderson-Burdick* calls for a holistic, flexible inquiry, ECF 20 at 11-12, the Secretary asks this Court to consider the following:

- By their own admission, *all* of the individual Plaintiffs who wanted to vote early in the past, voted early.  ECF 29 at ¶ 6, 7; ECF 30 at ¶ 7; ECF 31 at ¶ 5; ECF 32 at ¶ 5, 6. One even voted by mail.  ECF 26 at ¶ 9.

- Plaintiffs offer no data demonstrating that there were students who wanted to vote early but could not because of the alleged burden imposed by traveling off campus.

- Again by their own admission, *all* of the named Plaintiffs had early voting sites about 1 mile from their campuses.  ECF 16 ¶ 5, 63; ECF 25 at ¶ 14; ECF 29 at ¶ 18; ECF 31 at ¶ 13.

- The statutorily required Campus Master Plans/Comprehensive Plans for the University of Florida and Florida State University anticipate that these campuses and the surrounding areas are and will remain pedestrian and bicycle friendly.  Exh. 1 (Excerpt from UF Campus Master Plan) and Exh. 2 (Excerpt from the FSU Campus Master Plan).  The University of

8

Florida's Plan even includes walking distance analysis; the Alachua County Supervisor of Elections Office, just north of University Avenue and East of NW 13th Street, is within walking distance.   Exh. 1.    Walking and biking are thus reasonable modes of transportation for students wishing to vote early.  *See* Exh. 1 and Exh. 2.

- Whether on foot or on a bicycle, it takes mere minutes to cover the approximately 1 mile from the University of Florida and Florida State University Campuses.  Specifically:

*It takes 24 minutes to walk from the University of Florida Campus (near the business school and prominent cluster of classrooms) to the mandatory early voting site at the Alachua County Supervisor of Elections Office.*



Exh. 3 at 1; *see also* Exh. 6 (Matthews Declaration) at ¶8.

*It takes <u>8 minutes to bike</u> from the University of Florida Campus (near the business school and prominent cluster of classrooms) to the <u>mandatory</u> early voting site at the Alachua County Supervisor of Elections Office.*



Exh. 3 at 2; *see also* Exh. 6 (Matthews Declaration) at ¶8.

It takes _16 minutes to walk_ from the College of Criminology, College of Music, Ruby Diamond, and the popular Landis Green to the _historically available_ early voting site at the Leon County Courthouse.



Exh. 3 at 3; _see also_ Exh. 6 (Matthews Declaration) at ¶8.

It takes _5 minutes to bike_ from the College of Criminology, College of Music, Ruby Diamond, and the popular Landis Green to the _historically available_ early voting site at the Leon County Courthouse.



Exh. 3 at 4; *see also* Exh. 6 (Matthews Declaration) at ¶8.

- All of the named Plaintiffs have had (and will have) at least 8 days (and up to 14 days) within which to cover the approximately 1 mile from their campus to an in-person early voting site for the upcoming primary and general elections. § 101.657, Fla. Stat.  Like all voters, this gives the Plaintiffs ample opportunity to make time to vote early despite the complexities of daily life.

- All of the named Plaintiffs have had (and will have) an opportunity to vote by mail.  § 101.62, Fla. Stat.  And again, one of the named Plaintiffs did in fact vote by mail.

- All of the named Plaintiffs have had (and will have) an opportunity to vote on Election Day.  Some of the named Plaintiffs actually voted on Election Day. ECF 29 at ¶ 6, 7; ECF 30 at ¶ 7; ECF 31 at ¶ 5; ECF 32 at ¶ 5, 6.  One of the Plaintiffs' own declarants concedes that Election Day voting is as popular for younger voters as early voting.  ECF 24 at 6 (approximately 40% for each).

- Section 101.657(1)(a) also does not explicitly prohibit the use of an on-campus site as a county's "wildcard" site if that "area

of the county . . . does not have any of the eligible early voting locations" and the site is "geographically located so as to provide all voters in that area with an equal opportunity to cast a ballot, insofar as is practicable." § 101.657(1)(a), Fla. Stat.

- It is highly unlikely that most of the *registered* voters in Alachua and Leon Counties are students who live on or near campus. Only 6.1% of the students at the University of Florida are from Alachua County, and only 10.8 % of the students at Florida State University are from Leon County. Exh. 4 (Excerpt from UF Fact-book) and Exh. 5 (Excerpt from FSU Fact-book). Put another way, 93.9% of University of Florida students are from out-of-state or other Florida counties, and 89.2% of Florida State University students are from out-of-state or other Florida counties. *See* Exh. 4 and 5. Out-of-state or out-of-county voters cannot vote at early voting sites in Alachua and Leon Counties without first changing their address of legal residence. § 101.045, Fla. Stat.

- Section 101.657(1)(a) contemplates that the local supervisors of elections will choose sites, and expend their limited funds, with all of a county's *registered* voters in mind.

- Considering a given county as a whole, and limited resources, it makes little sense to place one early voting site approximately a mile from another early voting site.

- Finally, as the Plaintiffs concede, parking on-campus is difficult for students, faculty, employees, and the general public alike. ECF 26 at ¶ 10; ECF 30 at ¶ 15. It follows that voting on campus would be difficult for all of the *registered* voters in Alachua and Leon Counties respectively.

Taken together, these facts cannot provide the basis of a severe burden on the right to vote. At best these facts show a *de minimis* burden on a college-student's right to vote that, in turn, provides no basis for relief under the *Anderson-Burdick* test (or any related test under the Twenty-Sixth Amendment). *De minimis* burdens such as these were not "an infringement of constitutional dimension" in *Arizona Libertarian Party v. Reagan,* 798 F.3d 723, 732 n.12, 732-36 (9th Cir. 2015) where the Ninth Circuit upheld an Arizona law and accompanying voter registration form that allowed some voters to simply check a box for their preference but required others to fill in a blank. Nor was a prohibition on the use of student identification cards a basis for relief in *Nashville Student Organizing Committee v. Hargett,* 155 F. Supp. 3d 749, 757-58 (M.D. Tenn. 2015) even though "allowing students to use these cards would make it easier for them to

14

vote."  And the district court in *One Wisconsin Institute v. Thomsen,* 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016) held that a photo voter identification requirement did *not* violate the constitutional rights of "younger voters" even though they were "more likely" to move and lack the necessary credentials.  This is because the "younger voters" could overcome the burdens "with reasonable effort."  *Id.*

It is (or should be) undisputed that Florida provides the named Plaintiffs an opportunity to vote early within an 8-14 day window at locations approximately 1 mile from their respective campuses *or* to vote by mail *or* to vote on Election Day. Thus, neither the *Anderson-Burdick* test nor any related test under the Twenty-Sixth Amendment provides constitutional relief.  And there is no irreparable harm to the right to vote – harm that "must be neither remote nor speculative, but actual or imminent" stemming from the Division's 2014 Advisory Opinion.  *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000); *see also id* at 1177 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone so far, however.").

The Plaintiffs' argument to the contrary relies on several declarations and reports that, due to the Plaintiffs' lack of diligence in pursuing their claims,  the Secretary has not had an opportunity to rebut through the use of his own experts. Unlike the Plaintiffs who had 4 years and 4 months since the issuance of the 2014 Advisory Opinion to prepare their case, the Secretary had 2 weeks to respond to

the Plaintiffs' request for preliminary injunction.  One of those two weeks included the week of the Fourth of July, making experts difficult to identify, hire, and prime to respond.  Nevertheless, on their face, the Plaintiffs' declarations and reports are replete with dubious assumptions and inconsistencies.

**_Daniel Smith_**, for example, a PhD in political science, makes sweeping conclusions that are not falsifiable and thus not credible.   Smith claims that burdens imposed on voting are more likely to impact turnout among younger voters – those 30 and under according to Smith, ECF 24-2 at 7; that younger voters prefer in-person early voting simply because approximately 40% of them used this method during the 2016 General Election, _id._ at 6; that Election Day voting on a Tuesday would interfere with a younger voter's other obligations, _id._ at 9; that younger voters face informational barriers and a general lack of knowledge about the voting process, _id._ at 13-14; and that younger voters "_might_ shy away from using the ostensible convenience of an absentee mail ballot" because county canvassing boards reject more of their vote-by-mail ballots.  _Id._ at 12 (emphasis added).  Smith concludes that "[t]urnout among young registered voters would likely be higher if there was greater access to early voting polling places that were more convenient for younger voters." _Id._ at 9.

Smith's ultimate conclusion is impossible to test.  It would require one to conduct identical elections with and without on-campus early voting (and with or

16

without the *near* campus early voting sites already available).  One would also have to account for other factors that might contribute to low turnout such as the popularity of candidates for the leading political parties among younger voters, the weather, and the length of the ballot.  Smith does none of this in his analysis.

Smith's other statements similarly serve as unsubstantiated conclusions. Smith says that early voting is particularly popular among younger voters because 40% of them voted early in 2016.  But just as many younger voters used Election Day voting (40%) and a significant percentage voted by mail (20%).  *Id.* at 9. These percentages hold for all age groups.  *Id.*  Smith assumes without explaining that only younger voters face unique burdens voting on Election Day because it is a Tuesday when in fact all voters face this burden and must make time in the workday (or school day) to vote.  Smith argues that young voters *might* shy away from voting by mail because more of their ballots are rejected.  But this makes no sense if, as Smith also claims, younger voters are ill-informed about the voting process.  Importantly, during the 2016 General Election, 96% of mailed ballots by those 18-21 were accepted; 96.5%% of mailed ballots by those 22-25 were accepted; and 97.2% of mailed ballots by those 26-29 were accepted.  *Id.* at 13. These percentages hardly inspire a crisis in confidence in the vote-by-mail process as Smith would have us believe.  And the rejection of a vote-by-mail ballot, without more, proves nothing without knowing *why* the ballot was rejected. Smith

17

does not argue, for example, that county supervisors of elections have rejected vote-by-mail ballots on a discriminatory basis such as age, or for any reason other than the faithful application of the ballot canvassing standards established by Florida law.

**Jonathan Rodden**, another PhD in political science, offers an opinion based on a study that is itself flawed.  ECF 24-9.  Rodden's study seeks to answer a simple question: "First, do individuals living in census block groups with large dormitory populations face longer travel times to and from existing early voting locations than those living elsewhere in the surrounding community?"  *Id.* at 14. He concludes that, in the aggregate, residents of dorm-intensive areas face travel times to early voting sites that are 20 minutes longer than residents of areas without dorms.  *See id.* at 73-74.

Rodden may provide an answer, but he asks the wrong question.   By focusing on travel times to early voting sites from dorm-intensive areas, Rodden can only provide conclusions related to a narrow subset of students.  Less than 18% of students live in dorms at each of Florida's largest universities.  ECF 24-9 at 20 (UF); 30 (FSU); 43 (UCF); 51 (USF).  Even among the minority of dorm-dwellers, some are not Florida residents.  Others, such as Plaintiff Boatner, are not registered to vote in the county where they attend school.  *See* ECF 26 at 1.

Rodden's study also does not account for the majority of young voters in Florida who do not utilize early voting.  Approximately 20% of voters under age 30, including Plaintiff Boatner, vote by mail. ECF 24-2 at 6-7.  Forty percent, including Plaintiff Rmus, vote on Election Day. ECF 24-2 at 6-7; ECF 31 at 2.

Even if we assume Rodden used a sound methodology, accurate data, and justifiable assumptions, his conclusions are still of limited probative value because they ignore the overwhelming majority of students who do not live in dorms[3] and even the majority of dorm-dwellers who do not vote early.  *See Democratic Nat'l Comm. v. Reagan*, 2018 U.S. Dist. LEXIS 77690, at *112 (D. Ariz. May 8, 2018) ("Dr. Rodden's . . . analysis paints an incomplete picture of the practical impact of [out of precinct] voting because the majority of Arizonans successfully vote by mail and therefore are unaffected by precinct requirements.").

Not only is Rodden's conclusion only applicable to a narrow subset of students, it is also marred by faulty assumptions.  Rodden calculates travel times from dorm-intensive areas by using a Google application that provides the fastest travel times to early voting locations by walking, public transit, and automobile. ECF 24-9 at 15-16.  There is no complete dataset regarding car ownership among

---

[3] Rodden might retort that his analysis also includes "surrounding neighborhoods with student-oriented rental housing."  ECF 24-9 at 18.  Nonetheless, the output of his analysis is a comparison "between matched 'dorm' and 'non-dorm' census places."  *Id.* at 72. In other words, even these surrounding neighborhoods still contain "a substantial dorm population."  *Id.* at 72.

dorm-dwellers at Florida's colleges and universities.[4]   Rodden uses available data and assumptions to arrive at a percentage of dorm-dwellers with access to a car. ECF 24-9 at 16-17.   His model assumes that students without access to a vehicle either walk or use public transit, whichever approach is faster. ECF 24-9 at 16. There are several issues with this approach.

First, Rodden has no direct data regarding car ownership of dorm residents. As a result, "Rodden's error rate is unknown" and this Court should be "mindful of [the] limitations" of his approach. *Democratic Nat'l Comm. v. Reagan*, 2018 U.S. Dist. LEXIS 77690, at *14-15 (D. Ariz. May 8, 2018).

Second, Rodden's methodology inflates travel times by leaving out several commonly used methods of transportation.   *See* ECF 26 at 3 (bikes and ride-hailing services are common modes of transport at the University of Florida); ECF 29 at 2 (rides from friends).   Rodden's failure to include more expedient modes of transport for students without cars skews his results.

Third, Rodden's methodology distorts travel times by lumping together all dorm-intensive areas, regardless of their distance to an early voting site.   *See* ECF 24-9 at 21.   For example, the dorm-dominated blocks identified by Rodden in Gainesville include both a block on the northeast side of campus containing

---

[4] *See*, *e.g.* ECF 24-9 at 29-30 (FSU did not provide data on car ownership among dorm-dwellers); 37 ("FIU does not provide information about the availability of cars for its dormitory residents."); 44 ("I have been unable to find any information about automobile access" for UCF).

Infinity Hall and a block on the far western side of campus containing Maguire Village.   The nearest early voting site is the Alachua County Supervisor of Elections Office, located to the northeast of campus. *See* ECF 24-9 at 21. According to Google Maps, it is a 1 mile walk from Infinity Hall to the Supervisor of Elections, and a 3.5 mile walk from Maguire Village.   Aggregating the travel times for residents of Infinity Hall with those in Maguire Village skews the aggregated travel time upwards.[5]

Even assuming Rodden's methodology is accurate, he did not take the necessary second step of calculating whether students would save any travel time if an early voting site was provided on campus. It is not at all clear that this is the case.  A few anecdotal examples illustrate this.

***Plaintiff Adams*** last lived at Landis Hall on the Florida State University Campus.   ECF 25 at 1.  Landis Hall is a one mile walk from the nearest early voting location at the Leon County Courthouse.   ECF 25 at 1.   According to Google Maps, moving the early voting site to the Donald L. Tucker Civic Center on campus would only shave 8 minutes off of Plaintiff Adams's walk.  Doing so

---

[5] This aggregative approach is not justified simply because the early voting site is located off campus.   Even if an early voting site was placed on campus, some students would face a greater travel time to the polling place than others. According to Google Maps, it is a 0.3 mile walk from Hume Hall to the Reitz Student Union, and a 1.5 mile walk from Maguire Village.   In other words, there would be a fivefold difference in travel time between students living in Hume Hall and in Maguire Village.

would also increase the travel times faced by residents of non-dorm areas in Tallahassee. ECF 33 at 2 ("scarcity of parking" at FSU).

*Plaintiff Roy* currently lives 3 miles from the University of Florida campus at 4455 SW 34th Street.  ECF 32 at 2.  Even if the Reitz Student Union were designated as an early voting location, Plaintiff Roy would see no reduction in travel time to the polls between early voting and Election Day.  In the 2018 Gainesville City Commission Race, Plaintiff Roy voted in-person at the Florida Museum of Natural History.  ECF 32-2.  The Museum is located on the University of Florida Campus. This trip took roughly 40 minutes to an hour each way.  ECF 32-2.  According to Google Maps, it would take 30 minutes to travel to the Reitz Student Union by bus from the same address.  As Rodden points out, Google "assumes that the bus departs instantly upon the passenger's arrival at the stop," which is "unrealistic."  ECF 24-9 at 17.  As a result, it is likely that Plaintiff Roy would face the same travel time to either the Union for early voting or the Museum on Election Day.  Nor is the Union necessarily more convenient for Plaintiff Roy, since both the Union and the Museum are located on the same campus.

Setting aside these methodological concerns, Rodden's study also fails to demonstrate any real burden on students' right to vote.  The analysis does not purport to quantify the number of students who would have voted early but for the additional travel time he calculates.  Indeed, it is worth repeating that the named

Plaintiffs who wanted to vote early were able to do so.  *See* ECF 29 at 2 (Plaintiff Jethwani); ECF 30 at 2 (Plaintiff Newsome); ECF 34 at 3 (Plaintiff Tingum).  At most, Rodden's study merely shows that early voting is inconvenient for a narrow subset of students.  The analysis does not provide "quantifiable evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised as a result of the challenged law."  *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631-632 (6th Cir. 2016). There is an "unjustified leap" between mere inconvenience and "denial or abridgement of the right to vote."  *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016).

***Levine, Bergom, and Gautam*** simply state the obvious:  "the convenience of voting is a significant factor in an individual's decision to vote, as it affects the cost side of the implicit cost/benefit calculation that each prospective voter makes."  ECF 24-16 at 9.  But these declarants fail to isolate the true "cost" of walking, biking, driving, carpooling, taking a bus, taking a taxi, or taking a ride-hailing service to cover approximately 1 mile from campus to an in-person early voting site.  Nor do these declarants account for the "cost" of voting by mail.  Nor does their analysis make a distinction between a "cost" imposed on voting early with an outright ban on voting early.

*Ion Sancho*, formerly the Supervisor of Elections for Leon County, actually highlights the practical flaw in on-campus early voting.  Sancho notes that "[p]arking on [the] FSU Campus and in the surrounding neighborhoods is particularly problematic during the school year" – when 8-14 days of in-person early voting must be set aside for the General Election.  ECF 33 at 2.  And "[d]ue to the scarcity of parking, other than those fortunate enough to have assigned parking, even individuals with access to cars are likely to find it difficult to leave and return to campus by car to vote during business/school hours."  *Id.*  Sancho says nothing about the early voting site at the Leon County Courthouse located a short walk, bike ride, bus ride, or Uber ride from Florida State University.

*Plaintiff Boatner* explains that parking on campus is difficult and that students often bus, bike, walk, and use Uber to get around.  ECF 26 at 3.  Boatner's declaration further illustrates the parking problems on-campus, especially for an 8-14 day in-person early voting window for the county as a whole, and undermines Rodden's methodology because Rodden fails to account for biking and Uber.

The Eleventh Circuit requires that the Plaintiffs "clearly establish" a likelihood for success and irreparable harm.  *Keister*, 879 F.3d at 1287.  The Plaintiffs fail to do so through their flawed declarations and reports.  *See id.*

Instead, the Plaintiffs "ask this Court, in effect, to perform a unique balancing analysis that looks specifically at a small number of voters who may

experience a special burden under the statute and weighs their burdens against" the State's interests. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 200 (2008). The Plaintiffs have not provided this Court with the means to do so, since "on the basis of the evidence in the record it is not possible to quantify . . . the magnitude of the burden on this narrow class of voters…" *Id*. Furthermore, Plaintiffs offer no "quantifiable evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised as a result of the challenged law." *Ne. Ohio Coal for the Homeless,* 837 F.3d at 631-632.   At most, the record demonstrates that some unquantifiable number of students may be inconvenienced.   There is an "unjustified leap" between mere inconvenience and "denial or abridgement of the right to vote." *Lee,* 843 F.3d at 601.  The Constitution does not demand "accommodation of . . . variable personal preferences, even if the preferences are shown to be shared in higher numbers by members of certain identifiable segments of the voting public." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 630 (6th Cir. 2016).  "[E]very polling place will, by necessity, be located closer to some voters than others." *Lee,* 843 F.3d at 601. This does not mean that "every polling place . . . need[s] to be precisely located such that no group ha[s] to spend more time travel to vote than . . . any other." *Id*.

The Plaintiffs thus cannot show a likelihood for success on the merits or irreparable harm.

### 2.     *Equities and the Public Interest*

In addition, the equities and public interest decidedly favor the Secretary. "Call it what you will – laches, the *Purcell* principle, or common sense – the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so." *Crookston v. Johnson,* 841 F.3d 396, 398 (6th Cir. 2016) (citing *Purcell v. Gonzalez,* 549 U.S. 1, 5-6 (2006).  This is especially so when a plaintiff waits to file an action.  It was for this reason that the Sixth Circuit in *Crookston* stayed the district court's preliminary injunction, which the plaintiff requested approximately 5 weeks before the November 2016 General Election so that he could take a selfie with his ballot.  *Id.* at 399.  In *Conservative Party of New York State v. New York State Board of Elections,* 2010 U.S. Dist. LEXIS 114155, at *2 (S.D.N.Y. 2010) the district court similarly denied a preliminary injunction where the plaintiffs waited until 6 weeks before an election to file their action.  In *Silberberg v. Board of Elections of New York,* 216 F. Supp. 3d 411, 420 (S.D.N.Y. 2016) the district court denied a late-filed action for fear of the disruption.  And less than a month ago, the U.S. Supreme Court held that the balance of equities did not weigh in favor of a request for a preliminary injunction in an election law case where the plaintiffs did not demonstrate reasonable diligence in requesting injunctive relief. *See Benisek v. Lamone*, 2018 U.S. LEXIS 3688, at *5 (Jun. 18, 2018) ("In considering the balance of equities among the parties, we think that plaintiffs'

26

unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request.").

The Plaintiffs in this case could have filed their action much sooner. The Florida Legislature enacted the relevant statutory provision expanding early voting in 2013. The Division issued the Advisory Opinion that the Plaintiffs now challenge in January of 2014. The Plaintiffs, however, did not file their Complaint until May 22, 2018. ECF 1. The Plaintiffs did not ask for a preliminary injunction until June 21, 2018. ECF 22. Put another way, the Plaintiffs waited 4 years and 4 months to file this action, and 4 years and 5 months to ask for injunctive relief.

Florida's 67 supervisors of elections are well on their way to finalizing in-person early voting sites for the upcoming Primary Election. Section 101.657 of the Florida Statutes requires these 67 supervisors to submit to the Division of Elections by July 29, 2018 (a Sunday) a list of all early voting sites with addresses, dates of operations, and hours of operation. And as the detailed, 14-page list of relevant 2018 Election Dates makes clear, Florida's supervisors of elections and the Division of Elections have much to do in the upcoming weeks and months. Exh. 6 (Matthews Declaration) at Attachment 1. Changing one date – adding one more task – could have a disruptive, cascading effect on a well-planned timeline. *Id.* at Attachment 1; *see also Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1327 (S.D. Fla. 2008) (noting that the weeks leading up to an election "are the most tumultuous

27

times in a Supervisor's office" and identifying the catalogue of tasks that must be accomplished to ensure a successful election).

If as the Sixth Circuit said that "[t]iming is everything," then the Plaintiffs are too late for 2018. *Crookston,* 841 F.3d at 398.

The Plaintiffs' delay creates a separate problem. According to the Eleventh Circuit, "[p]reliminary injunctions of legislative enactments – because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits – must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution." *Ne. Fla. Chapter. of Ass'n of Gen. Contractors of Am. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990). While the Plaintiffs do not challenge § 101.657(1)(a) of the Florida Statutes, they do challenge the Division's 2014 Advisory Opinion interpreting that provision. There, the Division concluded that an educational facility affiliated with a public university is not a "community center" or "convention center" for purposes of § 101.657(1)(a). *E.g.,* ECF 16 at ¶ 56 (quoting Fla. Div. of Elec. Op. DE 14-01 at 1). If the Plaintiffs disagreed, they could have filed a lawsuit at any time over the past four years to prompt legislative action. The Plaintiffs still remain free to lobby their representatives to change the law through "the democratic process" when the Florida Legislature next convenes. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.,* 896 F.2d at 1285. But

seeking a *de facto* legislative amendment through a federal court's interpretation of state law is improper.  *See Pennhurst,* 465 U.S. at 106; *Hand,* 888 F.3d at 1213-14.

## IV.   CONCLUSION

This Court should deny the request for a preliminary injunction.   A preliminary injunction here would contravene well-established principles of federalism.   *See Pennhurst,* 465 U.S. at 106; *Hand,* 888 F.3d at 1213-14.   A preliminary injunction is also "the exception rather than the rule," and the Plaintiffs have failed to clearly establish their entitlement to one.   *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975).

\*\*\*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES

The undersigned certifies that this Response complies with the size, font, and formatting requirements of Local Rule 5.1(C).   The undersigned further certifies that this Response complies with the word limit in Local Rule 7.1(F); it contains 6,463 words, excluding the case style, signature block, and certificates.

\*\*\*

Respectfully submitted by:

DAVID A. FUGETT  (FBN 117498)
  *General Counsel*
  david.fugett@dos.myflorida.com
JESSE DYER (FBN 114593)
  *Assistant General Counsel*
  jesse.dyer@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone:  (850) 245-6536
Fax:  (850) 245-6127

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL (FBN 72556)
  mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
  gperko@hgslaw.com
MALCOLM N. MEANS  (FBN 0127586)
  mmeans@hgslaw.com
HOPPING GREEN & SAMS, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax:  (850) 224-8551

Dated:  July 5, 2018             ***Counsel for the Secretary of State***

30

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via transmission of a Notice of Electronic Filing through the Court's CM/ECF system to the following on this 5th day of July, 2018:

Frederick S. Wermuth
KING, BLACKWELL, ZEHNDER
&WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Amanda Callais*
Jacki L. Anderson*
John M. Geise*
Alexi M. Velez*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
efrost@perkinscoie.com
acallais@perkinscoie.com
jackianderson@perkinscoie.com
jgeise@perkinscoie.com
avelez@perkinscoie.com
*Admitted Pro Hac Vice*

*Counsel for the Plaintiffs*

/s/ Mohammad O. Jazil
Attorney

31