

# FLORIDA DEPARTMENT of STATE

**RICK SCOTT**
Governor

**KEN DETZNER**
Secretary of State

# MEMORANDUM

**FROM:**   Ken Detzner
Florida Secretary of State

**TO:**   Supervisors of Elections

**DATE:**   July 27, 2018

**SUBJECT:**   Directive 2018-01— Early Voting Sites

---

In my capacity as the Chief Elections Officer of the State of Florida and pursuant to my authority in section 97.012(16), Florida Statutes (2018) and in accordance with the attached Order Granting Motion for Preliminary Injunction, I hereby issue this directive regarding the interpretation of section 101.657(1)(a), Florida Statutes (2018) [hereinafter, "Early Voting Statute"] set forth in Division of Elections Advisory Opinion 14-01.

I advise you of the court's determination that the interpretation of the Early Voting Statute set forth in Advisory Opinion 14-01 that excludes from consideration as early voting sites any facilities related to, designed for, affiliated with, or part of a college or university, is unconstitutional and, accordingly, that you retain discretion under the Early Voting Statute to place early voting sites at any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center, including any such site as may be related to, designed for, affiliated with, or part of a college or university. Based upon this directive, Advisory Opinion 14-01 is hereby rescinded. All early voting sites must continue to satisfy the requirements of section 101.657, Florida Statutes.

This directive remains in effect until such time as it is superseded or revoked by subsequent directive, law, or final court order.

Attachment

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., et al.,

      *Plaintiffs,*

V.                              CASE NO. 4:18-CV-251-MW/CAS

KENNETH W. DETZNER, in his official
capacity as the Florida Secretary
of State,

      *Defendant.*
_____/

## ORDER GRANTING PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION

Florida is home to 12 public universities and 28 state and community colleges. ECF No. 24, Ex. I, at 7 ("Rodden Report"). Four of the 10 largest public universities in the United States are in Florida. *Id.* For example, the University of Florida ("UF") in Gainesville—revered by many as Florida's first and finest institution of higher education—enrolls more than 52,000 students, 9,000 of whom live on the campus's three centrally located square miles. *Id.* at 11, 18–19. Nearly 68 percent of Gainesville's voting-age population is affiliated with UF and nearby Santa Fe College. *Id.* at 9; ECF No. 24, Ex. H, at 2.

Across Florida, more than 1.1 million young men and women were enrolled in institutions of higher learning in 2016; nearly 830,000 were enrolled at public colleges or universities. ECF No. 24, Ex. P, at 6 ("Levine, et

1

al. Report"). Almost 107,000 staff members worked at these public institutions. *Id.* Put another way, the number of people who live and work on Florida's public college and university campuses is greater than the population of Jacksonville, Florida—or the populations of North Dakota, South Dakota, Alaska, Vermont, Wyoming, and the District of Columbia.

In November 2016, 2.4 million men and women under the age of 30 were registered to vote in Florida. ECF No. 24, Ex. B., at 7 ("Smith Report"). They comprised more than one quarter of the 9.5 million Floridians who voted that election. *Id.* at 6. Many of them chose to vote early, a popular form of voting in Florida.[1] In 2012, roughly 2.4 million Floridians of all ages—or 28.1 percent of the electorate—voted early. Smith Rep., at 5. That number rose in 2016 to more than 3.9 million Floridians of all ages—or approximately 40.3 percent of all those who voted—who cast their ballots at an early voting site. *Id.* at 4.

Early voting is especially popular among college students. They vote early at a higher rate in Florida than the national average. In the 2012 election, 16 percent of college students across the country voted early; that number increased to 18 percent in 2016. Levine, et al. Rep., at 14. In Florida, 29 percent of college students voted early in 2012. *Id.* In 2016, 43 percent of Florida's college students voted early. *Id.*

---

[1] This case is about early voting. This Court uses the term "early voting" or "vote early" as synonyms for "in-person early voting." This is different than absentee or mail-in voting. It is also different than voting on Election Day; on-campus polling places are permissible on Election Day.

Despite early voting's popularity among Florida's college students, no early voting site can exist on a college or university campus. As a direct result of Secretary of State Kenneth Detzner's ("Defendant") Opinion DE 14-01 (the "Opinion"), ECF No. 24, Ex. A,[2] issued through the Division of Elections, *none* of the nearly 830,000 students enrolled in a public university or college can vote early on campus. And *none* of the 68 percent of Gainesville residents affiliated with UF or Santa Fe College can vote early where they work, study, or, for thousands of students, live.

This Court has considered, after hearing on July 16, 2018, Plaintiffs' motion for preliminary injunction. ECF No. 22. The issue is whether the Secretary of State's Opinion that categorically bars early voting on any university or college campus violates the First, Fourteenth, and Twenty-Sixth Amendments to the U.S. Constitution. It does. The motion is **GRANTED**.

# I

More lines, more problems. In November 2012, many Florida voters "found themselves waiting in line for hours to cast a ballot both during the early voting period and on Election Day," according to Defendant's post-election report intended to improve the state's election administration. ECF

---

[2] This Court refers to the Opinion throughout this Order as Defendant's Opinion even though Maria I. Matthews, the Director of the Division of Elections, signed the Opinion. The Division is part of the Florida Department of State, the body through which the Secretary of State issues "formal opinions on the interpretation of election laws." ECF No. 33, at ¶ 14.

3

No. 24, Ex. C, at 4. Supervisors of elections attributed these "excessive and unreasonable waiting times" to several factors, including "inadequate voting locations." *Id*. Under Florida law, supervisors of elections have discretion to designate certain eligible locations as early voting sites. Fla. Stat. § 101.657(1)(a) ("The supervisor *may* also designate . . .") (emphasis added). In 2012, however, supervisors of elections could only designate their offices, city halls, or public libraries as early voting sites. ECF No. 24, Ex. C, at 7–8.

Defendant recommended that Florida's legislature amend its early voting statute to expand what qualifies as an eligible early voting site. *Id*. at 7. "If given the flexibility to choose more and larger sites, supervisors could more effectively select early voting locations that meet the geographic needs of their voters and reduce the wait times at these locations," Defendant urged. *Id*. at 5.

The legislature obliged. In May 2013, the Governor signed into law a provision (the "Early Voting Statute") that permits supervisors of elections to "designate any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites." Fla. Stat. § 101.657(1)(a). The Early Vote Statute did not include language from a proposed amendment that would have added "any . . . Florida College System institution facility" as an early voting site. ECF No.

4

24, Ex. D. Nor did the legislature pass other proposed bills that, among other things, explicitly identified universities and colleges as eligible early voting sites. *See* ECF No. 24, Exs. K, L, & M.

In January 2014, Defendant, through the Division of Elections, issued the Opinion in response to Gainesville's City Attorney's question whether the J. Wayne Reitz Union, located on UF's campus, fit within the "government-owned community center" or "convention center" language in the Early Voting Statute. ECF No. 61, Ex. 1. A group of UF students had approached the Gainesville City Commission about placing an early voting site on campus, prompting the City Attorney to seek clarification from Defendant. *Id.*

Defendant's answer was a resounding "no." He declared that "[t]he Reitz Union is a structure designed for, and affiliated with, a specific educational institution. It is part of the University of Florida." ECF No. 24, Ex. A, at 3. He then interpreted the Early Voting Statute to exclude as "convention center" and "government-owned community center" the Reitz Union and "any other college- or university-related facilities" as an early voting site. *Id.* Defendant reasoned that because the Florida legislature declined to include explicit language identifying colleges and universities as early voting sites, "the terms 'convention center' and 'government-owned community center' cannot be construed so broadly" as to include college or university facilities such as the

5

Reitz Union. *Id.* Besides citing the unadopted amendment to the Early Voting Statute and other unadopted bills, Defendant offered no other rationale.

Plaintiffs are six university students and two organizations, the League of Women Voters and the Andrew Goodman Foundation.[3] Megan Newsome is a 22-year-old recent graduate of the University of Florida who serves as a Puffin Democracy Fellow of the Andrew Goodman Foundation in addition to her on-campus research job. ECF No. 30, at ¶¶ 2–3. Ms. Newsome has voted early in past elections. *Id.* at ¶ 7. Amol Jethwani is a 21-year-old University of Florida student who has voted early in past elections and has experience arranging rides for fellow students to voting sites in Gainesville. ECF No. 29, at ¶¶ 3, 6–9, 12. Mary "Jamie" Roy is a 20-year-old University of Florida student who serves as a Student Ambassador to the Andrew Goodman Foundation and has voted both early and on Election Day in past elections. ECF No. 32, at ¶¶ 3, 5. Dillon Boatner is a 21-year-old University of Florida student who is a student member of the League of Women Voters. ECF No. 26, at ¶ 3. Alexander Adams is a 19-year-old student at the Florida State University; he has never voted before and intends to vote for the first time in the 2018 election. ECF No. 25, at ¶¶ 3, 8. Anja Rmus is a 19-year-old University

---

[3] Plaintiffs have standing. This Court addresses Defendant's standing arguments in its Order Denying Defendant's Motion to Dismiss. ECF No. 64, at 12–14.

of Florida student who has voted both early and on Election Day in past elections. ECF No. 31, at ¶¶ 3, 5.

Plaintiffs Newsome, Jethwani, Roy, and Rmus are residents of and registered to vote in Alachua County. ECF No. 30, at ¶ 2; ECF No. 29, at ¶ 2; ECF No. 32, at ¶ 2; ECF No. 31, at ¶ 2. Plaintiff Boatner is currently registered to vote in Volusia County but intends to change his registration this fall to Alachua County, where he spends the academic year. ECF No. 26, at ¶ 2. Plaintiff Adams is a resident of and registered voter in Leon County. ECF No. 25, at ¶ 2.

Defendant is Florida's Secretary of State. Under Florida law, the Secretary of State is the "chief election officer." Fla. Stat. § 97.012. He is required to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws." Fla. Stat. § 97.012(1). He provides "written direction and opinions to the supervisors of elections on the performance of their official duties." Fla. Stat. § 97.012(16). The supervisors of elections treat Defendant's opinions as "authoritative" and follow them "absent contrary directive." ECF No. 33, at ¶ 16.

All individual Plaintiffs assert various burdens to their own and their peers' voting rights because of Defendant's Opinion. For instance, Mary "Jaime" Roy does not own a car and is dependent on Gainesville's public

7

transportation system. ECF No. 32, at ¶ 5.[4] In one municipal election, they had to travel on two buses from their home to their voting location, which took between 40 and 60 minutes each way. *Id.* at ¶ 7.

Megan Newsome has helped organize a one-day shuttle program between campus and the polling place during the early voting period. ECF No. 30, at ¶ 8. Using the shuttle involved multiple waiting points for participants— waiting for the shuttle to fill before leaving, waiting in line to vote, waiting for all individuals to finish voting, and then driving back to campus. *Id.* Each trip took approximately one hour. *Id.* Some students were unable to use the shuttle because they did not have an hour to spare in their schedules on that day or they sought the shuttle out after the shuttle program ended. *Id.* at ¶ 9. In other elections, Ms. Newsome has asked other people for rides or hired Uber cars for the round-trip from campus to the early voting location. *Id.* at ¶ 10. Amol Jethwani, meanwhile, helped coordinate rides to voting locations, exerting significant effort in identifying drivers, coordinating riders, and synchronizing suitable times for the rides. ECF No. 29, at ¶¶ 9–10. All individual Plaintiffs emphasize that an early voting site on-campus would lighten the burdens on their voting rights. *Id.* at ¶ 20; ECF No. 25, at ¶ 17; ECF No. 26, at ¶ 23; ECF No. 30, at ¶ 19; ECF No. 31, at ¶ 15; ECF No. 32, at ¶ 11.

---

[4] Plaintiff Roy identifies as gender-queer and prefers the use of the gender-neutral pronoun "they." ECF No. 16, at ¶ 19.

## II

Before reaching the merits of Plaintiffs' motion, this Court addresses some threshold issues.

First, this Court rejects Defendant's argument that the *Pennhurst* doctrine precludes this Court from considering this case. Defendant conjures Plaintiffs' federal claims into state claims. *See* ECF No. 45, at 2 ("The Plaintiffs have now put this Court in a position of interpreting *state* law and then requiring *state* officials . . . to follow that *federal* interpretation of *state* law.") (emphases in original). This attempt to scurry out of federal court is a swing and a miss.

Plaintiffs have brought forth federal claims. "Since the plaintiff has alleged a violation of the federal Constitution, *Pennhurst* does not apply." *Brown v. Georgia Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir. 1989). This Court would be on thinner ice if Plaintiffs were asking this Court to compel Defendant to abide by a federal judge's interpretation of the Early Voting Statute—and then this Court charged ahead and did so.

Here, this Court is on rock-solid ground. Plaintiffs are explicit in their federal claims. ECF No. 36, at 13 & 29; *see also* ECF No. 47, at 1–2. They discuss state law only to the extent it has informed Defendant's interests—or lack thereof—in promulgating the Opinion. ECF No. 36, at 26–29. They do not

seek this Court to interpret and enjoin Defendant on the basis of state law. ECF No. 47, at 1.

It is axiomatic that federal courts can review state or local laws alleged to be unconstitutional. *See, e.g., District of Columbia v. Heller*, 554 U.S. 570, 636 (2008) (invalidating District of Columbia's ban on possession of handguns in the home as a violation of the Second Amendment); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (invalidating Virginia law restricting marriage based on racial classifications as a violation of the Fourteenth Amendment). It is also "beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (citing *Ex parte Young*, 209 U.S. 123, 160–62 (1908)); *see also Armstrong v. Exceptional Child Cent.*, 135 S.Ct. 1378, 1384 (2015) (citing *Osborn v. Bank of United States*, 9 Wheat. 738, 838–39 (1824) *and Ex parte Young*, 209 U.S. at 150–51) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law.").

That this Court is reviewing a state officer's interpretation of state law—an interpretation that has the effective force of a state law or policy—presents an added wrinkle that is quickly ironed out. Simply stated, a federal court can review a state official's interpretation of—or gloss over—state law when it is alleged to violate the United States Constitution. Otherwise, state legislatures

could pass ambiguous statutes, giving cover for state officers to interpret vague laws in manners contrary to the U.S. Constitution. Barred in federal courts, challenges to these interpretations in state court could then fade under state courts' deference to state interpretations of state law.[5]

The best analogues are those federal invalidations of restrictive interpretations of state election laws. In 2012, a federal judge examined Ohio election statutes and the Ohio Secretary of State's interpretations of those statutes, which created different deadlines for military and non-military early voters. *Obama for Am. v. Husted*, 888 F. Supp. 2d 897, 899–902 (S.D. Ohio 2012). The court enjoined the state from enforcing those laws as a violation of the First and Fourteenth Amendments. *Id.* at 911. The Sixth Circuit affirmed. *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012). In affirming, the Sixth Circuit described how the Secretary "construed" Ohio law "to apply the more generous [early voting] deadline . . . to military and overseas voters." *Id.* at 427. This resulted in "particularly high" burdens on the impacted non-military voters. *Id.* at 431 (internal quotation marks omitted).

Similarly, a federal judge determined the Georgia Secretary of State's interpretation of a state statute violated federal law and enjoined her from acting pursuant to her interpretation. *Charles H. Wesley Educ. Found. v. Cox*,

---

[5] This Court is persuaded by Judge O'Neill's characterization: "[I]n deciding a question of federal law, I am not bound to follow a state agency's interpretation of state law." *United States v. Landsdowne Swim Club*, 713 F. Supp. 785, 795 n.22 (E.D. Pa. 1989).

324 F. Supp. 2d 1358, 1369 (N.D. Ga. 2004). The Georgia law detailed how "a person may apply to register to vote by completing and mailing" an application form. *Id.* at 1366. The Secretary, however, interpreted the law to require how "'a person' may register by sending *one* application in an individual envelope" to the Secretary. *Id.* (emphasis added). Plaintiff, a non-profit organization engaging in voter-registration drives, submitted more than one application in a bundle, which the Secretary rejected. *Id.* at 1360–61. The district court construed the Secretary's interpretation as a state policy, *id.* at 1366, and determined the Secretary violated federal law in rejecting the bundled registrations. *Id.* at 1368.

This Court is reviewing Defendant's Opinion. It has the effective force of state law or official policy. While Defendant emphasizes the advisory nature of his opinions and their limited reach, ECF No. 45, at 7, these characterizations are unpersuasive.[6] According to the undisputed declarations of Ion Sancho, who served as Leon County's Supervisor of Election for 27 years, ECF No. 33, at ¶ 2, the Florida State Association of Supervisors of Elections "and Florida's Supervisors of Election[s] generally treat written opinions of the Division . . . as authoritative and follow such opinions, absent contrary directive by a court, by statute, or by the Secretary of State." *Id.* at ¶ 16. Supervisors of elections

---

[6] In an accompanying Order Denying Defendant's Motion to Dismiss, this Court determined Defendant's arguments regarding the limited scope of the Opinion to be disingenuous and therefore unpersuasive. ECF No. 64, at 9–10.

"give broad and substantial deference" to such opinions. ECF No. 53, at ¶ 6. They do not act contrary to the opinions because, as a practical matter, "it takes enough effort to administer elections without adding controversy"—such as acting, or being perceived to act, inconsistent with the Secretary's opinion. *Id.* Even more, the Secretary of State sends copies of opinions to supervisors of elections, which "do not contain qualifying language to suggest the advisory opinions are narrowly limited in their application." *Id.* at ¶ 4. Therefore, the supervisors reasonably understand the state's chief election officer's opinions as how he "interpret[s] and [is] likely to enforce Florida's election laws." *Id.* That all supervisors of elections follow Defendant's opinions is no surprise.

Turning now to the Opinion's scope and language, this Court first examines what prompted it. A group of UF students approached the City Commission and requested an early voting site be placed on campus. ECF No. 61, Ex. 1, at 1. The Gainesville City Attorney, writing to Defendant, explained the Commission "desires to provide for early voting as allowed by state law." *Id.* She then asked: "Would the Reitz Union on the University of Florida campus qualify as a government-owned community center or a convention center for purposes of early voting under the recently amended Section 101.657, Florida Statutes?" *Id.* at 2.

Defendant's answer—the Opinion—was broader than the question. In concluding that "[t]he terms 'convention center' and 'government-owned

13

community center' cannot be construed so broadly as to include the Reitz Union or any other college- or university-related facilities that were rejected by the Legislature as additional early voting sites," Defendant looked only to unadopted legislation—legislation that referenced colleges or universities *as a whole* and *without* any limiting language on the types of permissible or impermissible on-campus facilities. ECF No. 61, at 2; *see also* ECF No. 24, Exs. D, K, L & M (the unadopted amendment and unadopted proposed legislation). As a result, Defendant's rationale for rejecting the Reitz Union as an early voting site was precisely *because* it "is a structure designed for, and affiliated with, a specific educational institution." ECF No. 61, at 2. [7] Put another way, because "[i]t is part of the University of Florida," the Reitz Union cannot be an early voting site. *Id.* This reasoning means that *any* on-campus facility cannot be an early voting site, including stadiums or permanent public library facilities, which are permissible early voting sites under the Early Voting Statute. Fla. Stat. § 101.657(1)(a). [8]

---

[7] Defendant's counsel ably and understandably attempted to narrow the Opinion's scope as merely interpretations of "convention center" and "government-owned community center." ECF No. 62, at 85–87. Doing so requires ignoring the whole Opinion, including Defendant's rationale.

[8] Defendant's Opinion reflects the following logic. A questioner asks whether it is permissible to do X. Answerer responds it is not permissible to do X because of Y reason. The Y reason can reasonably be understood as answerer's policy. Consider the following definitely hypothetical situation. A law clerk asks this Court if he can have a stuffed pony in his office for a decorative purpose, despite a federal regulation prohibiting "dogs or other animals on Federal property for other than official purposes." 41 C.F.R. § 102–74.425. This Court answers in the negative, reasoning that prohibiting non-official animals on federal property extends to stuffed animals. The dismayed law clerk would then reasonably conclude that no stuffed or live animals of any kind—a stuffed lion, a stuffed tiger, or a live bear—would be permitted in his office. What is more,

14

## III

Plaintiffs move for preliminary injunction, seeking this Court to enjoin Defendant from prohibiting county supervisors of elections from placing early voting sites on college or university campuses and to require Defendant to issue a directive to the supervisors of elections informing them of this Court's order and its effects. ECF No. 22, at 2.

A district court can only grant a motion for preliminary injunction "if the moving party shows that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citing *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).[9]

---

this Court's authoritative answer to one law clerk would extend to other law clerks, whose plans for office decorations would be unceremoniously scuttled.

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

15

## A

Courts examine alleged violations of the First and Fourteenth Amendment's fundamental right to vote under a balancing test—the so-called *Anderson-Burdick* test.

Voting is the beating heart of democracy. It is a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)). Voting also requires extensive administration, planning, and logistics. "[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974).

With these interests in mind, courts examine states' election laws and regulations under what has been termed "a sliding-scale balancing analysis" where "the scrutiny varies with the effect of the regulation at issue." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 210 (2008) (Scalia, J., concurring). Courts "'must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that plaintiff seeks to vindicate' against 'the precise interests put forward by the State as

16

justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)). When rights are subjected to "'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). When rights are subjected to "reasonable, nondiscriminatory restrictions" then "the state's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S. at 788. "However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

This Court assumes for the purpose of the following First and Fourteenth Amendment analysis that Defendant's Opinion is a "reasonable, nondiscriminatory restriction[]." *Anderson*, 460 U.S. at 788. As explained *infra*, at 30–34, the Opinion is facially discriminatory on account of age. But even after construing it under a more deferential "reasonable, nondiscriminatory" lens, the Opinion falters under *Anderson-Burdick* because it disparately imposes significant burdens on Plaintiffs' rights weighted against imprecise, insufficiently weighty government interests.

### 1. Defendant's Opinion Imposes Significant Burdens on Plaintiffs.

Contrary to Defendant's characterizations, Plaintiffs' burdens are more than *de minimis*. Defendant's Opinion imposes significant burdens on Plaintiffs' First and Fourteenth Amendment rights.

At first blush, Plaintiffs' burdens appear slight. Indeed, some courts have characterized administrative burdens like waiting in line and commuting as not severe. In a challenge to Indiana's voter identification requirement, for example, the Supreme Court explained "[f]or most voters" the process of document-gathering, traveling to a state office, and obtaining a voter identification "surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." *Crawford*, 553 U.S. at 198 (controlling op.). Drawing from this language, a federal court recently described a group of plaintiffs' logistical burdens in early voting at the only allowable early voting site in the county as "nonsevere, nonsubstantial, or slight." *Common Cause Ind. v. Marion Cty. Election Bd.*, 2018 WL 1940300, at *12 (S.D. Ind. Apr. 25, 2018).[10] And so courts have acknowledged there are differences between "disparate inconveniences that voters face when voting to the denial or abridgement of the right to vote." *Lee*

---

[10] The district court respectfully made this characterization "without intending any denigration" to the plaintiffs in that case. 2018 WL 1940300, at *12. There, Plaintiffs had to drive between 25 and 30 minutes to the early voting site or had to pay for public transportation. They also faced parking difficulties and long lines. *Id.* at *5.

*v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016). Voters are not entitled to have "every polling place . . . be precisely located such that no group had to spend more time traveling to vote than did any other." *Id.* Conceivably, then, a college student having to travel to vote early would perhaps not face a substantial burden under *Anderson-Burdick* because of her commute.

But those are not the facts here. Florida's public college and university students are *categorically prohibited* from on-campus early voting because of Defendant's Opinion. This is not a "nonsevere, nonsubstantial, or slight burden." *Common Cause Ind.*, 2018 WL 1940300, at *12. This is not a mere inconvenience.

The Opinion lopsidedly impacts Florida's youngest voters. Disparate impact matters under *Anderson-Burdick*. A majority of the *Crawford* Court determined that "[i]t 'matters' in the *Anderson-Burdick* analysis . . . whether the effects of a facially neutral and nondiscriminatory law are unevenly distributed across identifiable groups." *Common Cause of Ind.*, 2018 WL 1940300, at *13 (quoting *Crawford*, 553 U.S. at 216 (Souter, J., dissenting)); *see also id.* at n.18 (identifying six-justice *Crawford* majority agreeing that disparate effects across identifiable groups matter).

The Opinion has the effect of creating a secondary class of voters who Defendant prohibits from even seeking early voting sites in dense, centralized locations where they work, study, and, in many cases, live. This effect alone is

19

constitutionally untenable. *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."); *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."); *and Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("[I]t is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

Admittedly, the Early Voting Statute authorizes early voting as "a convenience to the voter." Fla. Stat. § 101.657. Constitutional problems emerge, however, when conveniences are available for some people but affirmatively blocked for others. "Once a unit of government has decided to administer a benefit or impose a burden, it must do so rationally and equitably, without offense to independent constitutional prohibitions." *Common Cause of Ind.*, 2018 WL 1940300, at *11. Defendant does not do this.

Defendant's Opinion prohibits a discrete class of individuals—nearly 830,000 individuals who live and work on public college and university communities, i.e. overwhelmingly young voters—from even the possibility of an alternative, reasonable early voting location. Further, this class of voters is the *only* class in Florida facing such a prohibition. Defendant's Opinion

20

transforms these "mere inconvenience[s]" to an abridgment of the right to vote. ECF No. 45, at 25.

Dr. Rodden's report scrutinizes in great detail the Opinion's lopsided effects on college students. *See generally* Rodden Rep.[11] He first examines the travel times within communities with large universities using the census block group as the basis for comparison. Dr. Rodden summarizes that in eight of these communities there is "a pronounced difference in travel times between dorm-dominated [and student-dominated] block groups" and the at-large community. *Id.* at 64. Travel times to the nearest early voting site are "significantly longer" from census block groups with large college-student populations than those census block groups without such populations. *Id.* at 2. He then compares those travel times to similar communities without large universities. "[C]ommunities with dorm populations always have greater inequalities in travel times across neighborhoods than their 'non-dorm' matches." *Id.* at 73–74.

These longer travel times are even more glaring when considered in conjunction with three additional data-based conclusions. First, college students' residences are generally clustered on or near campus. *Id.* at 20, Fig.

---

[11] This Court finds Dr. Rodden's report to be credible. His methodology is sound. His data originates from the most recent Five-Year American Community Surveys, the Florida Department of State, Google Maps (for analyzing travel times), U.S. News and World Report (for analyzing parking and car usage), and the National Center for Education Statistics. Rodden Rep., at 6–7.

1 (showing concentration of Gainesville's college population, including six census block groups where more than 75 percent of residents live in dorms); 30, Fig. 5 (Tallahassee); 37, Fig. 9 (Miami); 44, Fix. 13 (Orlando); *and* 52, Fig. 17 (Tampa).

Second, these areas contain some of the most densely populated areas of a community.[12] *Id.* at 21, Fig. 2 (Gainesville's population density); 31, Fig. 6 (Tallahassee); 38, Fig. 10 (Miami), 45, Fig. 14 (Orlando); *and* 53, Fig. 18 (Tampa).

Third, individuals living in these dense campus-centered areas are disproportionately without access to cars.[13] *Id.* at 22 (Gainesville's car access); 32, Fig. 7 (Tallahassee); 39, Fig. 11 (Miami); 46, Fig. 15 (Orlando); *and* 54, Fig. 19 (Tampa). Moreover, Dr. Rodden draws from credible data in explaining that commuting by biking is "quite rare in Florida," accounting for between one and five percent of all commutes—not to mention the relatively high levels of bicycle injuries and deaths located near Florida's university campuses that may dissuade the average commuter. ECF No. 49, at 5.

---

[12] This Court is mindful that some dorm-dominated census block tracks may not be among the most densely-populated area of a community but surrounding census block tracks, populated by students living off-campus, remain among some of the most densely populated areas. *Id.* at 38, Fig. 10 (Miami), *and* at 53, Fig. 18 (Tampa).

[13] As best as Dr. Rodden could determine from available data from surveys and universities.

This Court is not persuaded by Defendant's response to Dr. Rodden. In particular, Defendant measures the walking and biking distance between the nearest early voting site and UF from the *very edge* of campus. ECF No. 45, at 9–10 (showing a 24-minute one-way walk and an eight-minute one-way bike ride to the early voting site according to Google Maps). The University of Florida is like Hogwarts, which proscribes on-campus apparating—or instantaneous teleportation. Students do not and cannot apparate within the campus. Rather, UF students would begin their treks to the early voting site in downtown Gainesville from various points across campus. For example, it is a 2.5-mile distance from the center of campus at a dormitory like Hume Hall to the early voting site. Rodden Rep. at 26.

What is more, the Opinion's effects fall on a class of voters particularly invested in early voting for multiple reasons detailed in the record. Despite Defendant's Opinion and its effects, approximately 43 percent of Florida's college students voted early in 2016—more than the 18 percent of college students who voted early nationally that year. Levine, et al. Rep., at 14. And nearly half a million of the 1.2 million Floridians aged 18 to 29 (including non-college students) in 2016 voted at an early voting site. Smith Rep., at 5–6.

Plaintiffs' experts offer credible explanations on why younger voters turn toward early voting. Convenience is an unsurprising factor. *See* Levine, et al. Rep., at 8 ("[T]he convenience of voting is a significant factor in an individual's

23

decision to vote, as it affects the cost side of the implicit cost/benefit calculation that each prospective voter makes."); Smith Rep., at 10 ("When it comes to deciding whether to vote an absentee mail ballot, vote early in-person, or vote on Election Day, younger registrants, like their older peers, often seek to maximize convenience."). Political scientists have long recognized voting's cost-benefit nature. *Id.* at 10–11 n.6; Levine, et al. Rep., at 8 n.6. Costs decrease when voters face fewer restrictions to, or at, a polling location.

Moreover, the alternatives to early voting are fraught with potential pitfalls. Younger voters casting their ballots on Election Day disproportionately face information costs—"Where is my local polling location? What valid ID do I need to bring? . . . How do I get there?" Smith Report, at 13 (citing multiple academic articles studying the costs of voting). Younger voters are more likely to have their provisional ballots rejected because they have showed up at the wrong precinct, a not uncommon miscalculation for people who move at least once a year from dorm-to-dorm, dorm-to-apartment, house-to-dorm, apartment-to-apartment, Greek-house-to-house, among others. *Id.* at 14. In Florida, voters aged 18 to 21 had provisional ballots rejected "at a rate more than *four times higher* than the rejection rate for provisional ballots cast by voters between the ages of 45 to 64." *Id.* (emphasis added); *see also id.* at 15 (displaying table of rejected provisional ballots by age group).

24

Additionally, on-campus voting locations on Election Day are crowded. Dillon Boatner describes "very long lines to vote at the Reitz Student Union, which wrapped through several hallways" on November 8, 2016. ECF No. 26, at ¶ 5. Some "student voters had to wait in line for as long as an hour and a half to cast their ballots." *Id.* Ion Sancho describes similar scenes at Florida State University, where "a disproportionately high number of voters (mostly students)" appearing at on-campus voting sites had "changed residential addresses and required time-consuming assistance to update their voter registration," thereby "lead[ing] to delays that slow the rate" for other people to vote. ECF No. 33, at ¶ 8; *see also* ECF No. 53, at ¶ 8 (noting historically high volume of voters on Election Day on campuses). In Alachua County, two of the top three—and three of the top six—precincts with the largest number of registered voters are located on UF's campus. Smith Rep., at 17. On-campus Election Day voting can be, in Defendant's counsel's words, "difficult" and "a madhouse." ECF No. 62, at 66.

Mail-in ballot statistics are even starker. Vote-by-mail is convenient, but "a voter 18 to 21 years old is roughly *eight-times more likely* to have her vote by mail ballot rejected than an absentee voter over 65 years old." *Id.* at 12 (emphasis added). Put another way, 8,522 absentee ballots from voters aged 18 to 29 were rejected out of 243,409 cast; only 5,796 absentee ballots from voters aged 65 or more were rejected out of 1,229,279 cast. *Id.* at 13.

25

All the individual Plaintiffs live some distance away from their closest early voting site.[14] So do many other people. What is different about Plaintiffs is that Defendant's Opinion categorically prevents them from an alternative site on a dense, centralized location where they work, study, and, in many cases, live. This prohibition creates significant burdens.

### 2. Defendant Articulates No Precise Interests Sufficiently Weighty to Justify Plaintiffs' Burdens on Their Right to Vote.

Contrast the lopsided burdens that Defendant's Opinion imposes on Plaintiffs with Defendant's interests in it.

Generally, a state law or policy might claw back some expansions of its access to the ballot, "arguably burden[ing] some segment of the voting population's right to vote." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016). In doing so, the "state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Those interests must be "precise" to justify the burden. *Id*. at 789. Restrictions that "may appear" to create even "slight" burdens "must be justified by relevant and legitimate state interests

---

[14] Alexander Adams lived one mile from the closest early voting site, though he expects his dormitory assignment to change this upcoming semester. ECF No. 25, at ¶¶ 6 & 14. Other individual Plaintiffs live even farther away from their closest early voting site: Dillon Boatner, five miles, ECF No. 26, at ¶ 20; Amol Jethwani, 1.5 miles, ECF No. 29, at ¶ 18; Megan Newsome, five miles, ECF No. 30, at ¶ 15; Anja Rmus, two miles, ECF No. 31, at ¶ 13. All individual Plaintiffs explain that an on-campus early voting site will significantly ease the burdens on their voting rights. ECF No. 25, at ¶ 16; ECF No. 26, at ¶ 21; ECF No. 29, at ¶ 17; ECF No. 30, at ¶ 16; ECF No. 31, at ¶ 15; ECF No. 32, at ¶ 11.

26

'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (controlling op.) (quoting *Norman*, 502 U.S. at 288–89).

Here, Defendant fails to articulate "sufficiently weighty," *id.* or "important regulatory interests," *Anderson*, 460 U.S. at at 788, with any "precis[ion]" to explain why it is "necessary to burden the plaintiff's rights." *Id.* at 789. On the contrary, one must squint hard to identify Defendant's "important regulatory" and "precise" interests. *Id.* at 788–89.

As best as this Court determined during the preliminary injunction hearing, Defendant articulates three interests in the Opinion: following state law, preventing parking issues, and avoiding on-campus disruption that an early-voting campus site could create. ECF No. 62, at 65–66.

Defendant's claimed interest in following state law fails because the Early Voting Statute does not prohibit early voting sites on college campuses.[15] State law authorizes a supervisor of election to designate "any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites." Fla. Stat. § 101.657(1)(a). Defendant interprets this statute based on amendments

---

[15] At the risk of beating a dead horse, this Court emphasizes that it is not ordering Defendant to comply with a federal court's interpretation of state law. *Pennhurst*, 465 U.S. at 106. This Court is examining the Early Voting Statute for the limited purpose of evaluating Defendant's claimed interests in following state law, an evaluation *Anderson-Burdick* necessitates.

that were not adopted and bills not passed—that is, language not appearing anywhere near the statute. Justice Scalia is more than instructive here. "It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590.

As written, the law does not *require* supervisors of elections to designate such sites. Nor does the law *prohibit* supervisors of elections from designating such sites. The law grants discretion to supervisors of elections. The Opinion is a broad answer to a narrow question, effectively inserting a prohibition into an otherwise flexible authorizing statute. *See supra*, at 13–14. Slapping a gloss over a statute is not the same as following the statute.

Defendant also claims an interest in alleviating parking difficulties that an on-campus early voting site might create. ECF No. 62, at 63 & 65–66; ECF No. 45, at 14 & 24. This interest is neither precise nor sufficiently weighty. First, a local supervisor of elections is in a better position to evaluate the parking situation at potential sites than Defendant. For example, Ion Sancho states that an early voting site at FSU "would help alleviate the disproportionate burdens on voting, including transportation issues and administrative delay." ECF No. 33, at ¶ 10. He also explains how the "large, concentrated population of voting-age individuals" come to campus daily anyway despite "the scarcity of parking." *Id*. at ¶ 11. Second, common sense suggests that adding an additional early voting site would alleviate long lines

and parking problems at other early voting locations. *See, e.g.*, ECF No. 29, at ¶ 12 (describing how closest early voting site to UF campus had "influx of students using the various shuttle programs" which "created congestion and resulted in longer wait times").

The above rationales extend to Defendant's third claimed interest in the Opinion—avoiding on-campus disruption. A supervisor of elections is the more appropriate authority to evaluate the potential disruption an early voting site would create. Moreover, an early voting site would alleviate some of the disruption that exists on Election Day voting sites on campuses. *See supra*, at 25 (describing long lines and crowds that accompany on-campus voting sites on Election Day).

Defendant's lack of precise interests is all the more glaring when weighted against Plaintiffs' significant burdens. While a significant burden could be weighed against, and justified by, precise, sufficiently weighty government interests, Defendant has failed to articulate precise and sufficiently weighty interests in the Opinion to justify Plaintiffs' significant burdens on their voting rights. Plaintiffs have established a substantial likelihood of success on the merits of their First and Fourteenth Amendment claims.

**B**

Defendant's Opinion also violates Plaintiffs' Twenty-Sixth Amendment rights because it is intentionally discriminatory on account of age. The Twenty-Sixth Amendment states that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote, shall not be denied or abridged by the United States or any state on account of age." U.S. CONST. amend. XXVI.

Courts considering Twenty-Sixth Amendment claims have acknowledged the "dearth of guidance on what test applies." *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 522 (M.D.N.C. 2016), *rev'd on other grounds*, 831 F.3d 204 (4th Cir. 2016); *see also Nashville Student Org. Comm. v. Hargett*, 155 F. Supp. 3d 749, 757 (M.D. Tenn. 2015) ("[T]here is no controlling caselaw . . . regarding the proper interpretation of the Twenty-Sixth Amendment or the standard to be used in deciding claims for Twenty-Sixth Amendment violations based on an alleged abridgment or denial of the right to vote."). A consensus has been emerging, however, as recent courts have applied the *Arlington Heights* standard for Twenty-Sixth Amendment claims. *One Wis. Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 926 (W.D. Wis. 2016); *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 609 (E.D. Va. 2016), *aff'd, Lee*, 843 F.3d 592 (4th Cir. 2016).

This Court agrees with the *Thomsen* court's reasoning on applying this standard. The Amendment's text is "patterned on the Fifteenth Amendment

. . . suggest[ing] that *Arlington Heights* provides the appropriate framework"
and *Anderson-Burdick* likely is unfitting because applying it would indicate
the Twenty-Sixth Amendment "'contributes no added protection to that
already offered by the Fourteenth Amendment.'" *Thomsen*, 198 F. Supp. 3d at
926 (quoting *Walgren v. Bd. of Selectmen of Amherst*, 519 F.2d 1364, 1367 (1st
Cir. 1975)).[16] Accordingly, this Court applies the *Arlington Heights* framework
to Plaintiffs' Twenty-Sixth Amendment claim.

"The impact of the official action—whether it 'bears more heavily on one
[age-group] than another,' . . . may provide an important starting point." *Vill.*
*of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)
(quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976). "Sometimes a clear
pattern, unexplainable on grounds other than [age] emerges from the effect of
the state action even when the governing legislation appears neutral on its
face." *Id.* Absent a "stark" pattern, "impact alone is not determinative." *Id.*

Simply put, Defendant's Opinion reveals a stark pattern of
discrimination. It is unexplainable on grounds other than age because it bears
so heavily on younger voters than all other voters. Defendant's stated interests
for the Opinion (following state law, avoiding parking issues, and minimizing

---

[16] The parties concede that *Arlington Heights* is an acceptable framework for Plaintiffs' Twenty-
Sixth Amendment claim. ECF No. 36, at 33 n.15; ECF No. 62, at 67.

on-campus disruption) reek of pretext.[17] *Cf. Veasey v. Abbot*, 830 F.3d 216, 235–36 (5th Cir. 2016) (discussing pretextual characteristics in racially discriminatory election law). While the Opinion does not identify college students by name, its target population is unambiguous and its effects are lopsided. The Opinion is intentionally and facially discriminatory.

This Court does not lightly compare contemporary laws and policies to more shameful eras of American history. But addressing intentional discrimination does not require kid gloves. In 1910, Oklahoma amended its constitution to create exemptions to the state's literacy test; namely, anyone or his descendant who could vote on January 1, 1866—the so-called grandfather clause—"or who was at that time resided in some foreign nation" need not take a literacy test. *Guinn v. United States*, 238 U.S. 347, 356 (1915). January 1, 1866 was no coincidence—the overwhelming majority of African-Americans could not vote prior to that day because of, among other reasons, slavery and the absence of the Fifteenth Amendment's protections. While the Court acknowledged that Oklahoma's amendment "contains no express words" targeting African-Americans, "the standard itself inherently brings that result

---

[17] This Twenty-Sixth Amendment analysis differs from this Court's *Anderson-Burdick* analysis, which requires a balancing of burdens and governmental interests. In balancing Plaintiffs' burdens and Defendant's interests, this Court presumed the Opinion was nondiscriminatory. *Supra*, at 17. This Court concluded that Defendant's interests were, to understate, weak, meaning Plaintiffs' significant burdens outweighed Defendant's interests in the Opinion. In the Twenty-Sixth Amendment context, this Court is more willing to call out a pretextual rationale—or "a banana a banana," in Plaintiffs' counsel's words. ECF No. 62, at 72.

into existence." *Id.* at 364. Despite "seek[ing] in vain for any ground which would sustain any other interpretation" of the amendment, the Court unanimously determined the provision violated the Fifteenth Amendment because it intentionally targeted a discrete group seeking the vote. *Id.*

So too here. This Court has "s[ought] in vain for any ground which would sustain" a non-discriminatory interpretation of the Opinion both under the flexible *Anderson-Burdick* standard and now the Twenty-Sixth Amendment. *Id.* But the Opinion's scope and effects are clear abridgements of voting rights justified by, at best, weak interests. While Oklahoma in 1910 abridged voting rights by choosing an invidious date to exclude African-Americans from voting, Florida in 2014 limited places to stymie young voters from early voting.

Even more, "[t]he historical background of the decision" is another source to reveal "invidious purposes." *Arlington Heights*, 429 U.S. at 267. In 2013, Florida's leading policymakers were expanding ballot access across the board. Defendant even recommended expanding early voting sites and giving supervisors of elections more flexibility. ECF No. 24, Ex. C, at 5 & 7–8. Defendant's Opinion stands as a shady contraction in a context of expansion and easier access—the *only* contraction, in fact.

To Defendant's credit, there is no evidence that the "specific sequence of events leading up to the challenged decision" was problematic. *Arlington Heights*, 429 U.S. at 267. Nor did Defendant "[d]epart[] from the normal

procedural sequence" in issuing the Opinion. *Id.* But following procedural formalities to intentionally discriminate on account of age does not automatically attach constitutionality to a law or policy.

If a unanimous Senate, near-unanimous House of Representatives, and 38 ratifying states intended the Twenty-Sixth Amendment to have any teeth, then the Amendment must protect those blatant and "unnecessary burdens and barriers" on young voters' rights. *Worden v. Mercer Cty. Bd. of Elections*, 61 N.J. 325, 345 (1972).[18] This Court can conceive of fewer ham-handed efforts to abridge the youth vote than Defendant's affirmative prohibition of on-campus early voting.

Because the Opinion is unexplainable on grounds other than age, Plaintiffs have established a substantial likelihood of success on the merits of their Twenty-Sixth Amendment claim.

---

[18] The House of Representatives voted in favor of the Amendment 401-19. 117 CONG. REC. H7569 (Mar. 23, 1971). The Senate voted in favor of the Amendment 94-0. 117 CONG. REC. S5830 (Mar. 10, 1971). Soon afterwards, three-fourths of the States ratified the Amendment. 36 Fed. Reg. 12725 (July 7, 1971). Additional states have ratified the Amendment since its passage. Florida has not.

34

## III

Plaintiffs must also demonstrate they will suffer irreparable injury without a preliminary injunction. *Siegel*, 234 F.3d at 1176 (citing *McDonald's Corp.*, 147 F.3d at 1306). They have.[19]

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (quoting *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Accordingly, irreparable injury is presumed when "[a] restriction on the fundamental right to vote" is at issue. *Obama for Am.*, 697 F.3d at 436. Once the election comes and goes, "there can be no do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). As this Court explained in another elections-related preliminary injunction order, "[t]his isn't golf: there are no mulligans." *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016).

Here, Plaintiffs have all articulated irreparable injury to their voting rights that will follow a denial of their motion for preliminary injunction.

---

[19] This Court addresses Defendant's redressability-related arguments—that granting Plaintiffs' motion will not guarantee Plaintiffs an on-campus early voting site—in its Order Denying Defendant's Motion to Dismiss. ECF No. 64, at 7-12.

Individual Plaintiffs will have to travel longer and farther to vote early, if they are even able to. *See supra* at 26, n.14. Some will need to take multiple buses or an Uber to cast a ballot. ECF No. 30, at ¶ 10; ECF No. 32, at ¶ 7. The organizational Plaintiffs' will suffer irreparable injury because their members will have to expend more resources and time to assist voters in accessing off-campus early voting. ECF No. 27, at ¶ 14; ECF No. 28, at ¶ 18. Those members will also be injured in having an on-campus early voting site affirmatively prohibited by Defendant's Opinion. ECF No. 27, at ¶ 15; ECF No. 38, at ¶ 18.

Considering the constitutional injuries and the one-shot nature of elections, Plaintiffs have established irreparable injury would follow a denial of their motion.

## IV

This Court next considers whether "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party." *Siegel*, 234 F.3d at 1176. This is not a close call. On the one hand, the threatened injury is the violation of Plaintiffs' First, Fourteenth, and Twenty-Sixth Amendment rights—and the First, Fourteenth, and Twenty-Sixth Amendment rights of nearly 830,000 public college and university students across Florida.

On the other hand, Defendant's far-reaching, discriminatory Opinion would no longer have any effect. That is hardly inequitable "damage" to

36

Defendant. *Id.* After all, the Opinion's invalidation only restores supervisors' of elections discretion in designating early voting sites according to the Early Voting Statute. While Florida's 67 election supervisors must finalize a list of all early voting sites by July 29, 2018 for the August primary, Florida's supervisors could also not do so. Defendant could very well be correct that "adding one more task . . . could have a disruptive, cascading effect on [the supervisors'] well-planned timeline[s]" and they could decline to designate any on-campus early voting sites. ECF No. 45, at 27. They might agree that adding additional early voting sites "would inject unnecessary confusion and uncertainty." *Id.* at 3. But the benefits of barring supervisors from having that choice pales in comparison to the voting rights of 830,000 young voters.[20]

Finally, an injunction is unquestionably in the public interest. "The vindication of constitutional rights . . . serve[s] the public interest almost by definition." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012). Quite simply, allowing for easier and more accessible voting for all segments of society serves the public interest. "Cementing unconstitutional obstacles to 'that right strike at the heart of representative

---

[20] Defendant also makes an argument that Plaintiffs' lawsuit is too late because the Opinion is more than four years old. ECF No. 45, at 26–28. Individual Plaintiffs persuasively point out that none of them could vote in 2014; in fact, Alexander Adams is voting for the first time in 2018. ECF No. 47, at 11. It is up to the supervisors of elections to determine if it is "too late" to add on-campus early voting site for the 2018 elections. ECF No. 45, at 28.

government.'" *Fla. Democratic Party*, 215 F. Supp. 3d at 1258 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).

Voter turnout in the United States is at less than impressive levels. Younger voters turn out at noticeably lower rates than older voters—53 percent for those Florida voters aged 18 to 29 versus 70 percent for all registered Florida voters in 2016. Smith Rep., at 7–8. Throwing up roadblocks in front of younger voters does not remotely serve the public interest. Abridging voting rights never does.

V

This Court is not the Early-Voting Czar. Except for the invalidation of Defendant's Opinion, nothing must change because of this Order. This Court does not order the supervisors of elections to designate a single early voting site on a single college campus; rather, this Order removes the handcuffs from Florida's supervisors of elections and restores their discretion in setting early voting sites.

Accordingly,

**IT IS ORDERED:**

1. Plaintiffs' Motion for Preliminary Injunction, ECF No. 22, is **GRANTED**.

2. The Secretary of State is preliminary enjoined from implementing or enforcing the Early Voting Statute in any way prohibiting or

38

discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center for early voting because that facility is related to, designed for, affiliated with, or part of a college or university, including through the use of the Secretary of State's powers to obtain and maintain uniformity in the interpretation and implementation of Florida's election laws;

3. The Secretary of State shall issue a directive to the supervisors of elections advising them that the interpretation of the Early Voting Statute that excludes from consideration as early voting sites any facilities related to, designed for, affiliated with, or part of a college or university, is unconstitutional and, accordingly, the supervisors of elections retain discretion under the Early Voting Statute to place early voting sites at any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center, including any such site as may be related to, designed for, affiliated with, or part of a college or university.  The Secretary shall include in the directive a copy of this Order.

39

4. The Secretary of State shall file in this Court's electronic case filing system a Notice of Compliance with the above paragraphs on or before Friday, July 27, 2018.

5. The preliminary injunction set out above will take effect upon the posting of security in the amount of $500 for costs and damages sustained by a party found to have been wrongfully enjoined. Plaintiffs will immediately notify Defendant when the bond has been posted and thereafter file proof of such notice in this Court's electronic case files systems.

**SO ORDERED on July 24, 2018.**

**s/Mark E. Walker**
**Chief United States District Judge**