## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

LEAGUE OF WOMEN VOTERS OF
FLORIDA, INC., THE ANDREW
GOODMAN FOUNDATION, INC.,
AMOL JETHWANI, MARY ROY a/k/a
JAIME ROY, DILLON BOATNER,
ALEXANDER ADAMS, ANJA RMUS,
MACKINTOSH JOACHIM, BRIANNA
PALAZZOLO, and ALEXANDER
PEREDA,

     Plaintiffs,

     v.

LAUREL M. LEE, in her official capacity
as the Florida Secretary of State,

     Defendant.

Case No. 4:18-cv-00251
(MW/CAS)

## SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., THE

ANDREW GOODMAN FOUNDATION, INC., AMOL JETHWANI, MARY

ROY a/k/a JAIME ROY, DILLON BOATNER, ALEXANDER ADAMS, ANJA

RMUS, MACKINTOSH JOACHIM, BRIANNA PALAZZOLO, and

ALEXANDER PEREDA, by and through their undersigned counsel, file this

SUPPLEMENTAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE

RELIEF against Defendant LAUREL M. LEE, in her official capacity as the

1

Florida Secretary of State (the "Secretary"),[1] and allege as follows:

## NATURE OF THE CASE

1.    This litigation concerns the Secretary's interpretation and application of Florida law as it relates to early voting sites in facilities affiliated with Florida's colleges and universities. Although nothing in Fla. Stat. § 101.657 (1)(a) (the "Early Vote Statute"), the law that establishes where Florida's supervisors of elections (the "supervisors") may offer early voting, explicitly prohibits the use of such facilities, the Secretary issued an advisory opinion in 2014 that found that (1) *any* facilities that are "related" to, "designated for," "affiliated with," or "part of" a Florida college or university were impermissible early voting sites; and (2) student unions, such as the University of Florida's ("UF") Reitz Union do not constitute government-owned community centers or convention centers for purposes of early voting under the Early Vote Statute (the "2014 Opinion").

2.    Plaintiffs brought this action to obtain declaratory relief and preliminary and permanently enjoin the 2014 Opinion, both because of its discriminatory purpose and effect, specifically in burdening and in some cases denying the voting rights of Plaintiffs, together with hundreds of thousands of

---

[1]For purposes of the Supplemental Complaint, all allegations referencing the Secretary encompass both Secretary Lee in her official capacity, as well as her predecessors in their official capacities.

Florida's young voters, under the First, Fourteenth, and Twenty-Sixth Amendments.

3.    In July of last year, the Court issued Plaintiffs' requested preliminary injunction (the "Preliminary Injunction Order"), finding that the 2014 Opinion violated the First, Fourteenth, and Twenty-Sixth Amendments—a finding that the Secretary declined to appeal. Nevertheless, the Secretary continues to deny any and all wrongdoing in connection with the interpretations expressed in the 2014 Opinion and continues to make shifting and ambiguous statements regarding the permissibility of college and university campus early voting sites, declining repeatedly to offer clear and unambiguous direction to the supervisors as a whole to ensure that young voters' access to early voting is not thwarted by the Secretary's historically hostile and persistently opaque interpretation of the Early Vote Statute.

4.    After the Court issued its Preliminary Injunction Order, in which it found the Secretary's alternative explanation for the total dearth of early voting sites on campus—a claimed lack of adequate parking—to be pretextual, eleven early voting sites were opened on Florida's college and university campuses. This immediate response itself proved that the Court's conclusion about the Secretary's arguments about parking was correct. Supervisors had not offered early voting on

campus previously for a very simple reason—they understandably believed the Secretary interpreted the Early Vote Statute to prohibit it.

5.      As a direct result of Plaintiffs' efforts and the Court's issuance of the preliminary injunction order, nearly 60,000 ballots were cast at those eleven early voting sites that otherwise would have never been opened.

6.      Following the issuance of the Preliminary Injunction Order, the Secretary offered several new directives, each of which underscored that, while early voting could presently be offered on campus as a result of the Court's order, that order was preliminary and subject to change. The Secretary's most recent directive, which was issued in a clear effort to moot this action, was no different; further, it explicitly appears to reembrace the conclusion of the 2014 Opinion, that student unions do not qualify as the types of sites that may be used permissibly for early voting under the Early Vote Statute (the "2019 Directive").

7.      Plaintiffs supplement their Complaint to clearly reach the Secretary's continued conduct, which, upon information and belief, is both intentionally discriminatory toward young voters and will have the effect of burdening or denying their right to participate in elections in Florida, in violation of the First, Fourteenth, and Twenty-Sixth Amendments. In addition, just one day after the Court rejected the Secretary's argument that the 2019 Directive rendered this matter moot, the Florida Legislature slipped in a last-minute amendment to the

Early Vote Statute in an attempt to codify the exact pretextual alternative explanation for the Secretary's discriminatory and burdensome interpretation of the Statute into the law (the "Permitted Parking Prohibition"), and avoid the import and impact of this Court's Preliminary Injunction Order, specifically the discretion to the supervisors to offer early voting to the substantial populations of young voters that reside in or around the state's college and university campuses. Plaintiffs supplement their Complaint to add claims reaching this unjustifiable revision to the law, which also violates the First, Fourteenth, and Twenty-Sixth Amendments. Plaintiffs also supplement the complaint to add additional student plaintiffs and update the complaint's factual allegations regarding the existing plaintiffs.

## JURISDICTION AND VENUE

8.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

9.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the Constitution and laws of the United States.

10.     This Court has personal jurisdiction over the Secretary, who is sued in her official capacity only.

11.     Venue is proper in the Tallahassee Division of the U.S. District Court in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because, *inter alia*, the Secretary resides in the Tallahassee Division in the Northern District, is subject to this Court's personal jurisdiction, and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.

12.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

13.     All conditions precedent to the maintenance of this case and Plaintiffs' claims have occurred, been performed, or otherwise waived.

## PARTIES

14.     Plaintiff, LEAGUE OF WOMEN VOTERS OF FLORIDA, INC. (the "League"), is a nonpartisan political organization dedicated to encouraging informed and active participation of citizens in government, including young citizens in Florida. Among other things, the League educates citizens about their voting rights and facilitates voting including through get-out-the-vote efforts, registration drives, and BeReadytoVote.org, which is a website published by the League to give Florida voters "all the voter registration and election information [they] need." The League is active in, and dedicated to, enabling and protecting the right to vote of Florida's young voters, including specifically students who are eligible to vote. Demonstrative of this commitment, the League offers free

membership to all Florida students. The League has 6,721 members, approximately 548 of whom are students. A substantial number of the League's student members reside on or near Florida's college or university campuses. To achieve its mission, the League devotes substantial time, effort, and resources to encouraging voting by engaging in voter registration at various community events, in public places, such as parks and college and university campuses, and by educating members of the community, including young people on campuses, about the League, public policy issues, and the importance of voting.

15.     In 2018, after the issuance of the Preliminary Injunction Order, the League and its members advocated to supervisors, county government, and university officials for the placement of early voting sites on college and university campuses. While some supervisors, county governments, and university officials moved quickly, it took a campaign of public advocacy by the League and its allies to convince decisionmakers in other locations to establish campus early voting sites. The Permitted Parking Prohibition, which places additional restrictions upon the selection of early voting sites, will only make these efforts more difficult. In the case of some campuses with very limited nonpermitted parking options, the Permitted Parking Prohibition may make it impossible for a supervisor to locate early voting sites so as to provide all voters in the county—including young voters who live and work on or in close proximity to such campuses—an equal

opportunity to cast a ballot. The League has devoted and will continue to devote substantial time, effort, and resources to such campaigns for the placement of early voting sites on college and university campuses. Thus, as a direct result of the Secretary's interpretation of the Early Vote Statute and the Permitted Parking Prohibition, the League's organizational mission and a substantial number of its members and the constituencies that the League serves, have been and will suffer injury to both their organizational mission and voting rights. In addition, many of the League's members, and members of the voting constituencies the League exists to serve, will find it highly difficult—and, in some cases, impossible—to travel to their closest early voting site, which, in many cases, may be several miles away, to participate in early voting. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

16. Plaintiff, THE ANDREW GOODMAN FOUNDATION, INC., is a nonpartisan, nonprofit organization with the mission of making young voices and votes a powerful force in democracy. In the summer of 1964, Andrew Goodman, the Foundation's namesake, participated in Freedom Summer, a voter registration

project aimed at registering African-American voters in Mississippi. On Andrew Goodman's first day, June 21, 1964, he and his fellow civil rights advocates James Chaney and Michael Schwerner were kidnapped and murdered by members of the Ku Klux Klan, who did not want Black Mississippians to have access to the ballot box and the right to vote. Today, the Andrew Goodman Foundation empowers and develops youth leaders who work to increase youth civic power and youth voting rates, and provides financial assistance, training and mentoring to student leaders and recent college graduates as well as mini-grants to select institutions of higher learning. The Andrew Goodman Foundation's Vote Everywhere initiative is a national, non-partisan, civic engagement movement of student leaders ("Student Ambassadors") and university partners. The program provides extensive training, resources, as well as a peer network to support its Student Ambassadors while they work to register voters, remove voting barriers, organize Get Out The Vote ("GOTV") activities, and tackle important social justice issues on their college campuses. Vote Everywhere is located on 59 campuses in 24 states plus Washington D.C., including four campuses in the state of Florida: The UF campus in Gainesville and three campuses at Miami Dade College. To achieve its mission, the Andrew Goodman Foundation devotes substantial time, effort, and resources to training and supporting Student Ambassadors who work to transform their campus culture to encourage youth civic engagement and electoral participation, including

registering voters, removing impediments to voting, GOTV, and advocating for the voting rights of their communities.

17.     In 2018, after the issuance of the Preliminary Injunction Order, the Andrew Goodman Foundation and its members advocated to supervisors, county government, and university officials for the placement of early voting sites on college and university campuses. While some supervisors, county governments, and university officials moved quickly, it took a campaign of public advocacy by the Andrew Goodman Foundation and its allies to convince decisionmakers in other locations to establish campus early voting sites. The Permitted Parking Prohibition, which places additional restrictions upon the selection of early voting sites, will only make these efforts more difficult. In the case of some campuses with very limited nonpermitted parking options, the Permitted Parking Prohibition may make it impossible for a supervisor to locate early voting sites so as to provide all voters in the county—including young voters who live and work on and in close proximity to such campuses—an equal opportunity to cast a ballot. The Andrew Goodman Foundation has devoted and will continue to devote substantial time, effort, and resources to such campaigns for the placement of early voting sites on college and university campuses. Thus, as a direct result of the Secretary's interpretation of the Early Vote Statute and the Permitted Parking Prohibition, the Andrew Goodman Foundation's organizational mission of making young voices

and votes a powerful force in democracy has been and will continue to suffer injury, as will the voting rights of the student voters that the Andrew Goodman Foundation serves to champion and protect. In addition, the Andrew Goodman Foundation's Student Ambassadors themselves, as well as the student members of the campus communities that the Student Ambassadors serve, will find it highly difficult—and, in some cases, impossible—to travel to their closest early voting site, which, in many cases, may be several miles away, to participate in early voting. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

18. Plaintiff AMOL JETHWANI is a resident of Miami-Dade County and is 22 years old. In 2018, Mr. Jethwani was enrolled at UF and was a registered voter in Alachua County, Florida. Mr. Jethwani plans to update his registration to Miami-Dade County when he moves into a new apartment in North Miami Beach within the next few weeks. Mr. Jethwani is applying to the University of Central Florida's online degree program, and will likely enroll in the spring of 2020. Mr. Jethwani is currently working full time in Miami Dade County as a community organizer, with a focus on electoral organizing and GOTV efforts at campuses in

Miami-Dade County including but not limited to Florida International University ("FIU") and the University of Miami. A significant component of Mr. Jethwani's GOTV activities at college campuses in 2020 will include promoting early voting and assisting college students with early voting. In 2018, Mr. Jethwani lived four blocks from the campus of UF at 1500 NW 4th Avenue, Gainesville, FL 32603, and was registered to vote at that address. Mr. Jethwani originally preregistered to vote in high school; the UF College Democrats helped him change his registration to Gainesville when he was a freshman. Mr. Jethwani has consistently used early voting to vote in Florida, but because all of his experience as a voter in Florida thus far has been as a student of a public university, until the Preliminary Injunction Order, early voting had always come with considerable difficulty. In the spring of 2016, he was able to vote in the Democratic primary and city election only because he was driven to the polls by a member of the UF College Democrats, who had a car. In the fall of 2016, Mr. Jethwani worked with the Florida Democratic Party to coordinate rides to polling sites for college students for both early and election day voting. This involved signing up students who wanted to vote, finding students willing to drive, coordinating the students who wanted to vote with the students with cars, and then finding a time when everyone's schedule would permit them to go to vote. In addition, given space constraints, each car could necessarily only fit four interested voters. In the spring of 2018, Mr. Jethwani was a full-time student

and active member of the Florida College Democrats at both the UF and statewide level, and was a candidate for the Florida House of Representatives. Because his schedule was likely to make it difficult and burdensome for him to vote on election day, he hoped to be able to use early voting in the 2018 primary and general elections. However, until the Preliminary Injunction Order, traveling to and from the nearest early voting site was likely to be burdensome. Prior to the Preliminary Injunction Order, the closest early voting location to Mr. Jethwani's residence at the time was located 1.5 miles away, at the Gainesville Office of the Supervisor of Elections.

19.     In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Alachua County Supervisor was able to designate UF's Reitz Union as an early voting location and Mr. Jethwani voted early at that location. Mr. Jethwani plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mr. Jethwani's work schedule is likely to make it difficult and burdensome for him to vote on election day, he hopes to be able to use early voting in the 2020 primary and general elections. However, because his community organizing work will frequently require him to be present at various campuses in Miami-Dade County during the early voting period, traveling to off-campus early voting sites is likely to be burdensome for Mr. Jethwani. In addition, if early voting

sites are not located on campuses in Miami-Dade County, including FIU and the University of Miami, Mr. Jethwani will have to expend more resources and effort to achieve his interest as an organizer in conducting GOTV efforts targeting college student voters.

20. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mr. Jethwani's right to vote has been and will continue to be burdened, both because he was and will be denied equal opportunity to participate in early voting as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mr. Jethwani, to access early voting in Florida. In addition, Mr. Jethwani's interest in organizing other young voters to participate in the democratic process has been and will continue to suffer injury. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

21.     Plaintiff MARY ROY, who identifies as gender queer, prefers the use of the gender-neutral pronoun "they," and goes by "Jaime," is a resident and registered voter in Alachua County, Florida. They are 21 years old and a rising senior at UF. In addition to attending school fulltime through the spring of 2019, they also worked approximately 15 to 20 hours a week as a freelance writer and had a busy extracurricular schedule that involves youth civic engagement organizing and activism and swing dancing. Mx. Roy has also previously served as an Andrew Goodman Foundation Student Ambassador. Mx. Roy is currently on a leave of absence during the fall semester of 2019, and plans to re-enroll as a full time student in the spring of 2020, continuing through the fall semester of 2020. Mx. Roy lives approximately three miles from the UF campus and is registered to vote at their current address, 4455 SW 34th Street, Gainesville, FL 32608. In August 2019, Mx. Roy will move to 2330 SW Williston Road, Gainesville, FL 32608, which is also approximately three miles from campus. Mx. Roy has used both early and election day voting to vote in Florida, but, prior to the Court's Preliminary Injunction Order, voting early came with considerable difficulty, as Mx. Roy does not own a vehicle and is entirely dependent on public transportation. They were able to vote early in the 2016 general election at Gainesville's Millhopper Library, because they were given a ride by their sister. For the 2018 Gainesville City Commissioner race, Mx. Roy voted in-person on election day at

the Florida Museum of Natural History in Gainesville. In order to get to the Florida Museum of Natural History to vote, Mx. Roy had to take two buses from their house for a trip that takes between 40 minutes to one hour each way.

22.    In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Alachua County Supervisor was able to designate UF's Reitz Union as an early voting location and Mx. Roy voted early at that location. Mx. Roy plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mx. Roy's schedule and reliance on public transit are likely to make it difficult and burdensome for them to vote on election day, they hope to be able to use early voting in the 2020 primary and general elections. However, if the Reitz Union or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Mx. Roy.

23.    Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mx. Roy's right to vote has been and will be continue to be burdened, both because they were and will be denied equal opportunity to participate in early voting as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the

Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mx. Roy, to access early voting in Florida. These injuries are highly likely to repeat themselves, if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

24.    Plaintiff DILLON BOATNER is currently a registered voter in Alachua County, Florida. He is 22 years old, a student at UF, and a student member of the League. Since the fall of 2018, Mr. Boatner has lived at 318 SW 27th St., Gainesville, FL 32607, about one mile from campus. Mr. Boatner passionately believes there should be early in-person voting on campus and he has vigorously campaigned for on-campus early voting. At a League event in December 2017, Mr. Boatner asked State Senator Keith Perry (R - 8th District) whether he would be willing to support a bill to change Florida law to explicitly permit early in-person voting on campus. Mr. Boatner was told by Senator Perry, however, that it was too late in the legislative session to propose a new bill. Undeterred, Mr. Boatner found a somewhat-related bill that sought to amend the vote-by-mail statute to allow for voters to drop off vote by mail ballots at any early voting location within the county where the voter is registered, and he testified

before the Senate Rules Committee about amending the bill to include a change to the Early Vote Statute.

25. Mr. Boatner is both a student and has worked since his freshman year, first delivering pizzas and more recently on political campaigns. He currently works 30-40 hours per week in addition to taking a part-time course load. Mr. Boatner plans to graduate from UF after either the fall or spring semester of the 2019-2020 school year. He plans to continue to work after he graduates, and may continue to live at his current address in Gainesville, or may move elsewhere in the state. In 2018, Mr. Boatner was concerned his schedule was likely to make it difficult and burdensome to vote on election day, so he hoped to be able to use early voting in the 2018 general election. Prior to the Court's Preliminary Injunction Order, the closest early voting location to Mr. Boatner's residence was located approximately 2.5 miles away at the Gainesville Office of the Supervisor of Elections. While Mr. Boatner owns a car, he commutes to campus on the bus or on foot daily for class because parking on campus is difficult. In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Alachua County Supervisor was able to designate UF's Reitz Union as an early voting location and Mr. Boatner voted early at that location. Mr. Boatner plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mr.

Boatner's schedule is likely to make it difficult and burdensome for him to vote on election day, he hopes to be able to use early voting in the 2020 primary and general elections. However, if the Reitz Union or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Mr. Boatner.

26. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mr. Boatner's right to vote was significantly burdened, both because he was denied an equal opportunity to participate in early voting as compared to voters who do not live on or in close proximity to Florida's higher educational institutions, and because the because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mr. Boatner, to access early voting in Florida. These injuries are highly likely to repeat themselves, if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular— either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

27. Plaintiff ALEXANDER ADAMS is a registered voter in Leon County, Florida. He is 20 years old and a rising senior at Florida State University

("FSU"). Mr. Adams lives on-campus and is registered to vote at 0 Ragans Hall, Tallahassee, FL 32306, although his dorm assignment changes from semester to semester. Mr. Adams anticipates that his dorm assignment will change in the fall; he intends to update his registration to reflect this change once he has a final dorm assignment. Mr. Adams plans to graduate from FSU after the 2020 spring semester, and plans to apply to graduate programs at FSU. If he enrolls in a FSU graduate program in the fall, he intends to continue to live on or near the FSU campus and anticipates that his other relevant circumstances will likewise remain unchanged in any meaningful way.

28.     The 2018 election was the first election in which Mr. Adams was eligible to vote. Mr. Adams was eager to vote and was preregistered to vote at the Department of Motor Vehicles when he first received his driver's license at 16 years old, while living with his parents. When he arrived on campus at 17 years old, a student group helped him change his registration to reflect his campus address. In the 2018-2019 school year, Mr. Adams was a teaching assistant for two classes, took an 18-credit course load, and began to work on his honors thesis in political science. A traditional fulltime course load at FSU is 12 credits, and most students take between 12 to 15 credits per semester. Mr. Adams was concerned that his schedule was likely to make it difficult and burdensome to vote on election day, so he hoped to be able to use early voting in the 2018 general election. Prior to

the Preliminary Injunction Order, the closest early voting location to Mr. Adams's residence at the time was located 1.0 miles away at the Leon County Courthouse.

29.    In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Leon County Supervisor was able to designate FSU's Tucker Civic Center as an early voting location and Mr. Adams voted early at that location. Mr. Adams plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mr. Adams's schedule is likely to make it difficult and burdensome for him to vote on election day, he hopes to be able to use early voting. During the upcoming school year, Mr. Adams will again serve as a teaching assistant for two classes, will take a 15 to 16-credit course load, and will be preparing applications to graduate schools. Almost all of Mr. Adams's classes for the upcoming year will meet on Tuesdays, making it very difficult for Mr. Adams to vote in person at a polling place on a Tuesday election day. If the Tucker Center or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Mr. Adams.

30.    Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mr. Adams's right to vote has been and will continue to be burdened, both because

he was and will be denied equal opportunity to participate in early voting as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mr. Adams, to access early voting in Florida. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

31.     Plaintiff ANJA RMUS is a resident and registered voter in Alachua County, Florida. She is 20 years old and a rising junior at UF. Ms. Rmus is moving into a new apartment near the UF campus and plans to update her voter registration to her new address, 902 SW 7th Avenue, Gainesville, FL 32601. She plans to continue to reside at this apartment during her senior year, which will begin in the Fall of 2020. Ms. Rmus is a full time student with an 18-credit course load, and has a busy extracurricular schedule that includes service as the president of a student club, tutoring, and volunteering with a nonpartisan civic engagement and GOTV effort on campus. Ms. Rmus has used both early and election day voting to vote in Florida, but prior to the Preliminary Injunction Order, early voting came with

considerable difficulty. Ms. Rmus has a vehicle but is concerned about using it frequently because it does not run well and because she is always concerned with losing her parking space, a frequent issue in Gainesville. Ms. Rmus uses her vehicle only to visit her family in Sarasota once or twice a month and otherwise walks everywhere. In the first election in which she was eligible to vote, her car was not functioning well and she was able to use early voting only because she was driven to the polls by a friend with a functioning vehicle and a dedicated parking space. In the second election for which she was eligible to vote, a Gainesville City Commissioner run-off election, Ms. Rmus found time to vote on election day only because she did not have classes that day. Because Ms. Rmus's schedule was likely to make it difficult and burdensome for her to vote on election day, she hoped to be able to use early voting in the 2018 primary and general elections. Prior to the Preliminary Injunction Order, the closest early voting location to Ms. Rmus's residence at the time was located 1.2 miles away, at the Gainesville Office of the Supervisor of Elections.

32.    In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Alachua County Supervisor was able to designate UF's Reitz Union as an early voting location and Ms. Rmus voted early at that location. Ms. Rmus plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election.

Because Ms. Rmus's schedule is likely to make it difficult and burdensome for her to vote on election day, she hopes to be able to use early voting in the 2020 primary and general elections. However, if the Reitz Union or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Ms. Rmus.

33. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Ms. Rmus's right to vote has been and will continue to be burdened, both because she was and will be denied equal opportunity to participate in early voting as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Ms. Rmus, to access early voting in Florida. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

34. Plaintiff MACKINTOSH "MACK" JOACHIM is a registered voter in Alachua County, Florida. He is 20 years old and a rising junior at UF. Mr. Joachim

lives in an apartment approximately three miles from the UF campus and is registered to vote at his current address, 3415 SW 39th Blvd, Gainesville, FL 32608. He plans to continue living at his current address for the foreseeable future. In addition to attending school fulltime, Mr. Joachim works on campus about 20 hours per week. Mr. Joachim also has a busy extracurricular schedule that includes student body government, his work as the President of the Gator Chapter of the NAACP, and voter registration and GOTV activities in the Gainesville Black community. Mr. Joachim does not own a car and commutes from his apartment to the Reitz Union by bus every day.

35.     Without the ability to vote early at the Reitz Union or another centrally located on-campus site, voting early (and, in Mr. Joachim's case, voting at all) would come with considerable difficulty. Mr. Joachim's 2018 assigned election day in-person voting site was prohibitively burdensome for him to access. In order to vote in-person on election day at his assigned polling place at the Florida Museum of Natural History in Gainesville, he would need to either walk or take a bus and walk for a trip that would take about 40 minutes each way. In addition, during the 2018 general election, Mr. Joachim served as an election day pollworker for Alachua County, and was assigned at the last minute to a polling location that was different than his assigned precinct, which he reached by paying for a ridesharing service. Mr. Joachim plans to serve as a pollworker in future

elections as well. During the 2018 primary election, Mr. Joachim traveled to the Gainesville Office of the Supervisor of Elections in order to vote early using a ridesharing service, a trip that cost him approximately $15 each way.

36.    In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Alachua County Supervisor was able to designate UF's Reitz Union as an early voting location. Mr. Joachim voted during early voting at the Reitz Union in the 2018 general election and has since voted during early voting at that same location for a local city election. In 2020, Mr. Joachim plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mr. Joachim's schedule and reliance on public transportation is likely to make it difficult and burdensome for him to vote on election day, he hopes to be able to use early voting in the 2020 primary and general elections. However, if the Reitz Union or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Mr. Joachim.

37.    Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mr. Joachim's right to vote has been and will continue to be burdened, both because he was and will be denied equal opportunity to participate in early voting

as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mr. Joachim, to access early voting in Florida. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

38.    Plaintiff BRIANNA PALAZZOLO is a registered voter in Miami-Dade County, Florida. She is 19 years old and a rising sophomore at FIU. Ms. Palazzolo pre-registered to vote in Broward County when she was 16 years old. Ms. Palazzolo currently lives in a dormitory on campus. During the 2018-2019 school year, she lived in a different campus dormitory, where she is registered to vote. She plans to update her voter registration to reflect her new dormitory's address, 11040 SW 14th St, Miami, FL 33174. In addition to attending school fulltime in the Fall of 2019, Ms. Palazzolo will be working on campus about 10-15 hours per week. Ms. Palazzolo also has a busy extracurricular schedule that includes serving as a member of the Youth Advisory Board for the City of Sweetwater, and voter registration and GOTV activities on campus and in the

community. Ms. Palazzolo does not own a car and relies primarily upon friends with cars and ridesharing services to travel to locations that are not within walking distance of her dormitory.

39.     Without the ability to vote early at the FIU Student Academic Success Center or another centrally located on-campus site, voting early would come with considerable difficulty for Ms. Palazzolo. Prior to the Preliminary Injunction Order, the closest early voting location to Ms. Palazzolo's residence at the time was located about 2 miles away, at the West Dade Regional Library. In order to travel to this site from her residence at the time, Ms. Palazzolo would have had to rely upon public transportation for a trip that would take about 25-30 minutes each way, or would have had to split the cost of a ridesharing service with friends.

40.     In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Miami-Dade County Supervisor was able to designate the FIU Student Academic Success Center as an early voting location. Ms. Palazzolo voted during early voting at the Student Academic Success Center in the 2018 general election. Before she walked to the Student Academic Success Center to vote on the first day of early voting, Ms. Palazzolo knocked on the doors of her dormitory hallmates, and invited them to join her. About twenty-five students from Ms. Palazzolo's dormitory joined her. Ms. Palazzolo found the pollworkers at the Student Academic Success Center to be well prepared, and did not notice or hear

about any problems encountered by other students voting at the site. In 2020, Ms. Palazzolo again plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Ms. Palazzolo's schedule is likely to make it difficult and burdensome for her to vote on election day, she hopes to be able to use early voting in the 2020 primary and general elections. However, if the Student Academic Success Center or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Ms. Palazzolo.

41. Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Ms. Palazzolo's right to vote has been and will continue to be burdened, both because she was and will be denied equal opportunity to participate in early voting as compared to voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Ms. Palazzolo, to access early voting in Florida. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus

voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

42.     Plaintiff ALEXANDER PEREDA is a registered voter in Miami-Dade County, Florida. He is 19 years old and a rising second year student at Miami Dade College-North Campus, where he is a member of the Honors College. The Honors College involves a heavier and more rigorous course load, and almost half of Honors College graduates transfer to a nationally-ranked four-year college after two years. Mr. Pereda currently lives with his family at 8361 NW 166 Terrace, Miami Lakes, FL, 33016 where he is registered to vote. Mr. Pereda voted for the first time in the 2018 general election. In addition to attending school full time during the upcoming Fall and Spring semesters, Mr. Pereda plans to work on campus about 10 hours per week. Mr. Pereda also has a busy extracurricular schedule that includes serving in leadership positions with a student organization focusing on criminal justice issues and with the Phi Theta Kappa honor society, and civic engagement GOTV activities on campus through his work as an Andrew Goodman Foundation Student Ambassador. Mr. Pereda has a car and commutes to campus each day from his home in Miami Lakes. Although his commute can take as few as 20 minutes one way in the middle of the day, it can take him about an hour during rush hour in the morning. During his first year on campus, Mr. Pereda would arrive in the morning and would not usually leave campus until he was done

with his evening classes or studying, typically after 8 p.m. He does not typically use his car at all during that time. Mr. Pereda plans to graduate from Miami Dade College in the spring or summer of 2020, and will apply to transfer to a four-year institution, including four-year colleges and universities in the state of Florida.

43.     Without the ability to vote early at the North Campus Library or another centrally located on-campus site, voting early would come with considerable difficulty for Mr. Pereda. In the 2018 general election, as a result of the Court's Preliminary Injunction Order, the Miami-Dade County Supervisor was able to designate the Miami Dade College-North Campus Library as an early voting location. Mr. Pereda attempted to vote during early voting at the North Campus Library in the 2018 general election. When he presented himself to vote, the pollworkers told him that there was an issue in their system that prevented him from voting at that site. The pollworkers helped him locate another early voting location. Because he was concerned that he would not be able to early vote on another day due to his exam schedule, Mr. Pereda left campus and drove to that other early voting location, which took him about 20 to 25 minutes. After a 20-minute wait in line, Mr. Pereda was able to vote. Mr. Pereda estimates that had he been permitted to vote at the North Campus Library early voting location, it would have taken him about 10 minutes total. In addition, Mr. Pereda has concerns about voting on election day. While volunteering with a local union to hand out flyers in

the morning outside a local polling place on election day, Mr. Pereda witnessed lines that stretched out of the building and down the block, and saw voters who appeared to be leaving the line because they could not afford to wait any longer in order to vote. Later that day, he attempted to help two of his friends find their local polling place. His friends, who lived only a few blocks from one another, first traveled to the wrong polling location, and it was only when they reached the second polling location that they discovered that they were assigned to two different polling places, which Mr. Pereda and his friends found to be very confusing. In 2020, Mr. Pereda plans to vote in the March 17, 2020 presidential preference primary election, in the August 18, 2020 primary, and in the November 3, 2020 general election. Because Mr. Pereda's schedule is likely to make it difficult and burdensome for him to vote on election day, he hopes to be able to use early voting in the 2020 primary and general elections. However, if the North Campus Library or another centrally located campus facility is not an early voting site, traveling to and from the nearest early voting site is likely to be burdensome for Mr. Pereda.

44.     Thus, as a direct result of the Secretary's interpretation and implementation of the Early Vote Statute and the Permitted Parking Prohibition, Mr. Pereda's right to vote has been and will continue to be burdened, both because he will be denied equal opportunity to participate in early voting as compared to

voters who do not live or work on or in close proximity to Florida's higher educational institutions, and because the Secretary's interpretation and the Permitted Parking Prohibition are meant to and will have the effect of making it more difficult for young voters, such as Mr. Pereda, to access early voting in Florida. These injuries are highly likely to repeat themselves if the Secretary is not permanently enjoined from interpreting, applying, and enforcing the Early Vote Statute in a manner that discriminates against young voters by targeting on-campus voting in particular—either expressly as in the 2014 Opinion, or implicitly as in the 2019 Directive and the Permitted Parking Prohibition.

45.    Defendant LAUREL LEE is the Secretary of State of Florida and is named as a Defendant in her official capacity. She is Florida's chief elections officer and, as such, is responsible for the administration and implementation of election laws in Florida, including the Early Vote Statute. *See* Fla. Stat. § 97.012(1) (describing Secretary of State as "the chief election officer of the state" who has the responsibility to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws"). To this end, the Secretary has the power and authority to "[p]rovide written direction and opinions to the supervisors on the performance of their official duties with respect to the Florida Election Code or rules adopted by the Department of State," and to "[b]ring and maintain such actions at law or in equity by mandamus or injunction to enforce the

performance of any duties of a county supervisor of elections or any official performing duties with respect to [Florida election law]." *Id.* at §§ 97.012(16), 97.012(14). This case challenges the Secretary's interpretation and application of the Early Vote Statute prohibiting supervisors from placing early voting sites on university or college campuses, as well as the Permitted Parking Prohibition contained in the newly-amended Early Vote Statute, which echoes the pretextual reasons given by the Secretary for the on-campus early voting ban and which the Secretary is responsible for administering and implementing, including through the provision of written directions and opinions to the supervisors, and through bringing actions to enforce the performance of supervisors' duties. The Secretary, personally and through the conduct of her employees and agents, acted under color of state law at all times relevant to this action.

## STATEMENTS OF FACTS AND LAW

### A.  History of Early Voting in Florida pre-2012

46.  Florida infamously experienced a host of problems surrounding the administration of the 2000 general election, including problems with registration, absentee ballots, butterfly ballots, and significant recount issues, which eventually required resolution in the Supreme Court. *See generally Bush v. Gore*, 531 U.S. 98 (2000); Mireya Navarro & Somini Sengupta, *Arriving at Florida Voting Places,*

*Some Blacks Found Frustration*, N.Y. TIMES (Nov. 30, 2000).[2] In an attempt to remedy these problems, Florida introduced several reforms, including early voting, which was enacted in 2004. *See* C.S.S.B. 2346, 2004 Fla. Sess. Ch. 2004-252, § 13; *see also* Abby Goodnough & Jim Yardley, *In Florida, Early Voting Means Early Woes*, N.Y. TIMES (Oct. 19, 2004) ("Presidential voting in Florida began two weeks early on Monday, in an effort to avoid many of the problems that plagued Election Day 2000.").[3]

47.    Since its introduction, early voting has proved enormously popular among Florida voters. More than one-third of Floridians who voted in 2004 used early voting or absentee voting, accounting for around 2.8 of 7.6 million ballots cast (37%). Since 2012, this ratio has been above 50% in every election: 56% in 2012 (roughly 4.8 million of the 8.53 million ballots cast), 53% in 2014 (roughly 3.2 million of the 6 million ballots cast), 68% in 2016 (roughly 6.6 million of the 9.6 million ballots cast), and 64% in 2018 (roughly 5.3 million of the 8.3 million ballots cast). Thus, for more than half of Florida's voters, early voting—and not election day voting—has become the means by which they access the franchise.

---

[2]*Available at* https://www.nytimes.com/2000/11/30/us/contesting-vote-black-voters-arriving-florida-voting-places-some-blacks-found.html; William Welch, Florida voting -- what's the hang up?, USA TODAY (Nov. 7, 2012).
[3]*Available at* https://www.nytimes.com/2004/10/19/us/the-2004-campaign-voters-in-florida-early-voting-means-early-woes.html.

48. Early voting has been particularly popular among Florida's college students. Among Florida college students whose campuses are enrolled in the National Study of Learning Voting, and Engagement ("NSLVE"),[4] which includes around 65% of all Florida college students, 29% of those voting utilized early voting in 2012, 19% utilized it in 2014, and 43% utilized it in 2016. These numbers were significantly above the national averages in the 32 states plus the District of Columbia that allow some form of early-in person voting, where early-in person voting comprised 16% of college student turnout in 2012, 8% in 2014, and 18% in 2016.

49. As originally enacted, the Early Vote Statute provided that:

> Early voting shall begin on the 15th day before an election and end on the day before an election. . . . Early voting shall be provided for at least 8 hours per weekday during the applicable periods. Early voting shall also be provided for 8 hours in the aggregate for each weekend during the applicable periods.

Fla. Stat. § 101.657(d) (2005).

50. Thus, when early voting was first approved in Florida, the early vote period lasted 13 to 15 days, with 104 total hours of early voting, including eight hours during each of the two weekends immediately preceding the election. The

---

[4]The NSLVE is a dataset that includes nearly 10 million students for each of the past three national elections: 2012, 2014, and 2016. About 20 million students are enrolled in U.S. higher education, so the NSLVE contains about half of all U.S. college students. The NSLVE contains data for 705,140 students enrolled at Florida institutions in 2012, 601,888 in 2014, and 727,597 in 2016.

early vote statute gave supervisors the discretion to determine whether weekend voting would take place on a Saturday, Sunday, or be split between those days. *See Florida v. United States*, 885 F. Supp. 2d 299, 308-09 (D.D.C. 2012).

51.     In 2005, the Legislature revised the statute slightly to allow more time between the end of early voting and election day, amending it to allow early voting to end "on the 2nd day before an election." *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1240 n.4 (M.D. Fla. 2012). This modification still left 96 total hours of early voting.

52.     This changed drastically in 2011, when the Republican-controlled Legislature passed, and Governor Rick Scott signed, House Bill 1355 ("HB 1355"), an omnibus election reform bill.

53.     As is relevant for the purposes of this lawsuit, HB 1355 reduced the number of days that supervisors could offer early voting, from a maximum of 14 to eight days; eliminated early voting on the Sunday immediately preceding election day; and gave supervisors the discretion to offer a total of between 48 and 96 hours of early voting, eliminating the requirement to provide 96 hours.

54.     The Early Vote Statute in 2011 thus read in relevant part:

Early voting shall begin on the 10th day before an election that contains state or federal races and end on the 3rd day before the election, and shall be provided for no less than 6 hours and no more than 12 hours per day at each site during the applicable period.

Fla. Stat. § 101.657(d) (2011).

55.    At the time that HB 1355 was enacted, five of Florida's counties—Collier, Hardee, Hendry, Hillsborough, and Monroe—were designated as "covered" jurisdictions under Section 5 of the Voting Rights Act. *Florida*, 885 F. Supp. 2d at 305. This meant that between 1975 and 2013, when the Supreme Court decided *Shelby County v. Holder*, 570 U.S. 529 (2013), Florida's language and racial minority voters in those counties enjoyed protection from disenfranchisement and burdens on the right to vote in the form of federal oversight of any changes in voting laws, practices, or procedures.

56.    Specifically, Section 5 prohibited covered jurisdictions from making any changes to their election laws, practices, or procedures until either the U.S. Department of Justice or a federal court determined that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color or [membership in a language minority group]." 42 U.S.C. § 1973(c) (2011). This process of seeking approval from the Department of Justice or a federal court was known as "preclearance."

57.    In accordance with Section 5's requirements, shortly after HB 1355's reductions to early voting were passed by the Legislature and signed by the Governor, the five covered Florida counties filed a complaint, seeking judicial preclearance of the changes. The federal court, however, found that it could not

38

preclear the early voting changes in HB 1355, "because the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters." *Florida*, 885 F. Supp. 2d at 303. "Specifically, the State has not proven that the changes will be nonretrogressive if the covered counties offer only the minimum number of early voting hours that they are required to offer under the new statute, which would constitute only half the hours required under the prior law." *Id.*[5]

58. Eventually, the State was able to obtain Section 5 preclearance, but only after it instituted a 7 a.m. to 7 p.m. voting schedule for the five covered Florida counties. *See* Resp. re Mot. for J. on Count Four of the Fourth Am. Compl. & Order *State of Florida v. United States of America, et al.*, No. 1:11-cv-01428 (D.D.C. Sept. 5, 6, 2012), ECF Nos. 158, 159. The remainder of Florida's counties retained discretion to offer between 48 and 96 hours of early voting, under the amended version of the law.

**B.      The 2012 Election**

59. Thus, at the time of the 2012 election, Florida law gave each county (except for those then covered by Section 5) discretion to offer between 48 and 96

---

[5]Under Section 5 of the VRA, a change affecting voting is considered to have a discriminatory effect if it will lead to a retrogression in the position of members of a racial or language minority group (i.e., will make members of such a group worse off than they had been before the change) with respect to their effective exercise of the electoral franchise. *Beer v. United States*, 425 U.S. 130, 140–42 (1976).

hours of early voting over a maximum of eight days. At the same time, Florida law also severely limited the types of facilities that could be designated as early voting sites.

60.     The pre-2013 version of the Early Vote Statute provided in relevant part:

> As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor . . . The supervisor may also designate any city hall or permanent public library facility as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable.

Fla. Stat. § 101.657(1)(a) (2012).

61.     In other words, in 2012, the Early Vote Statute strictly limited the locations that could be used for early voting to the main or branch office of the supervisor of elections. For a branch site to be used, it had to be a permanent facility of the supervisor of elections and to have been designated and used as such for at least one year prior to the election in which it would serve as an early voting site. The only other permissible early voting sites were city halls or permanent public library facilities.

62.     This combination of highly restrictive voting laws proved to be a recipe for disaster, as demonstrated by the November 2012 general election. Floridians attempting to vote early and on election day that year encountered what

the Secretary would later characterize as "excessive and unreasonable" long lines at several different voting sites across the state. Sec'y of State Ken Detzner, *Recommendations for Increased Accessibility & Efficiency in Florida Elections* at 4, Fla. Dep't of State (Feb. 4, 2013) (the "Secretary's 2013 Recommendations").[6]

63.    Some voters waited in line for as long as seven hours to cast an early ballot, and as many as 200,000 Florida voters may have given up and not voted at all due to such unreasonably long lines. *See* Lawrence Norden, Brennan Center for Justice, *How to Fix Long Lines* (2013), at 1.[7]

64.    Young voters were particularly burdened, as numerous Florida counties showed a high correlation between youth voters and longer lines. *See* Advancement Project, *The Time Tax: America's Newest Form of Voter Suppression for Millennials, and How it Must be Eliminated to Make Voting Accessible for the Next Generation* (2013);[8] Project Vote, *Enfranchising America's Youth* (2014).[9]

---

[6]*Available at* https://dos.myflorida.com/media/693815/secretarys-report-on-recommendations-2013.pdf.
[7]*Available at* http://www.brennancenter.org/sites/default/files/publications/How_to_Fix_Long_Lines.pdf.
[8]*Available at* http://b.3cdn.net/advancement/ba719924e82b44bb92_14m6bgjh0.pdf, at 4.
[9]*Available at* http://www.projectvote.org/wp-content/uploads/2014/05/POLICY-PAPER-Enfranchising-Americas-Youth-May-9-2014.pdf.

65.    In the aftermath of the 2012 election, Governor Scott "tasked [the Secretary] with making recommendations to increase the accessibility and efficiency in Florida Elections." Sec'y's 2013 Recommendations at 3.[10]

66.    In a report published in February of 2013, the Secretary acknowledged the serious problems with long lines that Floridians had encountered, with "many voters . . . waiting in line for hours to cast a ballot both during the early voting period and on Election Day." *Id*. at 4. The Secretary further attributed the "longer wait times … to factors including … inadequate voting locations." *Id*.

67.    The Secretary made several recommendations to protect against long lines in the future, including specifically: (1) to "[e]xtend the early voting schedule from a minimum of 8 days to a maximum of 14 days, while also allowing supervisors of elections the flexibility to offer early voting on the Sunday immediately prior to Election Day"; and (2) to "[e]xpand the allowable locations of early voting sites at government owned, managed or occupied facilities to include the main or branch office of a supervisor of elections, a city hall, courthouse,

---

[10]At that time, the office of Florida's Secretary of State was occupied by Kenneth Detzner, who would serve in that capacity for seven years, throughout Governor Scott's two terms, until 2019, and under whose auspices the 2014 Opinion was issued. Detzner also briefly held the same office in 2003, when he was appointed to it in an interim capacity by then-Governor Jeb Bush.

county commission building, public library, civic center, convention center, fairgrounds or stadium." *Id.* at 3.

68.    The Secretary specifically recommended expanding the early voting locations to address the problems that arose when "several early voting sites in some counties could not manage the volume of voters without enduring excessive and unreasonable waiting times to vote." *Id.* at 4. The Secretary found that, "[i]f given the flexibility to choose more and larger sites, *supervisors could more effectively select early voting locations that meet the geographic needs of their voters* and reduce the wait times at these locations." *Id.* at 5 (emphasis added). The Secretary further acknowledged that, "[d]ue to varying populations, geography and voting habits in Florida counties, 'one size does not fit all'" when it comes to early voting. *Id.*

69.    The Legislature subsequently enacted both recommendations into law with House Bill 7013 ("HB 7013") in the 2013 legislative session. In a gesture that was reportedly aimed at "correcting the legislative-created dysfunction of the 2012 election," *Editorial: House voting reforms don't go far enough*, TAMPA BAY TIMES (Mar. 7, 2013),[11] the House passed HB 7013 on the first day of the 2013 session—

---

[11]*Available at* http://www.tampabay.com/opinion/editorials/editorial-house-voting-reforms-dont-go-far-enough/2107637.

March 5, 2013—by a vote of 118-1. The bill passed the Senate on May 5, 2013 by a vote of 27-13. The Governor signed HB 7013 into law on May 21, 2013.

70.     One of HB 7013's explicit purposes was to "*expand[]* currently authorized [early voting] sites," Fla. House of Representatives Final Bill Analysis, Bill No. CS/HB 7013 (May 21, 2013) (emphasis added), specifically, to address the excessive and unreasonable long lines encountered by many of Florida's voters in 2012.

71.     As enacted, HB 7013 maintained that the supervisors must offer a minimum of eight days of early voting, but it expanded the minimum number of hours per day that each site was required to be open from a six-hour minimum to an eight-hour minimum.

72.     HB 7013 also revised the Early Vote Statute to permit supervisors to offer, in their discretion and in addition to the mandatory minimum of eight early voting days, additional days of early voting "on the 15th, 14th, 13th, 12th, 11th, or 2nd day before an election that contains state or federal races." Fla. Stat. § 101.657(1)(d). If the supervisors chose to offer additional days of early voting on these days, they must do so "for at least 8 hours per day, but not more than 12 hours per day." *Id*.

73.     At the same time, HB 7013 also expanded the types of facilities that could permissibly be used as early voting locations. While previously the Early

Vote Statute had only allowed for early voting sites to be located at the main or branch office of the supervisor of elections, city hall, or a public library facility, HB 7013 expanded that list to include "*any* . . . fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center." *Id.* at 1(a) (emphasis added).

74.    Thus, the language in the Early Vote Statute that governs the sites where early voting sites may be located was amended to read as follows:

> 101.657   Early voting.— (1)(a)   As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor [ . . . . ] In order for a branch office to be used for early voting, it shall be a permanent facility of the supervisor and shall have been designated and used as such for at least 1 year prior to the election. The supervisor may also designate any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable. In addition, a supervisor may designate one early voting site per election in an area of the county that does not have any of the eligible early voting locations. Such additional early voting site must be geographically located so as to provide all voters in that area with an equal opportunity to cast a ballot, insofar as is practicable. Each county shall, at a minimum, operate the same total number of early voting sites for a general election which the county operated for the 2012 general election.

*Id*.

75.   The Statute remained as written above until it was amended in response to the Court's Preliminary Injunction Order in this litigation to add the Permitted Parking Prohibition.

76.   Nothing in the Secretary's recommendations that precipitated these amendments or in the text of the law, as adopted by the Legislature in 2013 (and as it remained until June of this year), either explicitly or implicitly limited or excluded the use of facilities associated with a higher educational institution.

## C.   The Secretary's Interpretation of the Early Vote Statute

77.   Less than a year after HB 7013 was enacted, the Secretary promulgated an opinion severely limiting the scope of the Early Vote Statute.

78.   The opinion arose when the City of Gainesville inquired regarding the usage of UF's student union as an early voting site in advance of a March 2014 municipal election. At the time, UF was home to over 50,000 students, many of whom were residents of the campus.

79.   Nicolle M. Shalley, the City Attorney of Gainesville, sought a formal opinion from the Secretary to answer the following question: "Does the J. Wayne Reitz Union on the University of Florida campus constitute a government-owned community center or a convention center for purposes of early voting under [the Early Vote Statute]?" Fla. Dep't of State, Sec'y Op. RE: DE 14-01 Early Voting - Facilities, Locations § 101.657, Florida Statutes at 1 (Jan. 17, 2014) *available at*

http://opinions.dos.state.fl.us/searchable/pdf/2014/de1401.pdf      (the      "2014 Opinion").

80.     The Secretary answered this question in the negative in a letter opinion issued on January 17, 2014. *See id*. at 2. In reaching that opinion, the Secretary broadly opined, not only that the student union was not a permissible early voting because it could not constitute a government-owned community center or a convention center for the purposes of early voting, but that no "college- or university-related facilities" could be used as early voting sites. *Id*.

81.     Specifically, the Secretary found that the student union center was unacceptable as an early voting site because it "is a structure designed for, and affiliated with, a specific educational institution," i.e., "[i]t is a part of the University of Florida." *Id*. The Secretary concluded that the Early Vote Statute "cannot be construed so broadly to include the . . . Union *or any other college- or university-related facilities*…." *Id*. (emphasis added).

82.     Although the text of the Early Vote Statute includes no limiting language that would prohibit the use of facilities "related" to, "designed for," "affiliated with," or "part of" a Florida college or university, the Secretary claimed that the Early Vote Statute had to be interpreted to exclude all such sites because, in the same session that it ultimately enacted HB 7013, the Legislature also considered and rejected "several bills, as well as an amendment to House Bill

7013," which would have broadly permitted the use of *any* public college or university facility as an early voting site. *See id*. at 2 (describing proposed bill that would have permitted use of "*any* 'Florida College System institution facility, state university facility, or college facility'") (emphasis added); "Fla. SB 388, 2013 Leg., Reg. Sess. (2013) (same); Fla. SB 82, 2013 Leg., Reg. Sess. (2013)" (proposed bill that would have permitted the use of "*any* 'community college facility, [or] university or college'"); "Fla. SB 80, 2013 Leg., Reg. Sess. (2013) (any 'university or college'); Amendment to Fla. HB 7013 (bar code no. 152969), filed Feb. 20, 2013, 7:54 p.m., in Appropriations Committee, 2013 Leg. Reg. Sess. (2013)" (proposed bill that would have allowed, without limitation, any "Florida College System institution facility" to serve as early voting site).

83.    From the Legislature's failure to enact these proposed bills, the Secretary made the unsubstantiated and unsupportable leap that the Early Vote Statute must be read to prohibit the use of *any* college- or university-affiliated facility.

84.    As noted, the Secretary also concluded that the terms "convention center" and "government-owned community center" "cannot be construed so broadly as to include the Reitz Union."

85.     As a result, the City of Gainesville used two different early voting sites for the March 2014 election, both of which were more than a mile and a half away from the Reitz Union.

86.     At the time, UF spokeswoman Janine Sykes acknowledged that "[w]e're not opposed to the concept of hosting early voting on campus, but we are precluded by state law from doing so." Steve Bousquet, *Gainesville Mayor Blasts Crist, Nelson in Early-Vote Dispute*, MIAMI HERALD (Feb. 11, 2014).[12]

## D.     Young Voters and Early Voting

87.     In the Fall of 2016, there were 1,127,988 students enrolled at higher education institutions in Florida, with nearly three-quarters (828,181) enrolled at public institutions. Hundreds of thousands of these students are eligible to vote in Florida.

88.     The Early Vote Statute, as interpreted by the Secretary and now amended by the Legislature to include the Permitted Parking Prohibition, directly infringes upon and burdens the right of Plaintiffs and hundreds of thousands of Florida's eligible young voters to participate in elections in Florida. The result has too often been that young voters in particular are required to travel long distances to reach the nearest early voting location.

---

[12]*Available at* http://miamiherald.typepad.com/nakedpolitics/2014/02/11/index.html.

89. During the 2016 general election, the closest early vote location to the University of North Florida was 2.6 miles from campus, the closest early vote location to Florida State University was 1.4 miles from campus, and the closet early vote location to Florida Atlantic University was 1.3 miles from campus. Each of these institutions have facilities that would otherwise plainly qualify as acceptable early voting locations under the plain terms of the Early Vote Statute (at least before it was amended to include the Permitted Parking Prohibition).

90. Accessible on-campus early voting is particularly critical to young voters, who are less likely than members of the general public to have easy and immediate access to reliable transportation, particularly while they are attending school or on campus—where they spend the majority of their days—while at the same time having demanding, inflexible school and work schedules.

91. The percentage of 20 to 24-year-olds possessing driver's licenses has also steadily decreased over the last 35 years, Michael Sivak & Brandon Schoettle, *Recent Decreases in the Proportion of Persons with a Driver's License Across All Age Groups*, (January 2016) *available at* http://www.umich.edu/~umtriswt/PDF/UMTRI-2016-4.pdf ("[T]here was a continuous decrease in the percentage of persons with a driver's license for the years examined. For example, the percentages for 20- to 24-year-olds in 1983, 2008, 2011, and 2014 were 91.8%, 82.0%, 79.7%, and 76.7%, respectively."),

while the percentage for other age groups has remained significantly higher, *id.* ("[T]he percentages for 60- to 64-year-olds in 1983, 2008, 2011, and 2014 were 83.8%, 95.9%, 92.7%, and 92.1%, respectively."). Those that do have driver's licenses, often do not own vehicles, or the vehicles that they own are not easily accessible or reliable. Thus, they often must rely on public transportation or arrangements largely dictated by others, in order to access early voting sites.

92.     Younger voters (particularly first-time voters) also face information costs and are less likely to know where to vote, how Florida's voting process works in general, and the voting processes and facilities in their geographical area in particular. Without the flexibility that early voting provides, many young voters would find it highly difficult—and, in some cases, impossible—to make it to the polls to cast their ballots.

93.     Limitations on accessible early voting also correlate with significantly longer lines and wait times for the voters who are able to make it to the polls. Young voters in Florida already often face long lines and wait times due to large populations of registered voters at their precincts, as well as the information deficits they face, which cause them to often travel to the wrong location in the first place to attempt to vote, and to need more time to fill out ballots and navigate the voting process.

94.    When faced with a long line, some voters will be forced to forego voting, meaning that these added burdens are likely to discourage many from attempting to vote. This is particularly true of young voters, who are more likely to be first time voters and thus more likely to be discouraged by these, and other, barriers to entry. *See* Eric Plutzer, *Becoming a Habitual Voter: Inertia, Resources, and Growth in Young Adulthood*, 96 AM. POL. SCI. REV. 41, 41-56 (2002) (noting that voter turnout rates increase with age due, in part, to barriers to entry that reduce once voting becomes a habit and gains "inertia").

95.    There is no legitimate, much less compelling, state interest in permitting the use of "any" "public library facility[ies]," "civic center[s]," "stadium[s]," "convention center[s]," or "government-owned community center[s]," Fla. Stat. § 101.657(1)(a), to serve as early voting locations, except when those sites are "related" to, "designed for," "affiliated with," or "part of" a specific educational institution, to conclude that a student union cannot or does not qualify as a civic center, convention center, or government-owned community center, or to direct supervisors that they may not offer early voting in communities such as these, where many voters do not travel to the voting site by car or have a permit to park at or near the site, due to lack of sufficient nonpermitted parking to accommodate the anticipated amount of voters.

96.    The Secretary's preclusive interpretation of the Early Vote Statute—and the Legislature's post-litigation amendment of the law to add the Permitted Parking Prohibition—are the most recent attempt by politicians in Florida to limit early voting specifically to the detriment of young voters, who historically have been among the groups that have disproportionately sought to exercise their voting rights through early voting in Florida. *See* Michael Herron & Daniel Smith, *Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355*, 11 ELEC. LAW J.: RULES, POLITICS, AND POLICY 3, 331-347 (Sept. 2012) (concluding Democratic, young, and first-time voters were disproportionately likely to vote early in 2008 in Florida).

97.    In 2017, Republican State Representative Chuck Clemons publicly approved of the Secretary's textually dubious interpretation of the law, arguing that the responsibility should be on students to work harder to have their voices heard.

**E.    The Court's Preliminary Injunction Order**

98.    Plaintiffs initiated this action on May 22, 2018, ECF No. 1, and moved for a preliminary injunction on June 21, 2018, ECF No. 22.

99.    The Court, after holding a preliminary injunction hearing on July 16, 2018, granted Plaintiffs' motion for preliminary injunction. ECF No. 65.

100.    In its Preliminary Injunction Order, the Court found that Plaintiffs had a substantial likelihood of success on the merits of their claims that the 2014

Opinion violated the U.S. Constitution's First Amendment, Equal Protection Clause, and Twenty-Sixth Amendment. ECF No. 65, at 3.

101.    The Court found that the 2014 Opinion imposes significant burdens on Plaintiffs' First and Fourteenth Amendment Rights by effectively prohibiting a discrete class of individuals—nearly 830,000 Floridians who live and work on public college and university communities, *i.e.* overwhelmingly young voters— from even the possibility of an alternative, reasonable early voting location. *Id.* at 18, 20.

102.    As a result, the Court found that the 2014 Opinion has the effect of creating a secondary class of voters who are effectively denied early voting sites in the densely populated locations where they work, study, and, in many cases, live. *Id.* at 19. As the Court found, this class of voters is the only class in Florida subject to such a prohibition. *Id.* at 20.

103.    The Court also found that the Secretary articulated no precise interests sufficiently weighty to justify the burdens upon Plaintiffs' rights. *Id.* at 26.

104.    The Court further found that the Secretary's claimed interest in alleviating parking difficulties that an on-campus early voting site might create was neither precise nor sufficiently weighty. *Id.* This is because local supervisors are in a better position to evaluate parking at potential sites than the Secretary, and

adding additional early voting sites would alleviate long lines and parking problems at other early voting sites. *Id.* at 27-28.

105. The Court found that the 2014 Opinion was intentionally discriminatory on account of age; that it reveals a stark pattern of discrimination, inexplicable on grounds other than age because it bears so heavily on younger voters than all other voters; and that the Secretary's stated interests for the 2014 Opinion (following state law, avoiding parking issues, and minimizing on-campus disruption) "reek of pretext." *Id*. at 30-32. It stated: "This Court can conceive of fewer ham-handed efforts to abridge the youth vote than Defendant's affirmative prohibition of on-campus early voting." *Id.* at 34.

106. Similarly, the Court found that the historical background of the decision revealed invidious purposes: given that the Legislature and the Secretary had advocated expanding early voting sites and giving supervisors more flexibility, the 2014 Opinion stood out as "a shady contraction in a context of expansion[.]" *Id.* at 33.

107. Based on these findings, the Court entered a preliminary injunction, enjoining the Secretary, "from implementing or enforcing the Early Vote Statute in any way prohibiting or discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-

owned community center for early voting because that facility is related to, designed for, affiliated with, or part of a college or university, including through the use of the Secretary of State's powers to obtain and maintain uniformity in the interpretation and implementation of Florida's election laws[.]" *Id.* at 38-39.

108. The Court also ordered the Secretary to "issue a directive to the supervisors . . . advising them that the interpretation of the Early Vote Statute that excludes from consideration as early voting sites any facilities related to, designed for, affiliated with, or part of a college or university, is unconstitutional and, accordingly, the supervisors . . . retain discretion under the Early Voting Statute to place early voting sites at any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center, including any such site as may be related to, designed for, affiliated with, or part of a college or university." *Id.* at 39.

**F.    On-Campus Early Voting Following the Court's Preliminary Injunction**

109. As a direct result of the Court's Preliminary Injunction Order, the Secretary issued a directive to the supervisors (the "2018 Directive") freeing them to open early voting sites on college and university campuses while the injunction was in place.

110. Even though the Court's Preliminary Injunction Order issued only about three months before the beginning of early voting for the November 2018 election, and many supervisors had already completed their early voting site plans, several acted quickly to open early voting sites on campuses across the state.

111. By the end of the early voting period, nearly 60,000 voters had cast their ballots at the eleven on-campus early voting sites that would not have existed absent the Court's Order:

| CAMPUS | LOCATION | VOTES |
|---|---|---|
| University of Florida | J. Wayne Reitz Union | 7,908 |
| Florida State University | Tucker Center | 6,114 |
| University of Central Florida | Live Oak Event Center | 5,117 |
| University of South Florida | Yuengling Center | 4,666 |
| University of North Florida | UNF University Center | 3,416 |
| Edward Waters College | Schell-Sweet Community Center | 2,109 |
| Florida Atlantic University | Housing & Residential Education Building | 4,410 |
| Florida Int'l University | Student Academic Success Center | 7,704 |
| Nova Southeastern University | Huizenga College of Business | 4,871 |
| Miami-Dade, North Campus | North Campus Library | 5,643 |
| Miami-Dade, Kendall Campus | Fascell Conference Center | 5,681 |
| **Total** | | **57,639** |

112. The result of the Preliminary Injunction Order was clear: As the Court has found, "to little surprise, [the 2018 Directive] had a strong impact on the

number of college and university facilities designated as early-voting sites." ECF No. 111, at 4.

113. The resulting dramatically expanded access to early voting for young people in Florida has had a profound impact on the Plaintiffs and other impacted young voters. *See, e.g.*, Hannah Beatty, *First two days of early voting at Reitz draws in more than 1,000 people*, INDEPENDENT FLORIDA ALLIGATOR (Oct. 22, 2018) (quoting Plaintiff Jaime Roy as stating that, "they felt exhilarated by the first day of early voting" and "It's not often that you get to see the change happen this quickly"); *see also id.* (quoting student voter Meriza Candia as stating that, "We're often the group that they blame a lot of things on," but "[w]hen students . . . come out in huge numbers and vote, it's showing other generations that we can do it, we are doing it and you're going to finally have to listen to us"); *id.* (quoting student voter Sabrina Ochoa, who "ma[de] history" as the first to vote at the Reitz Union early voting site). Those voters included first generation citizen voters like Leo Quintero, who the Miami-Dade Department of Elections took to Twitter to celebrate after he "voted for the first time [at Miami-Dade College's] North Campus!").

**G. The Secretary Has Never Disclaimed the 2014 Opinion and Has Repeatedly Declined to Offer Clear, Unequivocal Directive**

114. Despite the Court's clear finding that the 2014 Opinion constituted a categorical bar on early voting on any college or university campus and thereby violated the First, Fourteenth, and Twenty-Sixth Amendments—a finding that the Secretary declined to appeal—the Secretary continues to deny wrongdoing and continues to make shifting and ambiguous statements regarding the permissibility of college and university campus early voting sites, declining repeatedly to offer clear and unambiguous directives, despite multiple invitations from Plaintiffs and the Court to do so.

115. This is consistent with the Secretary's conduct since the 2014 Opinion was first issued, and raises serious risks that, absent a permanent injunction, Florida's young voters will continue to have their access to early voting unconstitutionally burdened or denied.

116. When a member of the Ethics and Elections Committee that formulated HB 7013 sent the Secretary a letter in 2014 advising that the 2014 Opinion got it wrong, pointing out that, "[t]he Reitz Union is government-owned, as [UF] is a public institution founded and funded by the state," and that it "is also a community center, obviously," the Secretary had no response, except to state through a spokesperson that the "opinion speaks for itself."

117. Although the Secretary by issuing the 2018 Directive abided by the Court's order to rescind the 2014 Opinion, the 2018 Directive in no way disavowed either the 2014 Opinion's reasoning and conclusions, or the Secretary's arguments unsuccessfully raised to seek dismissal or oppose entry of the Preliminary Injunction. The same is true of the subsequent 2019 Directive, issued at the same time the Secretary was attempting to argue to the Court that this matter had been mooted and should be dismissed.

118. To the contrary, the 2018 Directive, the 2019 Directive, and the Secretary's communications to supervisors repeatedly emphasize the preliminary nature of the Court's Order, casting an unnecessary cloud of doubt over whether supervisors can offer early voting on college and university campuses.

119. The 2018 Directive contained an express qualification of its instruction to supervisors, leaving open the possibility that it might be revoked: "This directive remains in effect until such time as it is superseded or revoked by subsequent directive, law, or final court order." ECF No. 68-1.

120. More troublingly, even after issuing the 2018 Directive, the Secretary continued to take the position that the text of the Early Vote Statute could somehow limit or exclude the use of facilities associated with higher educational institutions for early voting, even if they otherwise qualify as one of the types of acceptable locations expressly identified in the Statute. *Compare* ECF No. 16 at ¶

53 *with* ECF No. 73 at ¶ 53 (denying Plaintiffs' allegation, which the Court had already found to be true, that "[n]othing in the text of the law, as adopted by the Legislature (or the Secretary's recommendations that precipitated the law), limited or excluded the use of facilities associated with a public educational institution, provided that they otherwise qualify as one of the types of locations that the Early Vote Statute expressly identifies as an acceptable venue for early voting.").

121.    The 2019 Directive injected further ambiguity into the Secretary's position regarding the application of the Early Vote Statute to on campus sites, as the Court has recognized.

122.    First, the 2019 Directive placed even greater emphasis on the fact that the Court's legal rulings were made "at the preliminary injunction stage." ECF No. 98-1, at 2.

123.    Further, although the 2019 Directive clarifies that, it is now the Secretary's view that, "the plain text of the statute does not prohibit supervisors from placing early voting sites on college and university campuses," and "it is the position of this Office that early voting sites may be located on college and university campuses where the requirements of section 101.657(1)(a) of the Florida Statutes are met," ECF No. 98-1, at 2, it does not rescind or refute the 2014 Opinion's assertion that a site like Reitz Union did not qualify under the requirements of the statute—i.e., that the terms "convention center" and

"government-owned community center" "cannot be construed so broadly as to include the Reitz Union." To the contrary, the 2019 Directive appears to re-embrace that reasoning. ECF No. 98-1, at 2.

124.    Specifically, as the Court found, the 2019 Directive "only goes so far. Importantly, it leaves open whether the position articulated in [the 2014 Opinion]—*i.e.*, that a college or university facility (like the Reitz Union) cannot qualify as one of the statutorily-listed early-voting sites because of its college or university affiliation—is still permissible." ECF No. 111, at 9. "In sum," the Court concluded, with the 2019 Directive, the Secretary has "now surely muddied" the waters. *Id.*

125.    The Secretary has also previously implied in the course of these very proceedings that on-campus early voting sites are only permissible as a "wild card" early voting location. *See, e.g.*, ECF No. 43-6, at 5 (Matthews Decl.) ("If a Supervisor did determine that particular local circumstances called for an early voting site on campus, they have discretion to designate one via the 'wildcard' provision consistent with the requirements of Section 101.657(1)(a), Fla. Stat.").[13]

126.    Despite this suggestion, under direct questioning from the Court, counsel to the Secretary declined to give a definitive answer as to whether the

---

[13] The Early Vote Statute allows for a so-called "wildcard" early voting site in any type of facility "in an area of the county that does not have any of the eligible early voting locations." Each county is only allowed to have a single wildcard site.

Secretary actually considered the Reitz Union to be permissible "wild card" site. July 16, 2018 Hearing Tr., at 53:19-54:20.

127. Similarly, and in keeping with the 2019 Directive, the Secretary's counsel has represented in these proceedings that student unions are not appropriate early voting sites under the statute. July 16, 2018 Hearing Tr., at 63:4-6 ("[T]he state law, as we interpret it, does not say that a student union can be a convention center or community center[.]").

128. The Secretary's shifting and ambiguous views have caused confusion among supervisors regarding whether on-campus early voting sites may only be designated under the "wild card" provision of the Early Vote Statute.

129. For example, Palm Beach County Supervisor Wendy Sartory Link contacted the Secretary earlier this year to express confusion and request clarification as to the meaning of the 2019 Directive. ECF No. 114-2.

130. Even after counsel to the Secretary quoted verbatim the relevant text of the 2019 Directive to the Palm Beach County Supervisor, she expressed confusion about the Directive's meaning: "I'm sorry, but I still am trying to determine whether a college or university may only be used as one wild card site, or if I can have two early voting locations - one at a university and another at a state college." *Id.*

131. As the Court has previously recognized, it would be a perverse outcome if supervisors had to eliminate a "wild card" early voting site, which in many cases serve other types of often underserved and vulnerable voting populations, such as rural and minority voters, in order to place a "wild card" site on a college or university campus to enable young voters to access early voting. *See* July 16, 2018 Hearing Tr. 56:17-23.

132. Adding further confusion, the Secretary continues to assert that the 2014 Opinion did not in fact impose a prohibition on on-campus early voting sites—despite the Court's prior finding to the contrary. *See e.g.*, ECF No. 16 at ¶¶ 53-54, 59, 62; ECF No. 73 at ¶¶ 53-54, 59, 62; *see also* ECF No. 65 at 19.

133. Instead, the Secretary continues to assert that the 2014 Opinion answered only a narrow question of whether the Reitz Union qualified as a "community center" or "convention center," a premise that the Court considered and expressly rejected. *Compare* ECF No. 84, at 6, 7 n.5 with ECF No. 65, at 13-14, 14 n.7-8.

134. As a result, the Secretary introduces further ambiguity into when, if ever, a campus site can qualify as a "community center" or "convention center."

135. The Secretary suggests that her position with regard to Reitz Union in 2014 might be different now because the Reitz Union has since been renovated to add "office and support space," a "game room," "dance studios," and a "reflection

room," ECF No. 84, at 7 n.5, leaving supervisors and citizens to wonder whether there are special characteristics that must be present at an on-campus early voting site for it to qualify as a "community center" or "convention center[.]"

136. The Secretary's shifting and ambiguous statements regarding on campus early voting sites have created and will continue to create a cloud of uncertainty around when and where early voting may be offered on-campus and have a chilling effect upon the designation of such accessible sites among supervisors.

137. As the Court found, supervisors "give broad and substantial deference" to the opinions of the Secretary. They do not act contrary to her opinions because, as a practical matter, it takes enough effort to administer elections without adding controversy, such as acting, or being perceived to act, inconsistent with the Secretary's opinion. ECF No. 65, at 12-13.

138. Indeed, the Secretary herself admitted that even as late as February 15, 2019, months *after* the formal rescission of the 2014 Opinion, "some supervisors of elections might still treat [the 2014 Opinion] 'as authoritative and [might] follow the [the Opinion] 'absent contrary directive.'" ECF No. 91-1, at 1.

139. In addition, supervisors now have additional incentive not to act in a manner that they perceive may be contrary to the Secretary's authoritative view of the law. This is because, in the same bill that amended the Early Vote Statute to

add the Permitted Parking Prohibition, the Legislature also amended the elections code to penalize supervisors by withholding special financial compensation from any one of them who willfully violates any provision of the Florida election code. Fla. Stat. 104.051(5) *as amended by* SB 7066, at 64:1829-34.[14]

140. In sum, the Secretary's unconstitutional 2014 Opinion, and her shifting and ambiguous statements since its issuance, including, specifically, the 2019 Directive, have cast a shadow over the use of on-campus early voting sites.

141. Some supervisors reasonably believe that the designation of on campus early voting sites is either improper or subject to special requirements not applicable to other categories of early voting sites. Others may reasonably conclude that the ambiguous legal status manufactured by the Secretary makes the designation of on campus early voting not worth the risk or the trouble.

## H. The Permitted Parking Prohibition

142. On June 28, 2019, Governor Ron DeSantis signed into law SB 7066, a bill relating to election administration. SB 7066 made headlines for its provisions imposing severe restrictions on the ability of citizens with prior felony convictions enfranchised by the passage of Amendment 4 in the 2018 election to register and vote,[15] which are already the subject of federal constitutional challenges.[16]

---

[14]*Available at* https://www.flsenate.gov/Session/Bill/2019/7066/BillText/er/PDF
[15]*See, e.g., Editorial: Lawmakers slap a cruel price tag on democracy, voting*

143. However, SB 7066, and its companion bill in the House, HB 7101, were originally introduced as election administration bills containing fixes to a broad range of pre- and post-election ballot processing issues identified in the 2018 general election.

144. The provisions related to Amendment 4 and early voting were only inserted into the bill late in the legislative process.

145. Both SB 7066 and HB 7101 proceeded through multiple committees in the House and Senate, where amendments were proposed, discussed, and adopted or rejected.

146. The sponsors of both SB 7066 and HB 7101 stated that the bills were the results of meetings and hearings with supervisors from both Republican and Democratic leaning counties regarding the issues encountered in the 2018 election.

147. The Florida State Association of Supervisors of Elections (the "Association of Supervisors") supported the version of HB 7101 that passed out of the House committees because HB 7101 addressed eleven of the Association of Supervisors' nineteen legislative priorities.

---

*rights*, SOUTH FLORIDA SUN SENTINEL, May 4, 2019, *available at* https://www.sun-sentinel.com/opinion/editorials/fl-op-edit-amendment-four-2019-session-20190503-story.html.

[16]*See, e.g.*, *Gruver et al. v Barton et al.*, 1:19-cv-00121-MW-GRJ (N.D. Fla. 2019); *Raysor et al. v. Lee*, 4:19-cv-00301-RH-MJF (N.D. Fla. 2019).

148.   Expanding the number of "wildcard" early voting locations was the only one of the Association of Supervisors' nineteen legislative priorities related to early voting locations.[17]

149.   During a House hearing on election administration earlier in the legislative session, the assembled panel of supervisors unanimously agreed that when it came to early voting sites and early voting hours, the most important thing is flexibility both in terms of hours and the ability to open more sites. Supervisor Mark Earley of Leon County specifically advocated for legislation providing for additional wildcard sites.[18]

150.   The version of HB 7101 that passed out of the House committees expanded the number of "wildcard" early voting locations that supervisors could open in their counties, from one wildcard site to two wildcard sites.

151.   Both HB 7101 and SB 7066 were reported out of committee in early April and were calendared for a second reading on the floors of their respective chambers on April 25 and 26.

---

[17]*See* Fla. State Ass'n. of Supervisors of Elections, 2019 Session Priorities, *available at* https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/2019_Session_Priorities.pdf.

[18]*Available at* https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=2443575804_2019021054 (2:38:00 - 2:39:52).

152.   On April 22, the Court issued an Order rejecting the Secretary's argument that this action was moot due to voluntary cessation and ordered further proceedings regarding Plaintiffs' motion for summary judgment. ECF No. 111.

153.   Until the afternoon of April 23, no draft of or proposed amendment to either HB 7101 or SB 7066 contained any provision regarding the location of early voting sites—except for the provision of HB 7101 that, as the supervisors had requested, allowed for a second "wildcard" early voting site.

154.   However, at 3:57 p.m. on April 23rd, Representative Blaise Ingoglia filed a proposed floor amendment to HB 7101. The Ingoglia Amendment struck the existing text of HB 7101 in its entirety and replaced it with a new bill.[19]

155.   Many of the changes in the Ingoglia Amendment reflected negotiations between the House and Senate.[20] Thus, much of the Amendment was consistent with prior drafts of HB 7101 and other bills that had been considered and passed through committees.

156.   However, the Ingoglia Amendment also contained two substantive changes relevant to this action.

_____

[19] *Available at* https://www.flsenate.gov/Session/Bill/2019/7101/Amendment/692699/PDF.
[20] *See, e.g.*, David Smiley, *Florida Legislature gets closer to putting a disastrous 2018 recount in the past*, MIAMI HERALD (Apr. 24 2019) *available at* https://www.miamiherald.com/news/politics-government/election/article229543769.html.

157. First, the Ingoglia Amendment removed the provision of HB 7101 specifically requested by the Association of Supervisors that allowed for a second "wildcard" early voting site in each county.

158. Second, the Ingoglia Amendment amended the Early Vote Statute to impose a brand-new requirement: that both regular and "wild card" early voting locations "must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters."

159. The next day, Representative Ingoglia presented HB 7101 on the House Floor.

160. Although he spoke on the floor for nearly an hour, Representative Ingoglia waited until the very last minute of his speech to mention that the Ingoglia Amendment removed the provision for a second "wildcard" early voting site.

161. Representative Ingoglia did not give any the rationale for the removal of this provision, nor did he explain that in so doing, the Ingoglia Amendment eliminated one of the Association of Supervisors' legislative priorities.

162. Similarly, Representative Ingoglia waited until the very last minute of his speech to mention that the Ingoglia Amendment added a requirement that early voting locations "must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters[.]"

163. Representative Ingoglia offered no explanation of, or rationale for, the addition of the Permitted Parking Prohibition.

164. The House adopted the Ingoglia Amendment by a floor vote in the evening of April 25.

165. There was no public debate or further discussion of the Permitted Parking Prohibition in the House.

166. Once the Permitted Parking Prohibition was incorporated, moreover, the bill was never sent back to committee, meaning that there was never an opportunity for the public to comment on the revision or provide testimony for or against it.

167. On the very same day that the House adopted the Ingoglia Amendment, Senator Dennis K. Baxley (R - 12th Dist.) unveiled a brand-new floor amendment to SB 7066 (the "Baxley Amendment").[21]

168. Senator Baxley has a troubling history of authoring legislation restricting the right to vote, including legislation reducing early voting opportunities disproportionately utilized by African Americans in Florida. *See, e.g.*, Michael C. Herron & Daniel A. Smith, *Souls to the Polls: Early Voting in*

---

[21]*Available at* http://www.flsenate.gov/Session/Bill/2019/7066/Amendment/842530/PDF

*Florida in the Shadow of House Bill 1355*, 11 Election Law Journal 331 (2012) (discussing HB 1355 in 2011).

169.   The Baxley Amendment made three changes to the then-pending version of SB 7066. The first two changes, relating to ballot layout standards and no-solicitation zones at polling places, would be familiar to persons involved in the SB 7066 legislative process, as they were the subject of testimony, study, and debate over SB 7066 during the Senate committee process.[22]

170.   The third change contained in the Baxley Amendment was the identical Permitted Parking Prohibition set forth in the Ingoglia Amendment.

171.   The next day, April 26, Senator Baxley presented the Baxley Amendment on the Senate Floor.

172.   Near the end of the floor debate, Senator Oscar Braynon II (D - 35th Dist.) pointed out that the Permitted Parking Prohibition had not been raised or vetted in the Ethics & Elections Committee that had sent SB 7066 to the Senate floor.[23]

---

[22]*See, e.g.*, Fla. Senate, SB 7066 Bill Analysis and Fiscal Impact Statement, Mar. 4, 2019, at 3-5; Fla. Senate, SB 7066 Committee Substitute Bill Analysis and Fiscal Impact Statement, Apr. 23, 2019, at 17.
[23]*Available at* http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019041358 (39:11 - 40:10).

173. Senator Braynon also pointed out the obvious problem with imposing parking requirements for early voting locations: "I live in a big city where we're always asking for public transit [ . . . ] we're encouraging people to get off the streets and get out of their cars. Therefore, if we do a [ . . . ] polling place downtown; look, parking is hard to do in any major downtown in the State of Florida. So saying that you must provide sufficient parking spaces is eliminating certain polling places. And I think that's, I'm going to say, is an unintended consequence, and I hope that's not an intended consequence. But for me, I think that is taking a step too far."[24]

174. Senator Baxley offered no explanation of or rationale for the Permitted Parking Prohibition. Nor did Senator Baxley offer any explanation for why the Permitted Parking Prohibition had not been raised or vetted through the Senate committee process, or offer any rebuttal to Senator Braynon's concerns, other than to state his belief that it is important to provide "a space that has enough parking and enough room for people to be there."[25]

175. The Baxley Amendment passed the Senate on a party line vote.

176. Later that day, SB 7066 came before the Senate for a final vote. Senator Braynon gave a brief speech where he discussed the Permitted Parking

---

[24]*Id.*
[25]*Id.* at 41:30 - 41:50.

Prohibition. Senator Braynon stated that he was still concerned about the provision, but indicated that he had talked to his supervisor of elections, who told him that they would do what they had to do to find parking spaces downtown, even if renting such spaces would be very expensive.

177. Senator Braynon also stated that he had a discussion about the provision with Senator Baxley specifically regarding the provision's effect on campus early voting sites: "The other thing that I had a problem with was that when you say non-permitted parking spaces, if you think back to any school---like Florida State---you'd be hard pressed to find a space that's not metered or you have to have a permit for. So it would mean that there would be no parking spaces at any state university and most of our state colleges if there were an election site there. After speaking to Sen. Baxley, the intention of the bill is to make the school have parking so that should people come, they'll be able to. So that the school would now be required, if they're a polling place, to have parking."[26]

178. Senator Baxley offered no further statement on the Permitted Parking Prohibition, and the Senate passed SB 7066 by a floor vote in the evening of April 26.

---

[26]*Available at*
http://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019041358
(6:12:40 - 6:14:00).

179.   Thus, following the enactment of SB 7066, the Early Vote Statute now reads as follows (with the new language identified in bold):

101.657   Early voting.— (1)(a)   As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor [ . . . . ] In order for a branch office to be used for early voting, it shall be a permanent facility of the supervisor and shall have been designated and used as such for at least 1 year prior to the election. The supervisor may also designate any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable, **and must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters**. In addition, a supervisor may designate one early voting site per election in an area of the county that does not have any of the eligible early voting locations. Such additional early voting site must be geographically located so as to provide all voters in that area with an equal opportunity to cast a ballot, insofar as is practicable, **and must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters**. Each county shall, at a minimum, operate the same total number of early voting sites for a general election which the county operated for the 2012 general election. The results or tabulation of votes cast during early voting may not be made before the close of the polls on election day. Results shall be reported by precinct.[27]

180.   As a result of the Ingoglia and Baxley Amendments, a provision permitting supervisors to designate a second "wildcard" early voting site was

---

[27]Fla. Stat. 101.657 *as amended by* SB 7066, at 19:547-20:575, *available at* https://www.flsenate.gov/Session/Bill/2019/7066/BillText/er/PDF.

stripped out of the bill, and a provision imposing new restrictions on the selection of all early voting locations—the Permitted Parking Prohibition—was added in.

181.   Rather than increasing supervisors' flexibility to designate early voting locations according to the specific local needs of their community—as the supervisors had specifically requested through their statement of legislative priorities and unanimous testimony before the Legislature—these amendments instead decreased the flexibility afforded supervisors.

182.   The Permitted Parking Prohibition in both the Ingoglia and Baxley Amendments appeared to come out of nowhere.

183.   Prior to the unveiling of the Ingoglia Amendment on April 23, no bill or amendment filed during the 2019 Legislative Session contained the Permitted Parking Prohibition or any provision similar to the Permitted Parking Prohibition.

184.   On information and belief, prior to the unveiling of the Ingoglia and Baxley Amendments, there had been no public testimony, study, or debate during the 2019 Legislative Session regarding the topic of parking at early voting sites.

185.   The Permitted Parking Prohibition was not among the Association of Supervisors' nineteen legislative priorities.[28]

---

[28] *See* Fla. State Ass'n of Supervisors of Elections, 2019 Session Priorities, *available at* https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/2019_Session_Priorities.pdf.

186.   In fact, in a recent interview, Association President Paul Lux stated: "This is definitely nothing the supervisors asked for. It is something that we advised against. At the end of the day, we don't get to write the law[.]"[29]

187.   The Ingoglia and Baxley Amendments appear to be the first use of the term "nonpermitted parking" in Florida law. The phrase "nonpermitted parking" appears nowhere else in the Electors and Elections Title, or anywhere else in the Florida Statutes or Florida Administrative Code.

188.   The Ingoglia and Baxley Amendments also appear to be the first time in the State's history that either the legislative or executive branches have imposed parking requirements on voting locations.[30]

189.   On information and belief, no advisory opinion, directive, or other publication promulgated by the Secretary refers to "nonpermitted parking" or contains any requirement or guidance regarding the number of parking spaces at polling places or early voting locations.

---

[29]Sam Levine, *Florida Lawmakers Aim to Restrict Early Voting Locations Based On Parking Availability*, HUFFINGTON POST (June 24, 2019) https://www.huffpost.com/entry/florida-parking-early-voting_n_5d110dc0e4b0aa375f512a95.

[30]Other than the statute that requires "polling places that provide parking spaces for voters [to provide] one or more signed accessible parking spaces for disabled persons[,]" Fla. Stat. Ann. § 101.715(3), (4)(a), no other provision of the Florida Statutes or Florida Administrative Code appears to contain any requirement or guidance regarding the number of parking spaces at polling places.

190. The absence of any express requirements in Florida law or administrative guidance regarding minimum parking requirements prior to the adoption of HB 7066 is unsurprising, given that any supervisor deciding upon a polling place or early voting location would, as a matter of common sense, consider whether any such location was reasonably accessible by the voting population that it served, including whether that community required a certain amount of nonpermitted parking, or whether imposing such a requirement would actually be detrimental to that particular population of voters, because it would require placing the site substantially further away from the population that needed to access it, particularly where most of those voters would have no need for nonpermitted parking to access the site.

191. For example, at UF, the Alachua Supervisor worked with students and campus administration to set aside parking places for the exclusive use of early voters at the Welcome Center Parking Garage adjacent to the Reitz Union. Although the number of reserved spaces set aside for this purpose was only a small fraction of the total number of early voters who voted at the Reitz Union, parking issues were not a problem during early voting at the site.

192. This is because the vast majority of early voters at the Reitz Union were students and college employees who did not need access to nonpermitted parking spaces in order to travel to the Reitz Union to vote. Instead, virtually all of

these voters who travel by car to campus park in permitted parking spaces. Many other voters commute to campus by means other than a private vehicle, including by foot, bicycle, or public transit.

193. In sum, the legislative history of HB 7066 provides no legitimate, much less compelling, explanation for why the Legislature elected to reject the Association of Supervisors' request to permit an extra "wildcard" location, or to adopt the Permitted Parking Prohibition against the apparent wishes of the supervisors, let alone account for the irregular procedure by which these provisions were removed from and added to the legislation.

194. The already suspicious circumstances surrounding the adoption of the Permitted Parking Prohibition come into sharper relief when set against the backdrop of the Secretary's defense of this challenge to her office's unconstitutional and facially discriminatory policy regarding on-campus early voting sites.

195. Although neither the facially discriminatory 2014 Opinion nor the then-applicable Early Vote Statute made any reference to parking, the Secretary invoked the specter of on-campus parking issues in order to justify the 2014 Opinion's facially discriminatory policy towards young voters.

196. As Plaintiffs argued, and the Court recognized, these arguments were both insufficiently precise and weighty to justify the 2014 Opinion's facially discriminatory burden, and "reek[ed] of pretext." ECF No. 65, at 27-29, 31-32.

197. Indeed, as the Court and others have rationally recognized, in a densely populated geographic area with voters disproportionately reliant on travel by foot and public transit, a significant parking requirement could actually *prevent* supervisors from locating an early voting site to provide all voters in a supervisor's jurisdiction an equal opportunity to cast a ballot.

198. Until the Early Vote Statute was amended to add the Permitted Parking Prohibition, discretion as to whether, and to what extent, to consider parking was logically, rationally, and properly retained by the supervisors, who are in the best position to evaluate the needs of the voters who are likely to need to access and utilize early voting in each unique jurisdiction and at each specific site.

199. The Court also observed that by allowing for early voting on campuses, counties could also relieve congestion at other nearby early voting sites frequented by registered voters in the county. ECF No. 65, at 28-29.

200. At oral argument the Court also correctly noted that placing early voting locations in dense, parking-constrained campuses or downtown commercial areas is a matter of common sense, given patterns of where large groups of voters spend their day. *See* July 16, 2018 Hearing Tr., at 34:7-22.

201. The Court also observed that parking constraints in such locations is a key reason why the placement of early voting sites in such locations could be necessary: for example, at UF, students and campus workers would be likely to lose their campus parking spot if they travelled to an off-site location. *Id.* at 34:23-35:9.

202. The Legislature's irregular and unexplained adoption of the Permitted Parking Prohibition for early voting sites—and early voting sites alone, *there is no similar requirement for election day voting sites*—came immediately after this Court rejected as pretextual the Secretary's parking-based justification for her facially discriminatory early voting policy.

203. Upon information and belief, the intended effect of both the Secretary's persistent obfuscation of when and where early voting may be offered on campus and the adoption of the Permitted Parking Prohibition was to make it more difficult for young voters to cast early ballots.

204. The Secretary has not read any exclusion into the Early Vote Statute, *other than* for university and college facilities, nor has the Legislature acted to codify any of the considerations that supervisors have historically made in selecting early voting sites, to restrict them in their judgment of where to best place such sites, except to enact the Permitted Parking Prohibition following the

undeniable success of on-campus early voting enabled by the Court's Preliminary Injunction Order.

205.   Upon information and belief, these efforts to particularly burden young voters are animated by a belief that doing so will assist in gaining or maintaining a partisan electoral advantage.

206.   There has long been widespread criticism of the Secretary's interpretation and application of the Early Vote Statute, including from supervisors, one of whom publicly stated that she believed that the restrictive approach was "strategic," and specifically designed to make it more difficult for young people to vote. Steve Bousquet, *State Nixes UF Student Union as Early Voting Site*, MIAMI HERALD (Feb. 6, 2014).[31]

207.   A former Republican Governor of Florida, Charlie Crist, similarly stated that "[i]t's pretty clear to me they don't want young people to be voting, and there's no better way to illustrate that than on a university campus." Chris Alcantara, *Crist Comes to UF to Weigh in on Early Voting at Reitz Union*, THE GAINESVILLE SUN (Feb. 12, 2014), http://www.gainesville.com/article/LK/20140212/News/ 604132431/GS/.

---

[31]*Available at* http://miamiherald.typepad.com/nakedpolitics/2014/02/state-nixes-uf-student-union-as-early-voting-site.html.

208. Nonpartisan, nonprofit groups also protested that the Secretary's interpretation and application of the Early Vote Statute unfairly targets the voting rights of young Florida voters in particular.

209. In 2014, the then-President of the League, Deidre Macnab, described the Secretary's interpretation as "jaw dropping to consider that we wouldn't open up the student union, the student library and other buildings on campus to make it easier for our leaders of tomorrow to start their civic duty of voting." She continued: "[o]ne can only be left with the impression that . . . [the] Secretary of State would frankly prefer to discourage student participation." Steve Bousquet, *supra*.

210. Howard Simon, the Executive Director of the American Civil Liberties Union of Florida, echoed that statement: "[h]ow is a student union building any different from a library or other government building serving a community, especially since the UF student union already satisfies the requirements to serve as a polling place on election day?" ACLU of Florida, Division of Elections Claims Site Not "Government-Owned Community Center"; ACLU Investigating Possible Challenge to Decision (Feb. 7, 2014).[32]

---

[32]*Available at* https://www.aclufl.org/en/press-releases/aclu-responds-decision-block-early-voting-university-florida-campus.

211.  Simon continued that "[t]he decision by the Secretary of State's office that a student union at a state university is somehow not a 'government-owned community center' is a transparently political interpretation of the law intended to make it harder for students to vote." *Id.*

212.  Since the passage of SB 7066, public criticism of the Permitted Parking Prohibition has mounted. For example, the Palm Beach Post editorialized that because "[m]ost students get around a campus by walking, [ . . . ] having an early-voting site at the student union, say, is an obvious convenience for them. On the other hand, if you insist that every early-voting site come equipped with a large parking lot, you'll be ensuring that none of them is walking distance from a campus center. You'll be forcing many students to scrounge up transportation to take part in early voting."[33]

213.  Commentators have also criticized the passage of the Permitted Parking Prohibition without substantial debate and over the objections of the supervisors.[34]

---

[33] *Editorial: GOP making veiled attempt at suppressing early voting on Florida college, university campuses*, THE PALM BEACH POST (Jun. 26, 2019) https://www.palmbeachpost.com/opinion/20190626/editorial-gop-making-veiled-attempt-at-suppressing-early-voting-on-florida-college-university-campuses.

[34] *See id.*; Steve Bosquet, *A new voting issue, or old-fashioned GOP voter suppression?*, SOUTH FLORIDA SUN SENTINEL (Jun. 21, 2019) https://www.sun-sentinel.com/opinion/commentary/fl-op-com-parking-problem-or-more-gop-voter-suppression-20190621-fplthtzelnay7e2ix2f4fxnbvi-story.html.

214.   The Secretary through her unsustainable interpretation of the Early Vote Statute, and now the Legislature, through the enactment of the Permitted Parking Prohibition, have limited the discretion of local supervisors, in situations in which the voters would be best served by locating early voting sites in facilities affiliated with educational institutions, to comply with the mandate of the law that all voters in the county have equal access to early voting, to the clear and direct injury of young voters in particular. As a constitutional matter, this cannot be sustained.

## I.   The Permitted Parking Prohibition Provides a New Means of Suppressing the Vote of Young Voters

215.   When combined with the Secretary's shifting and ambiguous statements since the issuance of the 2014 Opinion, the Permitted Parking Prohibition casts an even greater shadow over the use of college and university early voting sites, to the direct detriment of Florida's young voters in particular.

216.   Some supervisors may reasonably believe that offering on-campus early voting is now improper because of low levels of nonpermitted parking, regardless of the fact that the vast majority of voters accessing that site already live on campus or are likely to travel there by means other than a private car, or to have a permit to park on campus.

217.   Other supervisors may reasonably conclude that all of the ambiguity created by the Secretary's repeated refusal to clarify whether and where on-campus

early voting may be offered makes offering on-campus early voting not worth the trouble, especially now that it may put them at personal financial risk.[35]

**CLAIMS FOR RELIEF**

**COUNT I**

**First Amendment and Equal Protection**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983,**
**28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Undue Burden on the Right to Vote**

218.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 217 as though fully set forth herein.

219.  Under the Equal Protection Clause, a state cannot utilize election practices that unduly burden the right to vote. While Florida does not have a constitutional obligation to provide early voting, having adopted early voting, Florida may not "by later arbitrary and disparate treatment, value one person's vote over that of another." *Obama For Am. v. Husted*, 888 F. Supp. 2d 897, 910 (S.D. Ohio 2012), *aff'd*, 697 F.3d 423 (6th Cir. 2012) (citing *Bush*, 531 U.S. at 104-05).

220.  The Secretary's interpretation of the Early Vote Statute does not treat Florida voters equally regarding access to early voting. To the contrary, it *mandates an inequality*, because Florida voters living or working on or near a college or university are subject to restrictions on their access to early voting, even

---

[35]Fla. Stat. 104.051(5) *as amended by* SB7066, at 64:1829-34, *available at* https://www.flsenate.gov/Session/Bill/2019/7066/BillText/er/PDF.

if the lack of an on-campus early voting location means that all voters in the county do *not* have an equal opportunity to cast an early ballot. There is no similar restriction on the access to early voting sites for other Florida voters, who do not live on or near a college or university.

221. The Secretary's interpretation further restricts supervisors' ability to designate early voting sites based on community geography and population, limiting their ability to ensure that all voters in a county have an equal opportunity to cast an early ballot, whether they live and are qualified to vote in a community affiliated with one of Florida's colleges or universities, or in any other community.

222. Absent relief from this Court, Plaintiffs, and in the case of the League and the Andrew Goodman Foundation, many of their members and those among their constituency, as well as members of the campus communities they serve, will be denied this opportunity to have an equal opportunity to cast an early ballot.

223. The burden of the current restrictive application of the Early Vote Statute, further, falls heaviest on Florida's young voters.

224. Not only are young voters significantly more likely to live in or near one of the educational institutions where the Secretary's interpretation imposes undue and unique restrictions on early voting, they are also less likely to have easy, immediate access to reliable transportation to travel to what has in practice often turned out to be significant distances to reach the nearest early voting site.

225.   Young voters are also more likely to be first time voters and to be figuring out how to vote for the first time. This fact already imposes significant barriers to entry for young voters seeking to vote. *See* Eric Plutzer, *supra*. The Secretary's interpretation only increases the barriers and is likely to discourage young people, in particular, from exercising their right to vote.

226.   In a case such as this, the Court must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiffs seek to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J., controlling op.) (quotation marks omitted).

227.   Here, the Secretary's interpretation and application of the Early Vote Statute clearly burden the Plaintiffs' (and in the case of the League and the Andrew Goodman Foundation, their missions, as well as their members' and constituencies') right to vote. *See Husted*, 888 F. Supp. 2d at 907 (holding restrictions on times of early voting violated voters' right to vote), *aff'd*, 697 F.3d 423 (6th Cir. 2012); *see also Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 974 (D.

Nev. 2016) (holding "distance Plaintiffs must travel and the associated costs [to vote early at certain locations] are a material limitation" on voting); *Florida*, 885 F. Supp. 2d at 329 (recognizing that restrictions on early voting in Florida "would impose a sufficiently material burden to cause some reasonable . . . voters not to vote" in Voting Rights Act context).

228.   Moreover, those burdens are not outweighed by any legitimate, much less compelling, state interest in the law. Indeed, the State has declared through the very same Early Vote Statute that a multitude of government-affiliated sites are acceptable locations for early voting sites, including several of the types of facilities that are commonly affiliated with colleges and universities.

229.   This includes student unions at public, government-owned institutions, which cannot rationally be excluded from the term "government-owned community center," civic center, or potentially even convention center, all types of locations specifically approved of by the Statute for early voting.

230.   The Statute further requires that the supervisors chose among approved categories of sites to locate early voting facilities so as to ensure, whenever practicable, that all voters in the county have an equal opportunity to cast an early ballot. The Secretary's restrictive interpretation of the law is contrary to the explicit State interest in promoting equal opportunity to access early voting.

231.   In its Preliminary Injunction Order, the Court correctly found that the 2014 Opinion imposes significant burdens on Plaintiffs' First and Fourteenth Amendment Rights and that the Secretary was unable to articulate any precise interests sufficiently weighty to justify those burdens. ECF No. 65, at 18-26.

232.   The Secretary's shifting and ambiguous statements since the Preliminary Injunction Order perpetuate the risk that young voters will continue to be burdened by her unconstitutional interpretation and application of the law, particularly given the Secretary's failure to provide clear and unequivocal direction to Florida's supervisors as a whole about the propriety of offering early voting on college and university campuses.

233.   As a result, some supervisors reasonably believe that the use of on-campus early voting sites is either improper or subject to special requirements not applicable to other categories of early voting site. Other supervisors may reasonably conclude that the ambiguous legal status manufactured by the Secretary makes the use of college and university early voting sites not worth the risk or the trouble.

234.   The Secretary has also repeatedly declined to clearly disavow her prior unconstitutional position that a campus site like Reitz Union does not qualify under the requirements of the statute because the terms "convention center" and

"government-owned community center" "cannot be construed so broadly as to include the Reitz Union."

235. Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Secretary's interpretation of the Early Vote Statute subjects Plaintiffs (and, in the case of the League and the Andrew Goodman Foundation, also their missions, and their members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held in 2020.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a)  declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Secretary's interpretation of the Early Vote Statute violates the First and Fourteenth Amendments to the United States Constitution;

b)  preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from implementing or enforcing the Early Vote Statute in any way prohibiting or discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center for early voting by discriminatory means, including because that facility is related to, designed for, affiliated with, or part of a college or university, or through the

facially unsupportable conclusion that a student union or similar civic or community center at a public educational facility does not qualify as either a civic center, convention center, or government-owned community center, or that similar facilities at a private educational facility do not qualify as a civic center.

c)  awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)  granting such other and further relief as the Court deems just and proper.

## COUNT II

**Twenty-Sixth Amendment**
**U.S. Const. Amend XXVI, 42 U.S.C. § 1983,**
**28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Denial or Abridgement of the Right to Vote on Account of Age**

236.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 217 as though fully set forth herein.

237.  The Twenty-Sixth Amendment to the U.S. Constitution provides in relevant part: "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by . . . any State on account of age."

238.  The goal of the Amendment "was not merely to empower voting by our youths but was affirmatively to encourage their voting, through the elimination of unnecessary burdens and barriers, so that their vigor and idealism could be

brought within rather than remain outside lawfully constituted institutions." *Worden v. Mercer Cty. Bd. of Elections*, 294 A.2d 233, 243 (N.J. 1972).

239.   The Twenty-Sixth Amendment guarantees young, qualified voters a substantive right to participate equally with other qualified voters in the electoral process. As a result, election laws, practices and procedures that have the purpose, at least in part, of denying or abridging the right to vote on account of age are unconstitutional. While the amendment "speaks only to age discrimination, it has, as noted by Senators Percy and Brooke, among many other legislators, particular relevance for the college youth who comprise approximately 50 per cent of all who were enfranchised by this amendment." *Walgren v. Howes*, 482 F.2d 95, 101 (1st Cir. 1973) (citing 117 Cong. Rec. 5817, 5825).

240.   On its face, the Early Vote Statute authorizes supervisors to designate additional early voting sites at "*any* city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites." Fla. Stat. § 101.657(1)(a) (emphasis added).

241.   Nevertheless, the Secretary has read into the Statute an additional limitation, forbidding the use of *any* facilities that are "related" to, "designated for," "affiliated with," or "part of" a Florida college or university, and finding that

a student union like Reitz Union does not qualify as an acceptable early voting site under the Statute.

242. This is the only limitation that the Secretary has read into the law and, as many have publicly noted, it unfairly and facially targets Florida's young voters to a significantly greater degree than the rest of Florida's voting population.

243. Thus, upon information and belief, the Secretary acted with the intent, at least in part, to suppress the vote of young voters in Florida with her interpretation of the Early Vote Statute. As such, her interpretation violates the Twenty-Sixth Amendment.

244. This is consistent with several other attempts in recent years by lawmakers to make it more difficult for Florida's young voters to participate in the electoral process in the hope of gaining or maintaining a partisan electoral advantage.

245. The Court found that the 2014 Opinion was intentionally discriminatory on account of age, revealing a stark pattern of discrimination, inexplicable on grounds other than age because it bears so heavily on younger voters than all other voters, and that the Secretary's stated interests "reek of pretext." *Id.* at 30-32.

246. The Court also found that the historical background of the decision revealed invidious purposes: given that the Legislature and the Secretary had

advocated expanding early voting sites and giving supervisors more flexibility, the 2014 Opinion stood out as "a shady contraction in a context of expansion[.]" *Id.* at 33.

247. The Secretary's shifting and ambiguous statements since the Preliminary Injunction Order have continued to discriminate against young voters by casting a shadow over the propriety of offering on-campus early voting early voting. Some supervisors reasonably believe that offering on-campus early voting is either improper or subject to special requirements not applicable to other categories of early voting site. Other supervisors may reasonably conclude that the ambiguous legal status manufactured by the Secretary makes the use of college and university early voting sites not worth the risk or the trouble.

248. Nor has the Secretary clearly disavowed her prior unconstitutional position that a campus site like Reitz Union does not qualify under the requirements of the statute because the terms "convention center" and "government-owned community center" "cannot be construed so broadly as to include the Reitz Union."

249. Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Secretary's interpretation of the Early Vote Statute subjects Plaintiffs (and, in the case of the League and the

Andrew Goodman Foundation, also their missions, and their members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held in 2020.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Secretary's interpretation of the Early Vote Statute violates the Twenty-Sixth Amendment to the United States Constitution;

b) preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. §2202, from implementing or enforcing the Early Vote Statute in any way prohibiting or discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center for early voting by discriminatory means, including because that facility is related to, designed for, affiliated with, or part of a college or university, or through the facially unsupportable conclusion that a student union or similar civic or community center at a public educational facility does not qualify as either a civic center, convention center, or government-owned community center, or that similar facilities at a private educational facility do not qualify as a civic center;

c) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) granting such other and further relief as the Court deems just and proper.

## COUNT III

**First Amendment and Equal Protection
U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983,
28 U.S.C. § 2201, 28 U.S.C. § 2202
Undue Burden on the Right to Vote
(Permitted Parking Prohibition)**

250.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 217 as though fully set forth herein.

251.   The Permitted Parking Prohibition does not treat Florida voters equally regarding access to early voting. To the contrary, the Legislature's enactment of the Permitted Parking Prohibition discourages and in some cases will effectively prohibit the use of early voting sites in densely populated commercial and residential areas that voters disproportionately access on foot, on public transit, or through cars with parking permits—including college and university campuses.

252.   The chilling effect of the Permitted Parking Prohibition upon campus early voting sites is exacerbated by the Secretary's facially discriminatory interpretation of the Early Vote Statute and the Secretary's shifting and ambiguous statements since the issuance of the 2014 Opinion.

253.   As a result, Florida voters living or working on or near a college or university are less likely to have access to an early voting location that is on campus or otherwise affiliated with that institution, even if the lack of such a

location means that all voters in the county do *not* have an equal opportunity to cast an early ballot.

254.  The Permitted Parking Prohibition further restricts supervisors' ability to designate early voting sites based on community geography and population, limiting their ability to ensure that all voters in a county have an equal opportunity to cast an early ballot, whether they live and are qualified to vote in a community affiliated with one of Florida's colleges or universities, or in any other community.

255.  Absent relief from this Court, Plaintiffs, and in the case of the League and the Andrew Goodman Foundation, many of their members and those among their constituency, as well as members of the campus communities they serve, will have their access to early voting burdened or denied, such that they will not have an equal opportunity to cast an early ballot.

256.  The burden of the Permitted Parking Prohibition, further, is likely to fall heaviest on Florida's young voters.

257.  Not only are young voters significantly more likely to live in or near the communities in which the Permitted Parking Prohibition discourages—and in some cases, is likely to effectively prohibit—early voting, they are also less likely to have easy, immediate access to reliable transportation to travel to what has in practice often turned out to be significant distances to reach the nearest early voting site.

258.    Young voters are also more likely to be first time voters and to be figuring out how to vote for the first time. This fact already imposes significant barriers to entry for young voters seeking to vote. *See* Eric Plutzer, *supra*. The Permitted Parking Prohibition only increases these barriers and is likely to make early voting harder to access, thereby discouraging young people, in particular, from exercising their right to vote.

259.    In a case such as this, the Court must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiffs seek to vindicate against the justifications put forward by the State for the burdens imposed by the rule. *See Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789. "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (quotation marks omitted).

260.    Here, the Permitted Parking Prohibition clearly burdens the Plaintiffs' (and in the case of the League and the Andrew Goodman Foundation, their missions, as well as their members' and constituencies') right to vote. *See Husted*, 888 F. Supp. 2d at 907 (holding restrictions on times of early voting violated voters' right to vote), *aff'd*, 697 F.3d 423 (6th Cir. 2012); *see also Sanchez*, 214 F. Supp. 3d at 974 (holding "distance Plaintiffs must travel and the associated costs [to vote early at certain locations] are a material limitation" on voting); *Florida*,

885 F. Supp. 2d at 329 (recognizing that restrictions on early voting in Florida "would impose a sufficiently material burden to cause some reasonable . . . voters not to vote" in Voting Rights Act context).

261. Those burdens are not outweighed by any legitimate, much less compelling, state interest in the law. There is no evidence that the supervisors, when exercising their discretion to locate early voting sites so that all voters in their county have an equal opportunity to cast an early ballot, could not or did not consider and accommodate the specific parking needs of their communities. Nor is there any evidence that requiring *nonpermitted* parking "sufficient . . . to accommodate the anticipated amount of voters" is legitimately necessary for all early voting locations, particularly those to which most voters already travel by foot, public transit, or in a car with a parking permit.

262. Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Permitted Parking Prohibition subjects Plaintiffs (and, in the case of the League and the Andrew Goodman Foundation, also their missions, and their members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held in 2020.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter

judgment:

a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Permitted Parking Prohibition, violates the First and Fourteenth Amendments to the United States Constitution;

b) preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from implementing or enforcing the Permitted Parking Requirement in any way prohibiting or discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center for early voting by discriminatory means, including because that facility is related to, designed for, affiliated with, or part of a college or university, or lacks adequate non-permitted parking;

c) awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d) granting such other and further relief as the Court deems just and proper.

## COUNT IV

**Twenty-Sixth Amendment**
**U.S. Const. Amend XXVI, 42 U.S.C. § 1983,**
**28 U.S.C. § 2201, 28 U.S.C. § 2202**
**Denial or Abridgement of the Right to Vote on Account of Age**
**(Permitted Parking Prohibition)**

263. Plaintiffs reallege and incorporate by reference paragraphs 1 through 217 as though fully set forth herein.

264.   On its face, the Early Vote Statute clearly authorizes supervisors to designate additional early voting sites at "*any* city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as early voting sites." Fla. Stat. § 101.657(1)(a) (emphasis added). Prior to the enactment of the Permitted Parking Prohibition, there was no further explicit limitation on the characteristics that these facilities must have in order to be properly utilized for early voting purposes.

265.   Nevertheless, the Secretary read into the Statute an additional limitation, forbidding the use of *any* facilities that are "related" to, "designated for," "affiliated with," or "part of" a Florida college or university. Sec'y's Early Vote Op. This is the only limitation that the Secretary read into the law and, as many have publicly noted, it unfairly and facially targets Florida's young voters to a significantly greater degree than the rest of Florida's voting population.

266.   Thus, as the Court found, the Secretary acted with the intent, at least in part, to suppress the vote of young voters in Florida with her interpretation of the Early Vote Statute through the 2014 Opinion in violation of the Twenty Sixth Amendment.

267.   Although the Secretary invoked the specter of on-campus parking issues in order to justify the Secretary's facially discriminatory policy towards

young voters, the Court found that this justification was insufficiently precise and weighty to justify the 2014 Opinion's facially discriminatory burden, and "reek[ed] of pretext."

268. The Legislature adopted the Permitted Parking Prohibition for early voting sites—and early voting sites alone—immediately after this Court rejected as pretextual the Secretary's parking-based justification for her facially discriminatory early voting policy, and directly following the 2018 general election in which almost 60,000 young voters voted early at on-campus early voting sites that were only opened as a result of Plaintiffs' efforts in this litigation and the Court's Preliminary Injunction Order.

269. The historical background of the adoption of the Permitted Parking Prohibition, the specific sequence of events leading up to its adoption, and the Legislature's substantive and procedural departures, demonstrate that the Permitted Parking Prohibition was, upon information and belief, enacted with the intent, at least in part, to suppress the vote of young voters in Florida.

270. The Permitted Parking Prohibition discourages and in some cases effectively prohibits on-campus early voting in communities that voters disproportionately access on foot, on public transit, or through cars with parking permits. The chilling effect of the Permitted Parking Prohibition upon campus early voting sites is exacerbated by the Secretary's facially discriminatory

interpretation of the Early Vote Statute and the Secretary's shifting and ambiguous statements since the issuance of the 2014 Opinion.

271. Injunctive and declaratory relief is needed to resolve this existing dispute, which presents an actual controversy between the Secretary and Plaintiffs, who have adverse legal interests, because the Secretary's interpretation and enforcement of the Permitted Parking Prohibition subjects Plaintiffs (and, in the case of the League and the Andrew Goodman Foundation, also their missions, and their members and constituents) to serious and concrete injuries to their fundamental right to vote, including, most immediately, in the upcoming primary and general elections to be held in 2020.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment:

a) declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Permitted Parking Prohibition violates the Twenty-Sixth Amendment to the United States Constitution;

b) preliminarily and permanently enjoining the Secretary, under the authority granted to this Court by 28 U.S.C. § 2202, from implementing or enforcing the Permitted Parking Prohibition in any way prohibiting or discouraging the use of any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center for early voting by discriminatory means, including because that facility is related to, designed for,

affiliated with, or part of a college or university, or lacks adequate non-permitted parking;

c)   awarding Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

d)   granting such other and further relief as the Court deems just and proper.

Dated: August 1, 2019.

Respectfully submitted,

/s/ Frederick S. Wermuth
Frederick S. Wermuth
Florida Bar No.: 0184111
Thomas A. Zehnder
Florida Bar No. 63274
KING, BLACKWELL, ZEHNDER
     & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
fwermuth@kbzwlaw.com
tzehnder@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost*
Amanda Callais*
Jacki L. Anderson*
John M. Geise*
Alexi M. Velez*
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959

melias@perkinscoie.com
efrost@perkinscoie.com
acallais@perkinscoie.com
jackianderson@perkinscoie.com
jgeise@perkinscoie.com
avelez@perkinscoie.com

*Counsel for the Plaintiffs*
*\*Admitted Pro Hac Vice*